**EXHIBIT B**

Rachael Doniger
PO BOX 1792
Snohomish, WA 98291
(425) 238-4608
rachael166@msn.com

October 2, 2023

Ann E. Trivett
Keating, Bucklin & McCormack, Inc., P.S.
801 2nd Avenue, Suite 1210
Seattle, Washington 98104

Dear Ms.Trivett,

As requested, I have reviewed the relevant facts of the Seattle Police Incident (19-165328) that occurred on May 8, 2019, at 617 3rd Avenue West, apartment #314, Seattle, Washington, as it relates to the processing of the 911 call by Call Taker Daniel Johnson and the dispatching of the incident by Dispatcher Stephanie Rezentes.

**Incident Overview**

The victim and 911 caller, Katy Nolan, made two phone calls to 911 regarding her boyfriend, Ryan Smith, stating, "My boyfriend is trying to kill me … he just keeps telling me that he's going to kill me, and his knife is out"(911 Audio & 911 Transcript). She stated that Smith "tackled [her] when [she] tried to call [911] earlier" (911 Audio & Transcript). Nolan took refuge in the bathroom where the door did not lock; she had to use her weight and a previously purchased device to help keep the bathroom door closed while Smith pounded on the door to try and force his way into the bathroom (911 Audio & Transcript) Additionally, Smith continued to make homicidal and suicidal threats towards the victim if she came out of the bathroom. Nolan repeatedly pleas to have Smith removed from the apartment.  Nolan told the 911 call taker, Daniel Johnson, that Smith told her there was "blood everywhere." However, she had no visual to validate that information, and she did not know if he had harmed himself, but he had a history of being suicidal. Nolan confirmed that she was tackled by Smith when she tried calling 911 the first time, but she declined the need for medical attention. Officers arrived, made announcements at the front door, identified themselves and asked for the apartment door to be opened. Officers kicked the front door in and encountered Smith inside the apartment. The interaction between Smith and the police officers resulted in Smith's death after being shot by Seattle Police and succumbing to his injuries.

**Background**

I have 22 years of 911 center experience working at Snohomish County Police Staff & Auxiliary Service Center (SNOPAC), which is now Snohomish County 911 (sno911.org), from 1995-2017. I held increasing responsibility and leadership positions during my career, including 911 Call Taker, Police Dispatcher, Center Training Officer (CTO), Lead CTO, Assistant Supervisor, and Supervisor.

1

SNOPAC provided 911 and police and fire dispatch services for the majority of Snohomish County, serving 13 police and 24 fire agencies. During most of my dispatch career, I was assigned to the swing shift, 15:00-23:00 hrs., which is typically the busiest shift with the highest call volume.

As a CTO, I trained new dispatchers to be successful radio operators, wrote trainee evaluations and developed training material and guides for SNOPAC. As a Lead Training Officer, I oversaw and guided other trainers and their assigned trainees to ensure a successful process. Employees struggling to pass their training were often assigned to me for evaluation and completion of training.

As a supervisor, I led and managed 40+ employees. My duties included but were not limited to preparing and conducting oral and written employee evaluations, ensuring policies and procedures were followed by employees, conducting coaching and counseling sessions, writing and delivering performance improvement plans to employees, investigating and researching complaints, training new supervisors, monitoring center operations – call takers, police dispatchers, fire dispatchers, and incoming 911 calls and active calls for service on all radios - manage/dispatch search and rescue calls, and various administrative duties. Employees with performance issues were often assigned to my shift for supervision and corrective action.

Since 2017, I have been employed by the City of Everett Fire Department as the Public Information Officer (PIO) and Public Education Coordinator for the Emergency Management Division within the fire department. At the beginning of 2023, I transitioned from the Emergency Management Division to the Everett Fire Fire Marshal's Office/Division.

I hold a bachelor's degree in Emergency Management and Homeland Security from the University of Alaska Fairbanks (2016).

**Certifications** (As it relates to 911 services.)

- Telecommunicator I
- Telecommunicator II
- Communication Supervisor Training (Association of Public Safety Communications Officers - APCO)
- Communications Center Supervisor (Washington State Criminal Justice Training Telecommunicator Program – CJTC)
- Active Shooting Response: Prearrival Survival Instructions (PowerPhone)
- Assisting Individuals in Crisis (ICISF)
- Infrastructure Disaster Management Certificate Program (Texas A&M)
- Telecommunicators Emergency Response Taskforce (TERT) Basic Course (FEMA IS-00144)
- National Incident Management System (NIMS) courses: ICS-100, ICS-200, ICS-300, ICS-400, ICS-700, ICS-800 (others upon request)

**Accolades**

- WA State recipient of APCO-NENA's "Telecommunicator of the Year for a Critical Incident" award for exemplary handling of an incident (2000)
- Nominee for APCO-NENA's "Telecommunicator of the Year for Sustained Superior Performance" award (2005)
- Certificate of Merit from Snohomish County Sheriff's Office for a Search and Rescue (2006)

2

- Certificate of Merit from the City of Marysville, WA Police Department for an "Active Shooter" incident (2014)

**Assignment**

I have been retained as an expert witness by the attorneys who are representing the City of Seattle in this specific case to review the work of the City of Seattle police dispatcher, Stephanie Rezentes, and 911 Call Taker, Daniel Johnson, in the case of the *Estate of Ryan Smith & Rose Johnson vs. The City of Seattle* as it relates to Seattle Police incident 19-165328. The time frame in question for review is from the start of the first 911 phone call at 19:15 hrs. to approximately 19:25 hrs. (CAD Incident) when Seattle PD encountered and interacted with the suspect, Ryan Smith, ultimately resulting in his death. More specifically, if the processing of the 911 call and dispatching of the call to officers fall within industry guidelines and City of Seattle processes as I know them based on the Seattle Police *Call Taker Training Manual,* documents provided to me related to this case (listed below), my training, knowledge, experience, and time in the profession.

**Summary of Opinions**

All opinions expressed are based on a more probable than not basis. I reserve the right to supplement this expert report based on any additional work I may be asked to do.

My overall opinion in this matter is that the call taker, Daniel Johnson, and dispatcher, Stephanie Rezentes, conducted themselves professionally and properly processed and dispatched the call for help from the victim, Katy Nolan, meeting or exceeding industry and City of Seattle standards and practices. Both operators commendably handled a dynamic, fast-paced, high-priority domestic violence call with a knife.  They gathered and provided pertinent information while maintaining a calm and professional demeanor. Daniel Johnson and Stephanie Rezentes processed the incident appropriately and consistently within industry standards and practices and City of Seattle policies and procedures, demonstrating a high level of training, knowledge, skills and experience. In the first 32 seconds of the victim's 911 call, Nolan was screaming in distress, crying, distraught, and out of breath, and shared the following information about her boyfriend, Smith:

- "My boyfriend is trying to kill me …"
- "Please get him out. I've been trying to get him to leave, and he won't leave …"
- "He just keeps telling me he's going to kill me …"
- "And he has his knife out…"

In the next 28 seconds of the phone call, Nolan states:

- "He tackled me when I called you earlier …"
- She offers that she has escaped from him to the bathroom, which has a door that doesn't lock and requires her to use her weight (and ultimately a device) to keep the door closed.

This information was gathered, processed, and disseminated to the officers in a proper manner and consistent with public safety telecommunication industry standards and practices and City of Seattle Communication policies and procedures, and formulated the foundation for the handling of this call as a high priority incident by the 911 operators, and ultimately the emergent and immediate response and actions of the officers. The depositions of Officers Muoio, Knight, Beecroft, and Myers support this opinion.

3

**Review Process**

In rendering my opinions in this case, I have reviewed the following information and materials:

1. Plaintiff's Second Amended Complaint (Complaint)
2. Declaration of William Neale with Exhibits
3. Declaration of Daniel Johnson with Exhibits
4. 911 audio of the incident
5. CAD printout
6. Seattle Police Department *Call Taker Training Manual*
7. Daniel Johnson Dec
   a. 20230511 #33-1 Exhibits A, B, D
   b. 20230511 #33 Dec of Johnson
   c. 20230511 #33-1 Exhibit 2
8. Transcribed audio
   a. Condensed - Dispatch and 911 calls
   b. Dispatch and 911 calls
   c. Dispatch and 911 calls Notice
   d. Word Index – Dispatch and 911 calls
9. Deposition of the following witnesses:
   a. Officer Brian Muoio
   b. Officer Joshua Knight
   c. Officer Ryan Beecroft
   d. Officer Christopher Myers
      i. Exhibit 1
      ii. Exhibit 2
      iii. Exhibit 3
      iv. Exhibit 4
      v. Exhibit 5
   e. Dispatcher Stephanie Rezentes
   f. Call Taker Daniel Johnson
10. Body Camera footage of the following officers:
    a. Officer Brian Muoio
    b. Officer Joshua Knight
    c. Officer Ryan Beecroft
    d. Officer Christopher Myers
11. Seattle Police Policies and Procedures – Communication Section
    a. 6.005 – Attitude & Skills
    b. 6.070 – Prioritizing Requests
    c. 6.085 – Radio Broadcasts
12. Interview with Stephanie Rezentes
13. "Recommended Minimum Training Guidelines for Telecommunicators - National Emergency Number Association." *Www.nena.org*, www.nena.org/page/trainingguidelines. Accessed October 1, 2023.
14. *911.gov*. (2019). 911.Gov. https://www.911.gov/
15. *3.103.2.2015 Minimum Training Standards for Public Safety Telecommunicators*. (2021, March 18). APCO International. https://www.apcointl.org/standards/3-103-2-2015-minimum-training-standards-for-public-safety-telecommunicators/

16. *Washington State Legislature HB 1055*. (2023). Wa.gov.
    https://app.leg.wa.gov/billsummary?BillNumber=1055&Chamber=House&Year=2023
17. *Washington State Legislature SB 5328*. (2023). Wa.gov.
    https://app.leg.wa.gov/billsummary?BillNumber=5328&Chamber=Senate&Year=2023
18. *911 Certification Board | Washington State Military Department, Citizens Serving Citizens with Pride & Tradition*. (2022, October 13). Mil.wa.gov. https://mil.wa.gov/911-certification-board
19. *Enhanced 911 Training | Washington State Military Department, Citizens Serving Citizens with Pride & Tradition*. (n.d.). Mil.wa.gov. Retrieved October 1, 2023, from
    https://mil.wa.gov/enhanced-911-training
20. *Washington State Legislature SSB 5555*. (2023, January 25). Wa.gov.
    https://app.leg.wa.gov/billsummary?BillNumber=5555&Year=2023&Initiative=false
21. *Home*. (n.d.). Snohomish County 911. Retrieved October 1, 2023, from https://sno911.org/

# Review & Opinions

### Public Safety Telecommunicator Profession

The work of public safety telecommunicators, such as dispatchers and call takers, has not always been a recognized profession. In the early years, the job tasks were carried out by an agency's administrative staff, jailers, police officers or firefighters who were assigned to a "desk duty" position. As technological advancements, tools, and processes have progressed, the skills and training needed to perform the job tasks have become more specialized. With that, the job of public safety telecommunicators has slowly changed from someone's job duties into a recognized profession. Since 2018 (possibly earlier), there has been a national movement within the industry to reclassify these workers with the Bureau of Labor Statistics (BLS) from "Office and Administrative Support" (e.g., secretaries, clerks, tellers) to a "Protective Service Occupations" classification (workers who provide public safety).

In Washington State, there are efforts to reclassify public safety telecommunicators. House Bill 1055 (HB 1055) was passed and takes effect in June of 2024. The companion bill, Senate Bill 5328 (SB 5328), has been introduced in the Senate and is currently in Committee.

### Minimum Standards of Training Guidelines

Considering these advancements, industry-related groups, committees, and associations are currently leading efforts to institute national or state minimum training standards and requirements for public safety telecommunicators. There are no federally owned or mandated requirements for minimum standards of training. Washington State passed Substitute Senate Bill 5555 (SSB-5555) in June 2022, which "recognizes the need to adopt and implement standardized training programs and certifications and recertifications" for public safety telecommunicators. The newly established certification board implemented through the Washington State 911 Office is currently working on developing these certification and training programs.

Through a three-year-long National 911 workgroup project, association groups, such as the Association of Public Safety Communications Officers Association (APCO) and the National Emergency Number Association (NENA), as well as members from various 911 Public Safety Answering Points (PSAPs), also known as Emergency Communications Centers (ECCs), have established guidelines of recommended training topics, which are broad in nature, to be included in a telecommunicator training program.

This project aimed "… to identify nationally recognized, universally accepted, minimum topics that can be used to train aspiring and current 9-1-1 telecommunicators—call-takers and dispatchers—and which provide the foundation for their ongoing professional development… It should be noted that the topics identified in the Guidelines provide minimum-level understanding. In order to field and manage emergency calls in a live environment, telecommunicators must receive supplemental training that will enable them to process the discipline-specific emergency calls that are fielded by their respective PSAP/9-1-1 Center or Emergency Services Provider. The Guidelines were vetted by the 911 community at large" ("Recommended Minimum Training Guidelines for Telecommunicators - National Emergency Number Association"). These guidelines are meant to supplement the training offered by the PSAP; they do not replace the training developed by the PSAP.

**Opinion #1: The Seattle Police Department's *Call Taker Training Manual* meets, if not exceeds, the national recommended guidelines for telecommunicator training.**

The main topics listed in the national guidelines are as follows:

- Telecommunicator roles and responsibilities
- 9-1-1 call processing
- Radio communications
- Emergency management
- Emergency communications technology
- Legal concepts
- Interpersonal communications
- Stress management
- Quality assurance
- On-the-job training guidelines

("Recommended Minimum Training Guidelines for Telecommunicators - National Emergency Number Association")

Seattle's 367-page *Call Taker Training Manual* is a comprehensive guide that follows the above-listed categories very carefully and delves into how these basic guides apply to the work of the City of Seattle telecommunicators. It provides practical application techniques the trainee can apply to their work while meeting the mission of the Seattle Police Department Communications Section.

Section 6A – Type Code Selection of the Seattle Police Department's *Call Taker Training Manual* sets forth the following criteria for the duties of a call taker:

> *"The call taker's job is to accurately interview each caller and create an appropriate police incident for the correct city or transfer the call to the appropriate outside agency. The call taker will classify the type of incident and priority by assigning the type code from this section which most closely represents the circumstances of the situation being reported, or the nature of the request made by the caller. The initial decision concerning appropriate action on an incident is the call taker's responsibility.*
>
> *Careful and timely questioning allows the call taker to provide a quick, clear and concise incident to the police dispatcher and field personnel. It is important to be thorough, including all safety information, but at the same time to avoid including details not pertinent to the incident."*

6

Section 6 of the *Call Taker Training Manual*, on page 18, states, "Do not type verbatim what the RP [reporting party] tells you." Call takers are required to properly and quickly assimilate information into clear and concise text that supports the most accurate type code and priority. To assimilate information, call takers do more than ask questions and gather information from 911 callers. They key into the tone of a caller's voice that might not correlate with the answers the caller is giving; they listen to noises they may hear in the background of a phone call that may provide other indications than what is being reported, and they listen to what is being said as well as what is not being said. In high-priority calls, they have seconds to use these skills to make the right decisions accurately and process the call to start help.

Seattle's *Call Taker Training Manual* is one of the most comprehensive call-processing guides I have reviewed. The guide provides step-by-step processes for making the best decisions and choices when processing 911 calls for help, answering "why" it is the best process and how it helps dispatchers and officers choose the best way to respond to a call. Section 6, page 10 of the *Call Taker Training Manual* states, "The Call Taker is the public's first contact with an image of 911. Without professional behavior, thorough questioning, and accurate information, every other aspect of the emergency response procedure is adversely affected." Every aspect of this manual provides a foundational platform for the telecommunicator to successfully achieve the best product so that emergency response procedures are not adversely affected.

It is common practice for dispatchers to be call takers before they advance to the dispatch position. They have the foundational knowledge of call taker practices, which then translate to dispatch skills. There is a greater demand for their prioritization and multi-tasking skills to be on point. Just as a 911 call can quickly switch directions, so can the radio traffic on a police radio. As stated in Seattle Police's *Policies and Procedures Radio Dispatch Operations and Roles – 6.005 – Attitude and Skills* document, "The standards dispatchers must maintain are important to the success of the dispatch operations. A professional attitude along with skills and technical abilities apply to all positions in Radio Dispatch Operations."

A Seattle police dispatcher monitors seven different computer monitors – three CAD monitors, a digital phone monitor, a digital radio monitor, mapping, and a data resource monitor. This amount of computer screens for one person to monitor at a dispatch position is typical in the industry. All of these monitors have information being delivered to the dispatcher, or the dispatcher is seeking the information based on the next radio transmission. Depending on the activities in the city, they are responsible for managing anywhere from five to fifty calls at one time (Rezentes deposition). Noted in the training manual, Seattle handles 800,000-870,000 calls for service a year. That is over 5,000 calls a day. Dispatchers maintain awareness of all unit statuses and locations, which can easily be 40 or more units. While quickly reading, assessing, and prioritizing 911 calls for dispatch, they are prioritizing emergent and non-emergent requests from officers, dispatching officers to incidents, running criminal justice data requests, making phone calls (e.g., tow companies, confirming warrants, contacting RPs for more information), communicating with a co-worker, and much more. This work can be equated to the work of an air traffic controller.

In general, dispatchers are trained to keep their radio transmissions brief so that the frequencies are open if there is a need to broadcast immediate or emergent radio traffic. As Seattle's Policies and Procedures 6.005 outlines, dispatchers must be concise and use brevity when broadcasting information. They do not always read the text of a CAD call verbatim on the police radio. Words and phrases are grouped to ensure accurate reception by the field units. A sense of timing and pace is used to deliver

larger chunks of information into digestible and understandable pieces. Seattle's *Policies & Procedures – 6.085 – Radio Broadcasts* outlines the appropriate way to broadcast a call based on priority and the nature of the call.

**Opinion #2 – Call Taker Daniel Johnson Complied with SPD Policy and Industry Standards During the May 8, 2019 Call at Issue.**

 In Paragraph 3.15 of the Complaint, Plaintiff alleges, "[d]uring the 911 call of May 8, 2019, Dispatcher [call taker] Daniel Johnson did not ask the caller if alcohol or drugs were involved."  This allegation does not support a finding that Johnson's actions failed to comply with SPD policy and training or industry standards and practices.

Standard industry questions, as outlined in the Seattle Police *Call Taker Training Manual* [Section 6a, page 10], are used within the first minute or earlier of a high-priority, in-progress police call to create an incident for the immediate dispatch of officers (if available). The answers to these questions, combined with the proper type code and priority, provide a quick snapshot for officers to base their response decisions to an incident as they are en route. Those questions are:

- Where – What is the address or the location of the incident?
- When – What is the time delay? (Is it in progress? Just occurred?)
- What – **Brief** text describing what happened (or what is happening).
- Weapons – Guns or knives
- Injuries

Daniel Johnson obtained all of this information.  Sometimes, there are situations where a call taker needs to respond to the RP or caller's needs based on the situation and the flow of information. It may be necessary to adjust the order of these questions or other questions may take priority so the call taker can gather a clearer picture of what is happening.

There are follow-up questions after the initial set of questions, such as obtaining more information about the weapon, if one is involved, any involved vehicle information, and a brief suspect information.

If timing allows before officers arrive, further follow-up questions are asked, such as greater information and description of the suspect(s); more details and pertinent information about the incident; officer/citizen safety questions, which may include but are not limited to questions about drug or alcohol use, mental or behavioral health concerns (list), and caller information.

As outlined by the call taker manual [Section 5, page 9], extenuating factors such as weapons, behavioral crises of an involved person, alcohol or drugs, the number of people involved, weather, etc., may need to be considered when choosing the accurate type code and priority of a call that supports the factual content of the incident. As is standard practice, incidents are assigned a priority number to help triage the urgency of the request for help.

Per the call taker manual [Section 5, page 5], the highest priority that can be assigned to a call is Priority 1, which indicates an "Immediate/High Priority [that] Poses a threat to life or a response as pre-defined through department policy." Examples of incidents that fall under this priority include ANI/ALI Hang Ups (aka 911 open line phone calls with unknown circumstances and 911 hang-up calls with no caller contact), serious assaults, and help the officer (aka officer in distress) calls.

Type codes are used to "identify a call with an alphanumeric abbreviation" [call taker manual Section 5, page 3], which helps quickly identify the call for dispatch and places the call in proper priority. Type codes have pre-defined priorities assigned to them. Sometimes, an incident may fall into several categories based on the information obtained from the RP; it is important for call takers to choose the most appropriate type code for what is occurring.

The initial seven-second 911 open line call with the sounds of a female screaming in distress was entered correctly, as outlined in the call taker manual, using the type code UNKWA1, which has a default Priority 1 assigned to it – the highest priority a call can be assigned.

When call taker Daniel Johnson received the second 911 call from Nolan, she conveyed information that her boyfriend was trying to kill her, that he was armed with a knife, that he had physically tackled her to prevent her from calling 911 for police help, and that he repeatedly was actively making threats to kill her while she was on the phone. This information was more than enough for the call to remain the highest priority incident – Priority 1 – without any further extenuating factors gathered, such as drug or alcohol use. The absence of asking for that information did not influence the decisions or actions of the responding officers. The deposition testimony of Officers Muoio, Knight Beecroft, and Myers supports this viewpoint. In fact, if Johnson had obtained information from Nolan indicating Smith was intoxicated, that only would have added to the exigent and high-priority nature of this call.

In Paragraph 3.16 of the Amended Complaint, the Plaintiff alleges, "[d]uring the 911 call, the caller indicated that she was not seriously injured, that she had barricaded herself in the bathroom, and that Smith was not actively trying to force himself into the bathroom." This allegation implies that Nolan was safe in the bathroom, but the evidence shows she was not and Johnson properly entered this call as a Priority 1. Although the caller declined the offer of medical treatment (audio 3:22), she stated that Smith was trying to kill her, and that he was armed with a knife and actively making threatening statements that he would kill her if she came out of the bathroom where she had barricaded herself. Additionally, Smith had already physically tackled her to prevent her from calling 911 for help during her first phone call.

While Nolan stated at  2 minutes and 31 seconds in the 911 audio that Smith was not actively trying to force himself into the bathroom," he was making continued threats of physical harm/death to Nolan if she comes out of the bathroom. At 4 minutes and 42 seconds, Nolan told Johnson that Smith was scraping at the door with his nails with unknown intent and had been pounding on the door and trying to force his way in. The following transcription [Condensed – Dispatch and 911 Calls – Page 118] outlines this exchange of information:

15  911 OPERATOR: Okay. If he starts saying anything or
16  trying to get inside the bathroom you let me know, okay?
17  CALLER: Well, he's been pounding at it.
18  911 OPERATOR: Just let me know if he tries to force his
19  way in.
20  CALLER: He's been trying to do that. He's -- waiting for
21  the police to break the door down. Oh, I might live. Okay.

In Paragraph 3.17 of the Amended Complaint, Plaintiff alleges, "[t]he caller told the dispatcher that she did not need a medic, but that Ryan did; she was concerned Ryan had cut himself and said, 'he needs help.'" This allegation misconstrues what was reported by Nolan. The primary concern from Nolan was that Smith was trying to kill her; he was armed with a knife and was repeatedly threatening to kill her if

she came out of the bathroom where she was hiding and then kill himself. Several times in the call, she said she wanted him to leave the apartment.

The section of Paragraph 3.17 that states, "she was concerned Ryan had cut himself and said, 'he needs help,'" combines two different lines of questioning from the call taker as outlined by a copy of the transcript below.

20  911 OPERATOR: You're not injured in any way; is that
21  correct?
22  CALLER: No, he tackled me and --
23  911 OPERATOR: Okay. So you don't need any medics; is
24  that correct?
25  CALLER: No. He needs -- he needs -- he needs help.
Page 118
1  911 OPERATOR: I do understand. Just let me know what
2  he's saying and what he's doing, okay?
3  CALLER: He's saying that there's blood everywhere and
4  that I can't come out there because I fucked up.

Nolan did not state that Smith needed a medic. She also did not express a concern that Smith needed help because he cut himself. Rather, Nolan made a general overarching statement that "he needs help." The information about the "blood everywhere" is in response to the call taker asking for any updates on what the suspect is saying or doing.

Daniel Johnson accurately and timely conveyed the pertinent information he was receiving from Nolan. Johnson did not omit or misstate any information during this call.  His actions were at all time consistent with Seattle Police Department policies and procedures and industry standards and practices.

**Opinion #3 – Dispatcher Rezentes Complied with SPD Policy and Industry Standards During the May 8, 2019, Call at Issue in this Lawsuit.**

In Paragraph 3.18 of the Amended Complaint, Plaintiff alleges, "[d]ispatcher Daniel Johnson [Rezentes] conveyed inaccurate information and told the responding officers that there was 'blood everywhere, inside the bathroom,' inaccurately conveying that the 911 caller was injured and potentially bleeding out." This allegation is unsupported by the evidence. Dispatcher Rezentes did not convey "inaccurate information" that conveyed the RP was injured and "potentially bleeding out."

The line of text in the CAD referenced in Paragraph 3.18 reads: "Susp [suspect] is saying there is blood everywhere, RP is inside bathroom, has no visual." Dispatcher Rezentes then broadcast: "… Caller is now saying there's blood everywhere inside the bathroom…"

Although the omission of the comma changes the context of that one line of text, it did not have any significant impact or influence on how the officers responded to this incident. Further, the omission of the comma does not violate industry standards and practices or Seattle Police Department policies and procedures discussed above. Put another way, Rezentes relayed that the "caller is now saying there's blood everywhere inside the bathroom" does not change or refute the fact that she calmly and professionally dispatched this call consistent with industry standards.  Stephanie Rezentes accurately broadcast the critical information to police in a timely fashion consistent with Seattle Police Department

policies and procedures and industry standards and practices. The statements and testimony of the four involved officers makes clear they were not misled or hindered in carrying out their job functions in any way by any of the information broadcast over the radio by Rezentes.

In general, police dispatchers work at a high level of multi-tasking. They monitor multiple means of information from different sources – radio, phone, CAD screens, officers, co-workers, and supervisors. As stated earlier, Seattle police dispatchers monitor seven monitors for information. With seven monitors of information, dispatchers develop the ability to "speed read" or quickly scan the various pieces of information they need to read, which is often text-heavy – CAD 911 incidents, warrant returns, retraining orders, vehicle registrations, stolen vehicle hits, Department of Correction information, etc. – and pick out the pertinent information needed by the officer. This allows the reader to look at words in groups instead of singly. It allows the reader to process entire phrases or blocks of text at once instead of reading one word at a time. Because seconds count in emergencies, dispatchers will quickly scan for the needed information and condense it, if needed, to broadcast it to officers. When you take all the activities they do at once, it is understandable how a comma (,) may be omitted.

In the CAD call, right after Rezentes broadcasted, "… Caller is now saying there's blood everywhere inside the bathroom…", she immediately sent two questions to the call taker to clarify the information.

> The first question at 19:18 hrs.: "susp [suspect] or vic [victim]??"

> Second question at 19:21 hrs.: "Did he lock himself in the bathroom? Or is the victim in there?"

It is apparent that Rezentes was appropriately seeking clarification to provide the officers with a better picture of what was happening. It's important to keep in mind that while she was seeking this information, she was managing other calls, which can also be high priority. Emergencies do not stop in the city just because of one call. There can be competing demands on attention and time that may cause a delay in providing updated or clarifying information. Stephanie Rezentes dispatched this high priority call consistent with Seattle Police Department policies and procedures and industry standards and practices.

**Opinion #4 - Dispatcher & Call Taker Commendations**

Both Rezentes and Johnson handled this call with expertise based on their training, knowledge, skills, and experience in their field. This was a high-priority, fast-paced, dynamic incident. When reviewing their work, the entirety of their work should be considered. There is more to the job than just following industry standards and City of Seattle procedures. The human factors must also be considered.

The work of a public safety telecommunicator is not an easy career. The entire time a person is at work, they must be on point for every phone call and radio transmission. It is a high-stress environment that is ever-changing based on each call received and dispatched. The next phone call answered, the next incident dispatched, or the next radio transmission can change their workday; it can be life-altering if not life-changing. They are tasked with acquiring and disseminating information within seconds to minutes. They do not have the luxury to stop the ball from rolling and evaluate the information they are receiving – this must be done at the moment while the ball is rolling.

Public Safety Telecommunicators are often overlooked for their positive role in an incident. They do not arrive to work daily with the expectation of recognition, accolades, or an award. They go to work with

11

the desire to help - help people, help their community, help the officers – even if it's just for a moment. When they are recognized for their work, it is a great honor and humbling all at the same time.

The facts and evidence of this incident support the commendation Rezentes and Johnson received for handling this call.

**Conclusion**

Based on my review as discussed in this report, it is my opinion that the call taker, Daniel Johnson, and dispatcher, Stephanie Rezentes, conducted themselves professionally and properly processed and dispatched the call for help from the victim, Katy Nolan, meeting or exceeding industry and City of Seattle standards. The choices and actions carried out by Ryan Smith on May 8, 2019, are the foundation for how Daniel Johnson and Stephanie Rezentes processed the call that day. Both operators commendably handled a dynamic, fast-paced, high-priority domestic violence call with a knife.   They gathered and provided pertinent information while maintaining a calm and professional demeanor, demonstrating a high level of training, knowledge, skills, and experience.

**Compensation**

I have not served as an expert witness in the last four years. I am being compensated for my services in this matter at my rate of $200 per hour.

Dated: October 2, 2023

Rachael Doniger