**EXHIBIT C**



# EXPERT REPORT

**CASE NO. 2:22–cv–00609–TSZ**

*Estate of Ryan Smith, et al; Plaintiff*
vs. *City of Seattle, et al; Defendants*

*Submitted by Master Investigator (ret.) Rachael Frost*
*39252 Winchester Road, Suite 107-169*
*Murrieta, CA 92563*
*rachael@frosticed.com*

*p. 949-413-9111*

Provided to Keating Bucklin & McCormack, Inc., P.S. / 801 2nd Avenue, Suite 1210/ Seattle, Washington 98104 / www.kbmlawyers.com / Cell: 206.550.2105

# EXPERT REPORT

**Expert:**     **Master Investigator (ret.) Rachael L.N. Frost**
Frost ICED / Investigation, Consultation, Education & Development
39252 Winchester Road, Suite 107-169
Murrieta, CA 92562
rachael@frostICED.com
p. 949-413-9111

**Report**
**Provided to:**  **Ann E. Trivett**
**Thomas P. Miller**
**KEATING, BUCKLIN & McCORMACK, INC., P.S. (KBM)**
ATTORNEYS AT LAW 801 SECOND AVENUE
SUITE 1210 SEATTLE, WA 98104
PHONE: (206) 623-8861
FAX: (206) 223-9423
www.kbmlawyers.com

## FEDERAL RULES OF CIVIL PROCEDURE

This expert report by Master Investigator (ret.) Rachael Frost will include the following as required by Federal Rules of Civil Procedure, Title V Disclosures and Discovery, Rule 26 (a)(2):

1. A complete statement of all opinions expressed and the basis and reasons for them, contained in the body of this report;
2. The facts or data considered in forming those opinions;
3. Any exhibits that were used to summarize or support the opinions included;
4. This expert's qualifications, including a list of all publications authored in the previous 10 years, a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and,
5. A statement of the compensation to be paid for the study and testimony in the case.

## I.     Evaluation Requested

I was engaged to review and evaluate evidence provided by attorneys Ann E. Trivett and Thomas P. Miller initially with the Christie Group Law Firm and now with Keating, Bucklin, & McCormack in the civil case of The *Estate of Ryan Smith, et al v. City of Seattle, et al* on September 14, 2022. I was asked to provide professional opinions involving the Seattle Police Department related to live-in boyfriend and girlfriend Ryan Smith ████████) and Katy Nolan ████████ during:

1. A call for service on May 8, 2019,  for an unknown disturbance at the apartment residence of Mr. Smith and Ms. Nolan, 617 3rd Avenue W, Apt. #314, Seattle, WA, 98119, at approximatley 1655 hours (4:55 p.m.). Officer Christopher Myers #5452 and Officer Ryan Beecroft #7722 responded with additional personnel and the incident resulted in an officer-involved shooting and the death of Mr. Smith.

My opinions are specific to the following issues:

1. Is it a general practice in law enforcement training to include content about potential dangers in domestic abuse situations; and are those dangers present to victims, suspects, police, and the public?; and

2. Did Katy Nolan's report to 911 indicate a continual and/or serious domestic violence event that required immediate police action, and, if so, why?; and,

3. Determine if there was or was not exigency for the officers to enter the apartment belonging to Katy Nolan and Ryan Smith as soon as the officers arrived, and if it was appropriate to do so, and why.

## II.    Qualifications

I possess the knowledge, skill, experience, training, and education beyond that of a lay person in domestic abuse, sexual assault, domestic violence, child abuse, stalking, strangulation, restraining orders, threat assessment and management investigations, and the actions, policies, procedures, and program development and implementation across disciplines within private and public entities, with a specialty in law enforcement,  as a result of the following:

- Twenty-year law enforcement veteran, including 15 years as an investigator specializing in sexual assault, domestic violence, child abuse, stalking, strangulation, restraining orders, threat assessment and management, including policy and program development and implementation for these areas of concern across multidisciplines and entities, grants, training, and police policies, and procedures (Internal Affairs);

- Three years specific to Internal Affairs and civil investigation experience related to law enforcement adherence to laws, policies, procedures, and legal and ethical concerns, with additonal employee-related criminal investigations from 2007 - 2019;

- Law enforcement-trained use of force instructor from 2002 – 2019;

- Chief Executive Officer of Frost ICED / Investigation, Consultation, Education & Development since 2019, a violence response and recognition firm, specializing in

domestic and sexual violence , investigations, and training, working with government agencies, education facilities, corporations, and military installations;

- Qualified manager private investigator licensed in the state of California and conducting personnel and litigation support investigations;

- Member of the Sexual Assault Cadre of Experts member for End Violence Against Women International (EVAWI) during its entire tenure (2016-2023);

- National Board member for the Association of Threat Assessment Professionals (ATAP/2023); past Vice President of the Pacific Southwest Chapter;

- Trained law enforcement and multidisciplinary teams in civil and criminal investigations since 2009 until present;

- Expert testimony provided in more than 25+ criminal and civil cases regarding abuse, domestic violence, sexual assault, strangulation, and law enforcement policies and procedures;

- Developed, provided, and received more than 2,000 hours of training in domestic violence, sexual assault, and strangulation (included on attached CV);

- Training Institute on Strangulation Prevention (TISP) staff member and instructor for "Hidden Homicides," a staged death scene investigation class, training multidisciplinary teams in the signs and symptoms of strangulation, as well as the development of programs and best practices to address strangulation cases:

- Investigator volunteering with the Justice Legal Network through the Alliance for Hope on actual staged suicide cases where the primary cause of death was asphyxiation; and,

- Past and current association memberships include the National Internal Affairs Investigators Association, California Homicide Investigators Association, Association of Threat Assessment Professionals, Association of Domestic Violence Intervention Providers, and International Law Enforcement Educators and Trainers Association;

The articles I have written during the past ten years include:

- "Frog-in-A-Pot: A Tale of Domestic Abuse." Experts.com (2021);

- "Lessons from One-Handed Nik : Steps Towards Operating an Effective Abuse Recognition and Prevention Program Begins with People (ATAP Newsletter, Washington, DC-area chapter); and,
- "ACE's and the Three Little Pigs: How Adverse Childhood Experiences Affect Our Foundation."

**III.    Area of Expertise to Provide Opinion**

I have specialized in domestic violence investigations, response, and creating programs and procedures for abuse cases across professional disciplines for more than 18 years, conducting law enforcement and civil investigations related to these crimes for 23 years. For three years, in the Riverside Sheriff's Professional Standards Bureau (Internal Affairs), I focused on police procedures, policies, and police misconduct related to all concerns, but specifically sexual assault and domestic violence. I served as an instructor through the Riverside County Sheriff's Department and across the United States in domestic violence and sexual assault investigations, threat assessment and management, restraining orders, strangulation, stalking, child abuse, personnel investigations, and more, and continues training now in these fields in private industry.

I created numerous multidisciplinary interactive programs and training materials related to domestic violence and sexual assault through grants obtained through the Office of Violence Against Women, the California Office of Emergency Services, and others. Addressing issues across entities for a coordinated response has been one of my focus areas during the past decade in program development, creating the ability to effectively evaluate procedures and operations to identify concerns within policy application. As an instructor, and both a law enforcement and now private investigator, I have focused on the prevention of and response to strangulation cases, specifically staged suicide cases with the Justice Legal Network, a division of the Alliance for Hope and the Training Instutute on Strangulation Prevention.

**IV.    Testimony History**

I have testified as an expert in sexual assault, domestic violence, stalking, strangulation, child abuse and threat assessment related to investigations, dynamics, procedures and research since 2006 – 2019 as a law enforcement officer both in criminal court and civil procedures. Testimony history including written content since September 2019 while working in private industry (absent all cases in progress without submitted report, cases settled prior to court, and cases of litigation support and consultation) includes:

| DATE | CASE NAME | DOCKET NUMBER | VENUE |
|---|---|---|---|
| November 2022 | *The Estate of Amy Smith v. State of Alaska and State of Alaska Public Safety* | #3AN-19-12011 CI | Expert Report (Settled; September 2023) |
| April 2022 | *Depp v. Heard, County of Fairfax, VA* | # CL-2019-0002911 | Supplemental/Rebuttal Declarations |
| March 2022 | *Depp v. Heard, County of Fairfax, VA* | # CL-2019-0002911 | Virtual Deposition |
| December 2021 | *Depp v. Heard, County of Fairfax, VA* | #CL-2019-0002911 | Initial Declarations |
| October 2020 | Confidential Victim information; California | N/A (California) | Summary report for court submission only |
| September 2020 | Confidential Victim information; Colorado | N/A (Colorado) | (Summary report provided for court submission, only) |
| August 2020 | *People v. Manjarez, Franciso* Riverside County, CA | BLF1800240 | Trial |
| August 2020 | *Jane Doe(s) v. Better Massage, et al.* | N/A (Utah) | Expert report provided |
| June 2020 | *Weber v. Torres* El Dorado County, CA | SFL20190173 | Family Law Restraining Order (susp) |
| February 2020 | *People v. GONZALEZ, Jasmine* San Bernardino County, CA | FSB18000248 | 402 Hearing October 2019 |
| October 2019 | *People V. Gregory Norman* Indio, CA | INF1900943 | Trial |
| September 2019 | *People v. MARPLES, Vincent James* Riverside County, CA | BAF1700115 | Death Penalty Hearing |

I am being compensated at a rate of $275 per hour for document review and evaluation, and $325 an hour for depositions and court hearings.

## V.    Exhibits and References

**Attachment    Description**

ATT #01        Curriculum Vitae for Expert (Rachael L.N. Frost)

**DOCUMENTS & EVIDENCE PROVIDED – Provided by KBM Law Firm**

1. SPD 81 (Audio_2150269).wma - First 911 call for 2019-165328

1       2. SPD 82 (Audio_2150270).wma - Second 911 call for 2019-165328
2       3. SPD 186-209 (2019OPA-0482 CAD 2019-165328).pdf - 911 call CAD log
3       4. SPD 81 (Audio)
4       5. SPD 82 (Audio_2150270)
5       6. SPD 83 (Audio_2150271)
6       7. SPD 84 (Audio_2150272)
7       8. SPD 85 (Audio_2150273)
8       9. SPD 86 (Audio_2150274)
9       10. SPD 87 (Audio_2150275)
10      11. SPD 88 (Audio_2150276)
11      12. SPD 89 (Audio_2150277)
12      13. SPD 90 (Audio_2150303)
13      14. SPD 91 (Audio_2150304)
14      15. SPD 92 (Audio_2150305)
15      16. SPD 93 (Audio_2150306)
16      17. SPD 94 (Audio_2193292)
17      18. SPD 95 (Audio_2193293)
18      19. SPD 104 (LEGAL D000006-051822_RADIO WD) - Merge of both incident dates for
19           Dispatch traffic
20      20. SPD 323 (2019OPA-0482 911 Call #1) - May 8, 2019, incident
21      21. SPD 324 (2019OPA-0482 911 Call #2) - May 8, 2019, incident
22      22. SPD 325 (2019OPA-0482 Call taker to Katy Nolan) - Voicemail
23      23. SPD 327 (2019OPA-0482 Dispatch RADIO WD) - Incident. May 8, 2019
24      24. SPD 334 (2019OPA-0482 Witness #2 Reporting Shots Fired) –
25      25. SPD 335 (2019OPA-0482 Witness #3 Reporting Shots)
26      26. SPD 336 (2019OPA-0482 Witness #4 Reporting Shots)
27      27. SPD 337 (2019OPA-0482 Witness #5 Reporting Shots)
28      28. SPD 338 (2019OPA-0482 Witness Reporting Yelling and Gunshots)
29      29. SPD 1095 (Audio_2150270[1])
30      30. SPD 1754 (19-165328 Officer Myers Follow Up)
31      31. SPD 1758 (Ackley, Steven statement)
32      32. SPD 1760 (Calhoun, Elizabeth statement)
33      33. SPD 1761 (Cynnthia Smith Statement)
34      34. SPD 1762 (Daniel Dods Statement)
35      35. SPD 1763 (Involved Officer Beecroft)
36      36. SPD 1764 (Involved Officer Myers 3rd Interview)
37      37. SPD 1765 (James England Statement)
38      38. SPD 1769 (Ulzii Gansukh Statement)
39      39. SPD 1770 (Ulziisaikhan, Temuulen and Lantuu, TseTse Gnyam statement)
40      40. SPD 1771 (Victim - Fortlock, Jessica)

41. SPD 1772 (Victim - Nolan, Kathy)
42. SPD 1773 (Whisenhunt, Mary statement)
43. SPD 1774 (Willott, Heather statement)
44. SPD 1775 (Witness - Blair, Christopher)
45. SPD 1776 (Witness - Culp, Madison)
46. SPD 1777 (Witness Officer Knight)
47. SPD 1778 (Witness Officer Muoio)
48. SPD 1779 (Involved Officer Myers)
49. SPD 1780 (Jordan, Marie statement)
50. SPD 1781 (Kogut, Linda statement)
51. SPD 1782 (Mary Genova Statement)
52. SPD 1783 (Medic Student McDarmont )
53. SPD 1784 (Robert Leyba Statement)
54. SPD 1790 (Thomas, Andrew statement)

**INVESTIGATION DOCUMENTS – Provided by KBM Law Firm**

55. SPD 113-147 (2019OPA-0482 Intake Follow-Up)
56. SPD 148-153 (2019OPA-0482 Original Complaint Letter)
57. SPD 156-170 (2019OPA-0482 DCM Final)
58. SPD 171-183 (2019OPA-0482ccs010620)
59. SPD 186-209 (2019OPA-0482 CAD 2019-165328)
60. SPD 210-314 (1_Report Number 2019-165328 - Combined Reports)
61. SPD 315 (1_19-165328-0001)
62. SPD 601 (2019OPA-0482 FIT Major Investigation Summary)
63. SPD 602-678 (2019OPA-0482 Force Investigation Team Case Summary)
64. SPD 679-681 (2019OPA-0482 KCME Investigator's Report)
65. SPD 731-743 (2019OPA-0482ccs010620-1) – Closed OPA Summary Findings
66. SPD 1053-1076 (2019-165328 SPD CAD)
67. SPD 1127-1150 (19-165328 Involved Officer Beecroft)
68. SPD 1151-1195 (19-165328 Involved Officer Myers 1)
69. SPD 1196-1206 (19-165328 Involved Officer Myers 2)
70. SPD 1207-1215 (19-165328 Involved Officer Myers 3)
71. SPD 1218-1235 (2019-165328 West FRB OIS Finding)
72. SPD 1238-1240 (2019FIT-0011 FIT LT Review -signed)
73. SPD 1241-1255 (Officer Knight Statement)
74. SPD 1256-1282 (Officer Muoio Statement)
75. SPD 1287 (2019-165328 Evidence Supplement)
76. SPD 1288-1305 (2019-165328 West FRB OIS Finding)
77. SPD 1336-1353 (2019-165328 West FRB OIS Finding)

78. SPD 1408-1456 (2019-165328 CAD)

79. SPD 1457-1577 (1_Case Jacket - Case _ 2019-165328)

80. SPD 1579 (2_2019-162276 VICTIM FOLLOW-UP REPORT SIRAN SHEN)

81. SPD 1588-1589 (4_2019-165328 STATEMENT FORM LOUIS MAHRE)

82. SPD 1613 (2019-167718 CAD)

83. SPD 1614-1617 (Case Jacket - Case _ 2019-167718)

84. SPD 1791-1829 (Merritt_PPT_2019-0011)

85. SPD 1830-1886 (2019-165328_CSI_Portion)

86. SPD 1887-1963 (2019-165328 OIS FIR (final copy)

87. SPD 1964-1965 (2019-165328 FIT Sgt Review)

88. SPD 1971-2104 (GOR)

89. SPD 2234 (Precinct Captain review)

90. SPD 2240 (19-165328 PSS Beecroft)

91. SPD 2241-2244 (Blue Team Lvl3 Officer Beecroft)

92. SPD 2245-2248 (Blue Team FD Officer Beecroft)

93. SPD 2249-2272 (19-165328 Involved Officer Beecroft)

94. SPD 2273 (Beecroft's Sketch DSC_0003)

95. SPD 2274-2277 (Blue Team Lvl1 Officer Knight)

96. SPD 2278-2292 (Officer Knight Statement)

97. SPD 2293 (Knight Sketch DSC_0004)

98. SPD 2294 (Knight Sketch DSC_0005)

99. SPD 2295 (19-165328 PSS Myers)

100. SPD 2296-2300 (Blue Team Lvl3 Officer Myers)

101. SPD 2301-2304 (Blue Team FD Officer Myers)

102. SPD 2305-2349 (19-165328 Involved Officer Myers 1)

103. SPD 2350 (Myers Sketch DSC_0001)

104. SPD 2351 (Myers Sketch DSC_0002)

105. SPD 2352-2362 (19-165328 Involved Officer Myers 2)

106. SPD 2363-2371 (19-165328 Involved Officer Myers 3)

107. SPD 2388-2414 (Officer Muoio Statement)

108. SPD 2415 (Muoio Sketch DSC_0006)

109. SPD 2416 (Muoio Sketch DSC_0007)

110. SPD 2431-2467 (19-165328 Victim Nolan, Katy)

111. SPD 2468-2477 (19-165328 Witness Blair, Christopher)

112. SPD 2478-2480 (19-165328 Witness Culp, Madison)

113. SPD 2481-2487 (19-165328 Witness Jessica Portlock)

114. SPD 2488-2493 (19-165328 Witness Odegard, Kristen BWV extraction)

115. SPD 2494-2497 (19-165328 Witness Seidell, Mary)

116. SPD 2498-2500 (19-165328 Witness Sobczyk, Lydia BWV extraction)

117. SPD 2537-2540 (Subject Information)

118. SPD 2541 (Subject DOL)

119. SPD 2542 (Subject RMS query)

120. SPD 2970-2973 (R Beecroft 7722)

121. SPD 2974-2977 (J Knight 8577)

122. SPD 2978-2984 (C Myers 5452)

123. SPD 2985 (DOL for Victim Nolan)

124. SPD 2986-2989 (2019-132314 CAD)

125. SPD 2990-2992 (2019-132314 GO)

126. SPD 2993-2998 (Justifiable Homicide 2019-167718)

127. SPD 3079 (SFD CAD 190046693 (Assessment of Officer Myers)

128. SPD 3147-3148 (Email with Vict Nolan) – For her belongings

**PRIOR INCIDENTS (HISTORY of DOMESTIC VIOLENCE)**

129. SPD 015577-015581 Case_Jacket

130. SPD 94 (Audio_2193292).wma 911 call

131. AXON_BODY_2_VIDEO_2019-04-14_1831

132. AXON_BODY_2_VIDEO_2019-04-14_1831-2

133. AXON_BODY_2_VIDEO_2019-04-14_1833

134. AXON_BODY_2_VIDEO_2019-04-14_1833-2

135. AXON_BODY_2_VIDEO_2019-04-14_1840

136. AXON_BODY_2_VIDEO_2019-04-14_1901

**TRAINING**

137. SPD 2970-2973 (R Beecroft 7722)

138. SPD 2978-2984 (C Myers 5452)

139. WSCJTC 000587-WSCJTC 000674 Book (87 pages) - Domestic Violence
    Student Handbook

140. WSCJTC 000693-WSCJTC 000693 FG Supp - Power and Control Wheel (2008-
    09-22) DV.pdf

141. WSCJTC 000702-WSCJTC 000704 HANDOUT - Domestic Violence - A Guide
    for Journalists (2006-00-00) DV.pdf

142. WSCJTC 000705-WSCJTC 000705 HANDOUT - DV Behavioral Definition
    (2008-09-18) DV.pdf

143. WSCJTC 000711-WSCJTC 000711 HANDOUT - Legal Definition of Family
    or Household

**VIDEO for INCIDENT 19-165328**

144. SPD 913 (AXON_Body_2_Video_2019-05-08_2020)
145. SPD 918 (Officer_Beecroft's_BWV)
146. SPD 931 (Officer_Knight_BWV)
147. SPD 936 (Officer_Muoio_BWV)
148. SPD 938 (Officer_Myers'_BWV)
149. SPD 2237 (DND - Witness - Sobczyk,Lydia #301)
150. SPD 2238 (Witness - Seidell, Mary #311)
151. SPD 2239 (DND - Witness - Odegard,Kristen #315)
152. SPD 339 (Officer_Beecroft_s_BWV)
153. SPD 340 (Officer_Knight_BWV)
154. SPD 341 (Officer_Muoio_BWV)
155. SPD 342 (Officer_Myers__BWV)

**POLICIES**

156. SPD 14385-15144 (050719_Seattle Police Department Manual)

**DEPOSITIONS (2023)**

157. Dispatcher Daniel Johnson (Deposition)
158. Dispatcher Stephanie Rezentes (Deposition)
159. Officer Joshua Knight (Deposition)
160. Officer Brian Muoio (Deposition)
161. Officer Christopher Myers (Deposition)
162. Officer Ryan Beecroft (Deposition)

**DOCUMENTS PROVIDED / REFERENCED BY EXPERT**

163. "*Responding to Domestic Disturbances,"* POLICE Magazine, October 4, 2018
164. National Institute of Justice; "*Extent, Nature & Consequences of Intimate Partner Violence*."
165. Domestic Violence Lethality Screen for First Responders (part of the Lethality Assessment Program: LAP; Maryland Network to End Abuse); ojp.gov
166. *Domestic Violence Calls: Officer Safety*. pdf (Dolan Consulting group, 2017)
167. Everytown for Gun Safety's Mass Homicide Statistics: Everytown Research & Policy Mass Shootings in the United States | Everytown Research & Policy
168. We're Missing The Big Picture On Mass Shootings | HuffPost Latest News
169. *American Roulette: Murder/Suicide;* Violence Police Center amroul2015.pdf (vpc.org)

170. Armed and Misogynist: How Toxic Masculinity Fuels Mass Shootings – Mother Jones

171. 30 Shocking Domestic Violence Statistics That Remind Us It's An Epidemic | HuffPost Women

172. Deadly Calls and Fatal Encounters (windows.net); Analysis of U. S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement (2010-2014); U.S. Department of Justice

173. Geller, L.B., Booty, M. & Crifasi, C.K. The role of domestic violence in fatal mass shootings in the United States, 2014–2019. *Inj. Epidemiol.* **8**, 38 (2021). https://doi.org/10.1186/s40621-021-00330-0

174. "Making Prevention A Reality," Federal Bureau of Investigation, 2017; Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks — FBI

175. National Coalition Against Domestic Violence. Why do victims stay? Available from: https://ncadv.org/why-do-victims-stay

176. Yekeen A. Aderibigbe, "Violence in America: A Survey of Suicide Linked to Homicides," Journal of Forensic Sciences 42, no. 4 (1997): 662-665.

177. *The Emergency aid Doctrine and 911 Hang Ups: The Modern General Warrant*, Vanderbilt.edu

178. Article covering, "*Northgate Homicide Suspect Killed Early Thursday in Officer Involved Shooting* (seattle.gov)

179. You Tube video, "*Northgate Homicide Suspect Killed Early Thursday in Officer Involved Shooting"* (YouTube)

180.    "Why Some Survivors Minimize Their Abuse," www.domesticshelters.org

**WASHINGTON STATE, CASE, and FEDERAL LAWS**

180. RCW 9A.36.150 Interference with the reporting of domestic violence

181. RCW 9A.46.020 Threats to Kill Felony

182. RCW 10.99.010 Intent to Recognize DV as a Violent Crime

183. RCW 10.99.030 Peace Officer Powers and Duties

184. RCW 10.99.033 Training Criminal Justice Commission

185. RCW 9A 40.040 False Imprisonment

186. WAC 388-76-10000 Definitions: Immediate Danger

187. *Graham v. Connor*, 490 U.S. 386, 396 (1989)

188. *Brigham City v. Stuart*, 547 U.S. 398 (2006))

189. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)

190. U*nited States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir.2016)

191. *U.S. v. Williams*, 354 F.3d 497 (6th Cir. 2003)

192. *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1989A 40.0404), Case Text
193. Knock and Notice Law: Exigent Circumstances, Justia Law
194. Model Jury Instructions: 9. 16 Civil Rights Action—42 U.S.C. § 1983Particular Rights – Fourth Amendment – Exception to Warrant Requirement – Exigent Circumstances
195. Model Jury Instructions: 9. 17 Civil Rights Action—42 U.S.C. § 1983; Particular Rights—Fourth Amendment—Unreasonable Search—Exception to Warrant Requirement—Emergency Aid
196. "Fourth Amendment reasonableness "is predominantly an objective inquiry." *Edmond, supra,* at 47, 121 S.Ct. 447." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011)
197. Code of Federal Regulations: Definitions: Imminent Threat 24 CFR § 5.2003
198. Causes of Law Enforcement Deaths: National Law Enforcement Officers Memorial Fund
199. Law Enforcement officer motor vehicle safety brief, provided by the Centers for Disease Control and NIOSH

**VI. Summary Opinions**

The opinions expressed herein are based on the documents and evidence available to me at the time of the writing of this report. I reserve the right to review additional documents and evidence should any become available and to address them at such time they are provided, identifying any modification to these opinions.

Where local, State, or Federal criminal code sections are provided, these are to indicate that the elements of that code are present in a subject's actions, not that they are guilty of a crime, which is a determination meant solely for the court, and not an expert witness.

Where case law is provided, this expert includes a specific citation for that case and is not responsible for the entire case content and all court opinions.

Additionally, having reviewed the aforementioned documents and evidence listed in the provided Index, I formulated the following opinions, on a more likely than not basis, and within a reasonable degree of certainty.

I provided three summaries below as part of informing my opinions throughout this report.

1. **The 911 Call for Service:** The 911 call was made by Ms. Katy Nolan who repeatedly sobbed and tried to catch her breath, as she described her boyfriend brandishing a switchblade knife at her and threatening to kill her. The 911 call becomes Incident 2019-165328, an Officer-Involved Shooting, and occurs on May 8, 2019, at approximately 1655 hours (4:55 p.m.). The 911 call is summarized as:

a.  911 Dispatcher Daniel Johnson # 8179 received a call where all he could hear was a women screaming, "No! No!," and then the line disconnected (SPD 323).

b.  A second call was made (SPD 324), later identified as Ms. Nolan. Through catching her breath and crying, Ms. Nolan told Dispatcher Johnson, "My boyfriend is trying to kill me." (SPD 324 @ 00:08.) "He just keeps telling me he's going to kill me and his knife's out." (@ 00:29).

c.  Ms. Nolan said her live-in boyfriend, Mr. Smith threatened to kill her, and himself, with a knife as she tried to get him to leave their apartment by packing some of his belongings. (SPD 324; @00:08, 01:07, 05:30)

d.  Ms. Nolan described the knife as a 4-inch switchblade. Ms. Nolan stated Mr. Smith tackled her when she originally tried to call police. (@00:40)

e.  Ms. Nolan cried throughout most of the call and apologized to the Dispatcher, "I am trying to breathe, I'm sorry." (@ 01:17)

f.  "He's saying there's blood everywhere." (@ 2:04), but Ms. Nolan could not see Mr. Smith, because after Mr. Smith tackled her, Ms. Nolan ran into the bathroom and was keeping him out by pushing against the door. "He's keeps saying that I fucked up. I can't – I can't leave. He's gonna kill me." (@ 02:51) She started crying harder.

g.  Dispatcher Johnson asked Ms. Nolan if she was injured, and she replied, while still crying, "I don't know, he tackled me." (@03:24) Dispatcher Johnson said, "So, you don't need any medics, is that correct?" Ms. Nolan kept crying and said, "He needs, he needs, he needs help (@ 3:37) …. He keeps saying that there's blood everywhere and I can't go out there because I fucked up."

h.  Dispatcher Johnson asked if she could still hear Mr. Smith and Ms. Nolan replied, "Yeah, he's scraping at the door."

i.  Dispatcher Johnson told Ms. Nolan, "If he starts saying anything or starts trying to get inside the bathroom you let me know, okay?

j.  Ms. Nolan said, "Well, he's been pounding at it," and her voice catches in her sobbing. (@04:40)

k.  Dispatcher Johnson told Ms. Nolan, "Just let me know if he tries to force his way in."

l.  Ms. Nolan said she wedged the door closed with an object in the bathroom.

m.  Dispatcher Johnson attempted to keep Ms. Nolan calm as officers responded, asking her questions about them getting access to the building.

n.  Ms. Nolan said, "He's waiting for police to break the door down… I might live."(@04:56)

o.  Dispatcher Johnson tells Ms. Nolan, "Ma'am, if you hear him leave, let me know."(@05:32)

p. Ms. Nolan could hear the officers banging on the door and yelling, "Seattle Police!" (SPD 2431-2467, p. 8, L. 6) In the audio, Ms. Nolan started crying harder, while there was banging in the background that sounded like the officers kicking at the door. (SPD 324, @ 07:06)

q. While crying, she said, "He won't open the door!" (Her crying becomes louder, as it appears she hears the officers telling Mr. Smith to drop the knife.

r. Ms. Nolan sobbed harder, and said almost unintelligibly, "No, please don't shoot," (@ 7:12). Then, Ms. Nolan starts screaming again at the sound of the gunshots. She stays on the line until Officer Knight helps her out of the bathroom and the apartment.

2. **CAD Log** (Comuter Aided Dispatch): The CAD Log (SPD186-209) includes the majority of the information from the 911 call made by Ms. Nolan, but does not how (1) Mr. Smith tackled Ms. Nolan; and, (2) Mr. Smith "has been pounding" at the bathroom door.

3. **RADIO TRAFFIC:** The following is a breakdown of the emergency radio traffic related to the 911 call that was broadcast by Dispatcher Stephanie Rezentes to officers responding to the incident (SPD 104, times indicated are from provided merged recording, not from actual Dispatch broadcast):

a. "911 hang-up with a disturbance female screaming. Female is back on the line saying boyfriend has a knife and is trying to assault her." (@16:58)

b. "Caller now saying suspect threatened to kill himself and her with the knife." (@17:42)

c. "Caller is now saying there's blood everywhere, inside the bathroom." (@18:43)

d. (Repeating call for supervisor 2 Mary) "…. She's saying the boyfriend is trying to kill her and himself and there's blood all over the bathroom." (@19:44)

e. "It sounds like for this call on 3 Avenue West that the caller has locked herself in the bathroom." (@19:59)

f. "Suspect, he is scratching at the bathroom door. Still inside the apartment. His name is Ryan Smith." (@20:18)

**A.    OPINION 1.** Is it a general practice in law enforcement training to include content about potential dangers inherent in domestic abuse situations; and are those dangers present to victims, suspects, police, and the public?

**YES. Law enforcement officers are trained that domestic violence calls for service are some of the most dangerous calls to which they respond and can be deadly for the victim of abuse, responding officers, and the public.**
This opinion is supported by the following:

1. A Department of Justice sponsored study on law enforcement officers and fatal encounters released in 2016 summarized, "The U.S. Department of Justice studies officer deaths and which calls are the deadliest. The most recent reports illustrate 40% of fatal calls, from 2010 to 2014, were related to domestic violence." (Expert's #172).

2. There is some conflicting data that states domestic violence calls are not the most dangerous calls for service, but they create dangerous situations (Expert's #166) and therefore domestic violence calls for service present higher risk dangers in certain situations.

3. In the Seattle Police Department's Domestic Violence Handbook (provided by the Washington State Criminal Justice Training Commission (WSCJTC 000587-WSCJTC 000674, #139), response to domestic violence incidents are outlined, primarily showing officers how to conduct effective, trauma-informed investigations that are victim-centric and hold the abuser accountable. The following statistics and points support this opinion (sharing statistics and content provided to law enforcement officers in the state of Washington, WSCJTC 000587-WSCJTC 000674).

   a. 72% of all murder-suicides involve an intimate partner: 94% of the victims of these crimes are female (NCDAV-15). (p.15)
   b. Leaving is the most dangerous time for a domestic violence victim. (p.16)
   c. 73% of battered women seek emergency medical services after separation (Stark et al. 1981). (p.16)
   d. 91% of all attacks on women are precipitated by their attempt to leave an abusive relationship. (p.16)
   e. Up to 75% of domestic assaults reported to police are made after separation (Hart, 1992). (p.16)
   f. Women are most likely to be killed when attempting to report abuse or leave the abuser (Sonkin et al. 1985). (p. 16)
   g. Approximately one-half of males who kill their wives do so after separation (Hart, 1992). (p.16)
   h. Partner may threaten to kill her or other family members if she leaves, threaten to kill himself or escalate his violence in an attempt to hold her in the relationship. (p. 18)
   i. Many victims try to leave only to be followed, pursued, harassed, terrorized and re-assaulted. A large number of severely violent incidents including homicides occur after the victim leaves the relationship. (p. 18)

4. In 2017, the Dolan Consulting Group, which trains law enforcement and public safety officers across the nation, released a research document titled, "How Dangerous are

Domestic Violence Calls to Officer Safety?" by Richard R. Johnson, PhD (Expert's #166) which summarizes content from his Journal of Family Violence 2011 study, "*Predicting Officer Physical Assaults at Domestic Assault Calls*." Dr. Johnson discussed that research revealed there were five characteristics to evaluate whether an officer safety involved incident would occur. If the characteristics were present, there was a 1 in 4 chance that the Domestic Violence batterer would assault the officers (Expert's #166, p. 2, L. 20-25). The more characteristics were present, the more likely an assault:

    a.   The batterer was unemployed.
    b.   The batterer damaged property in the incident.
    c.   The batterer shared a residence with the DV victim.
    d.   The batterer was drunk.
    e.   The batterer displayed a hostile demeanor toward the officers when they arrived.

All five of these characteristics appear to have been present with Mr. Smith on May 8, 2019 (damage to property would have to be confirmed due to previous holes in the walls from Mr. Smith punching them, per Ms. Nolan).

5.  Content related to both victim and community safety is available in the study Everytown for Gun Safety, a gun violence prevention organization, which analyzed FBI data from 2009 to 2015 and found that 57 percent of mass homicides during that period included a spouse, former spouse or other family member among the victims (analysis until 2022 has changed that figure to 46 percent)(Expert's #167). Studies indicating the highest target population for mass homicides are domestic and family violence related have been supported by additional sources such as the media (Mother Jones, Expert's #170) and scientific journals (Injury Epidemiology, Expert's #173). Of note, the weapon used within these studies is not the focus of this reference's inclusion; instead illustrating the connection to domestic violence and mass killing/community violence.

6.  Related to the prevalence of Murder/Suicide, which would encompass self-harm by the abuser, I used the 2015 updated study, "American Roulette: Murder/Suicide in the United States" produced by the Violence Policy Center as a reference which showed "Medical studies estimate that between 1,000 and 1,500 deaths per year in the United States are the result of murder-suicide. This VPC analysis reveals that in the first half of 2014:" (American Roulette, Expert's #169, p.1):

    a.   Seventy-two percent of all murder-suicides involved an intimate partner.
    b.   Of these, 93 percent were females killed by their intimate partners.
    c.   Forty-six percent of murder-suicides involving a male murderer and three or more victims were perpetrated by family annihilators.

The most prevalent type of murder-suicide was between two intimate partners, with the man killing his wife or girlfriend. Such events are commonly the result of a breakdown in the relationship. "Violence in America: A Survey of Suicide Linked to Homicides," Expert's #176).) "Domestic violence is associated with a very significant number of murder-suicides." (#176, p. 8, L.9)

7. Seattle Police Officers Christopher Myers and Brian Muoio discussed their own training and thoughts during depositions:

 a. "So basically, I'm thinking of many DV incidents. That's one representative that everybody in the room would be on the same page with because it was a recent idea, emphasizing how dangerous domestic violence calls are and why there is a need to intervene rather than allowing it to play out. (Myers, p. 118; L. 12-17)
 b. "There is (sic) always unknowns, and DV calls, domestic violence calls are a higher likelihood of danger to officers or danger to involved parties. (Muoio, p. 74; L. 8-10)

**B.     OPINION 2.** Did Katy Nolan's report to 911 indicate a continual and/or serious domestic violence event that required immediate police action, and, if so, why?;

**YES. Katie Nolan's 911 call indicated a significant, ongoing, and serious domestic violence event that required immediate police action**. Ms. Nolan needed immediate emergency assistance as she was in a highly volatile and dangerous situation involving threats to kill her, as well as threats by Mr. Smith to kill himself. The location of the blood or the knowledge that Ms. Nolan was, as yet, uninjured did not change the immediate need for police action to prevent potential further (or any) physical injury. To discount her as a domestic violence victim, afraid for her life, and calling emergency aid while in an escalating situation, trapped in an apartment

This opinion is supported by the following:

1. An analysis of the 911 call, CAD log, and radio traffic showed there were two differences between both Ms. Nolan's 911 call and the information included in the CAD log by Dispatcher Johnson, and with the radio traffic broadcast on the air to officers by Dispatcher Stephanie Rezentes.

2. Difference #1: Ms. Nolan advised Dispatcher Johnson that Mr. Smith said, "There's blood everywhere," but Ms. Nolan could not see Mr. Smith to confirm if that was true or not.

 a. Dispatcher Johnson entered this information correctly into the CAD report "(M)SUSP IS SAYING **THERE IS BLOOD EVERYWHERE**, RP IS **INSIDE BATHROOM**, HAS NO VISUAL" (SPD 186-209, @19:18)

b. Dispatcher Rezentes asked Dispatcher Johnson, typing over the CAD: "Susp or Vict?" (SPD 186-209, #59, @19:18), but broadcast to officers, "Caller is now saying there's blood everywhere, inside the bathroom." (SPD 327 @18:43) While this broadcast implies there is blood in the bathroom, this is not a material discrepancy in the handling of this call, as set forth below.

c. Dispatcher Rezentes stated the suspect threatened to kill both himself and Ms. Nolan (SPD 327 @1944), then Dispatcher Rezentes broadcast for the first time that the caller has locked herself inside the bathroom (@19:59.)

d. Dispatcher Rezentes never states if the blood belonged to either Ms. Nolan or Mr. Smith, just that (now) Ms. Nolan had locked herself inside the bathroom.

e. The location of the blood did not influence the officers' exigent response, just the statement about the blood itself. "What I recall understanding at the time that I approached was that there was a statement that there was blood everywhere. Now, whether it was in the bathroom, out of the bathroom, anywhere else, I did not have firmly fixed in my mind at that moment." (Expert's #161, Myers deposition, p.85; L. 2-6) During his FIT interview, Officer Myers shared further, "So, there was a lot of exigency as we're coming up on this with the mention with the knife, blood everywhere, he's trying to kill me, kill himself, and that she's barricaded herself in the bathroom. So, we have a victim there. I don't know who the blood is from, it's from him or her. Um, I don't whose injured, how badly they're injured...UNKNOWN:...(clears throat)...MYERS:...um, but she's obviously, panicked, calling for help, and we're the only help she's going to get." (SPD 1151-2019; p. 4)

3. Difference #2: Dispatcher Johnson correctly entering into the CAD log "ON THE LINE WITH FEMALE VICTIM, FEMALE NOT INJURED. (M)SUSP IS SAYING HE IS BLEEDING BUT RP DOES NOT HAVE VISUAL." (@19:19) Neither statement was broadcast by Dispatcher Rezentes over the air to responding units.

a. It is important for responding units to know if anyone has injuries as they enter a volatile situation.

b. Information about Ms. Nolan not being injured did not affect responding officers decisions about their response. As Officer Myers testified, "I'm aware at this point that she reported she was uninjured at that time, but this was a rapidly evolving, tense situation. Because she's not injured one moment, doesn't mean she can't be injured the next moment." (Expert's #161, Myers, p. 162; L 16-20)

    c.  The source of the blood (Ms. Nolan or Mr. Smith) and knowing that at least one of the parties (Ms. Nolan) was uninjured did not affect the immediate need for police action because with the statement "there is blood everywhere," it appeared that at least one someone on scene may have needed medical assistance, and both parties' lives are considered valuable.

        i.  Officer Knight advised that there was some confusion for him related to where the blood was located, and it was "convoluted," but he did not believe it impacted his response. The attorney taking Office Knight's deposition asked him if he had information that the person to whom they were responding was safe and they were not the ones bleeding out would that have changed their response to go seek confirmation?Officer Muoio said, "I don't agree with that in the sense that even if the person told me it's someone else's blood, I still have a responsibility to find out who's blood and why. . (Expert's #159; Knight, p. 176, L 10-20)

        ii.  During his deposition, Plaintiff's attorney asked Officer Muoio a similar question, and he replied, "Again, the only convoluted information that I had was whether there was blood in -- somewhere in the apartment or not. Again, the facts that I had was she was locked in a bathroom calling 911 because she was terrified for her life. (Expert's #160; Muoio, p. 65; L. 2-5)

4.  Based on information from Ms. Nolan's 911 call, the CAD log, and the radio traffic, I consulted a "Domestic Violence Lethality Screen" (Expert's #165) that is a component of the well-known Lethality Assessment Program (LAP) in the United States that originated at the Maryland Network Against Abuse.

The assessment is publicly available through the National Institute of Justice and includes a protocol to follow post-screening for high-risk behaviors that drastically increase the threat of harm to a victim. If the first three questions on the screening are answered in the affirmative, it "automatically triggers the protocol referral" (#165, L. 1-3) due to the increased and high-risk of danger/lethality to the victim.

    a.  Has he/she ever used a weapon against you or threatened you with a weapon?
    b.  Has he/she threatened to kill you or your children?
    c.  Do you think he/she might try to kill you?

These actions were all present in the incident with Mr. Smith:

5.  Ms. Nolan stated on the 911 call that she wanted Mr. Smith to leave and was packing his belongings when the argument started and then escalated into him threatening to kill her,

bardnishing the knife, and tackling her. The National Center for Health Research discussed how dangerous it was when a victim tries to leave an abusive relationship, quoting the National Coalition Against Domestic Violence: "Unfortunately, the most dangerous time in an abusive relationship is when the victim tries to leave. That is when they are most likely to be seriously injured or even killed by the abuser, so it is important to get the help you need to safely escape harm." (Expert's #175). This creates a high-risk factor for violence.

6. The "Initimacy Effect" exists when there is a relationship between an individual and someone who threatens them. ("Making Prevention A Reality," FBI, #174). Risk is increased when direct threats of harm are made, to be significantly higher when the threatener and target are known to each other, such as was the case with Ms. Nolan and Mr. Smith. Threatening to kill a live-in girlfriend falls under this category and the risk is increased due to the "Intimacy Effect." (#174)

7. The victim's combined and communicated statements as discussed on the emergency call for help through 911, the CAD log, and specifically, the radio traffic, show there was an active, ongoing, serious and imminent threat to Ms. Nolan's safety, as well as to the safety of Mr. Smith, and potentially the surrounding community.

8. The Washington Administration Code WAC 388-76-10000 states: **"Imminent danger"** or **"immediate threat"** means "serious physical harm to or death of a resident has occurred, or there is a serious threat to the resident's life, health, or safety."

9. The Code of Federal Regulations (CFR) provides the definition: "**Actual and imminent threat refers to a physical danger that is real, would occur within an immediate time frame, and could result in death or serious bodily harm.** In determining whether an individual would pose an actual and imminent threat, the factors to be considered include: The duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the length of time before the potential harm would occur." (24 CFR § 5.2003)

10. The immediate danger to Ms. Nolan was not over because of the inexpertly barricaded bathroom door between her and a man who was actively threatening to kill her with a knife - and escalating in his anger as evident by him saying, "You fucked up. You fucked up, now," to her. To assume that an interior apartment bathroom door prevents the immediate attack would be in error as the only aspect a suspect has to change to ensure a deadly attack is his mind. The dangerous and terrible end result to understimate that individual can be deadly, as law enforcement officers are well aware.

During his deposition, Officer Myers discussed that when officers approached the apartment where the incident took place, he saw Mr. Smith's eyes looking right at hime through what he referred to as a "viewport" (aka "speakeasy") in the door. Officer Myers had the following exchange during his deposition:

MYERS:        "So as soon as we were compromised on approach, which is what that would be considered, compromised on approach, when he looks out, sees us, sees that we're officers closing on his apartment, now becomes a exigent circumstance entry because this is the decision point where subjects typically make the decision to either surrender or carry out the attacks that they have threatened. So knowing that he has not opened the door to surrender, my biggest concern is that he is now launching his attack on Ms. Nolan. And so my goal at this point is to intervene in that attack or to have him refocus his attention from her back on to us, therefore, buying her more time." (p. 101 – 102; L.15-25, 1-3)

PLAINTIFF
COUNSEL:     You could have heard through the door if he was trying to beak (sic) down that door; right? He was trying to break down a barricaded door just inside the door? (p. 102, 4-6)

MYERS:        "I've broken down quite a few bathroom doors in my time, and the hollow core ones give very easily, very quickly. And so waiting to hear that would be waiting too long." (p. 102, 7-10)

11. This domestic violence incident was clearly:

   a. **Violent:** Mr. Smith tackled Ms. Nolan and brandished a knife while reoeatedly threatening to kill her (possibly meeting elements of RCW 9A.46.020 Threats to Kill; felony crime)
   b. **Ongoing:** While Ms. Nolan was on the phone with Dispatch, Mr. Smith provided increasing issues of concern and promises of violence, "There's blood everywhere," and, "You fucked up," while promising to kill her; and,
   c. **Dangerous:** Mr. Smith was armed with a knife, threatening to kill Ms. Nolan, scratching at the bathroom door that did not lock (with an object as an improvised barricade), while he became increasingly aggitated repeating to her, "You fucked up," and that she better not come out or he would kill her which indicated a potential escalation.

**C.    OPINION 3.** *Determine if there was or was not exigency for the officers to enter the apartment belonging to Katy Nolan and Ryan Smith as soon as the officers arrived, and if it was appropriate to do so, and why*.

**YES. Responding officers had (1) exigency to enter the apartment and to do so (2) quickly, with or without "knock and notice," to control Mr. Smith, his weapon, and limit Mr. Smith's actions to prevent imminent harm to Ms. Nolan (or to himself).  They also had exigency with (3) a concern for life saving measures, because of the information they had at the time of the call for service and due to Mr. Smith's actions, (4) the officers did not create the exigency to which they responded**. This opinion was formed with the previous sections and citations in mind, describing and summarizing the following which have been documented in this report.

These opinions are supported by the following:

1.  Officers are tasked with controlling incidents and subjects in an effort to maintain the safety of everyone involved while upholding the law. Sometimes officers may have a large number of individual choices on how to accomplish this control when all subjects are cooperating, and other times they must react to what is happening to the best of their abilities and with what information they have. In this volatile incident, officers knew the following from the broadcast radio traffic (SPD 324):

    a.  Upon their arrival, Mr. Smith was still in the apartment where Ms. Nolan was hiding in the bathroom;
    b.  Mr. Smith had a knife. (@16:58)
    c.  Ms. Nolan was blocking the bathroom door with only her weight/and an object against the door trying to protect herself as best she could from Mr. Smith and his threats to kill her;(@19:59)
    d.  There were statements of blood being "everywhere" indicating a possible injury to either Ms. Nolan or Mr. Smith; (@18:43)
    e.  The entire situation created an imminent threat to Ms. Nolan's safety; and,
    f.  There was a need for potential life saving measures.

2.  De-escalation tactics are an important part of a peace officer's toolbox. Slowing down or stabilizing an incident can help provide clarity and create connection between officers and subjects. Due to the exigency and likelihood of imminent harm to Ms. Nolan, Officers did not have the option of slowing the scene down to apply potential de-escalation tactics. To make this issue clearer, the Seattle Police Department included the following under Section 8.100 of the Policy Manual:

    a.  " … When safe and feasible under the totality of the circumstances, officers shall attempt to slow down or stabilize the situation so that more time, options and

resources are available for incident resolution. De-escalation may take the form of scene management, team tactics, and/or individual engagement. Even when individual engagement is not feasible, de-escalation techniques including scene management and team tactics such as time, distance, and shielding, should still be used **unless doing so would create undue risk of harm to any person due to the exigency/threat of a situation**. The overall goal of this policy is to promote thoughtful resolutions to situations and to reduce the likelihood of harm to all persons involved. **De-escalation is reviewed and evaluated under the totality of the circumstances present at the time of the incident** (#159: SPD 14385-15144; Seattle Police Department manual, p. 226 of 270, Section 8.100, effective 01/19/2019**).**

3. Officers must make decisions on what they know at the time, with what time they have and the multitude of issues they must consider in close proximity to one another, and sometimes simultaneously. What a peace officer knew <u>at the time of the call</u> and how that drove his/her decision to determine exigency to enter the dwelling is an important key point because a peace officer's reasonableness should not be "judged through 20/20 hindsight." (*Graham v. Connor*, 490 U.S. 386, 396 (1989); Expert's #186)

4. When we look at what the officers knew, we must look at the communications, as discussed herein:

    b. The 911 call from Ms. Nolan (SPD 323, SPD 324) **articulated an imminent threat** to Ms. Nolan, and life safety concerns for Mr. Smith;

    c. The CAD log (SPD 186-209) **articulated an imminent threat** to Ms. Nolan, and life safety concerns for Mr. Smith;

    d. The broadcast to responding units through radio traffic (SPD 327), to include the two acknowledged differences between the 911 Call and the radio traffic, **articulated an imminent threat** to Ms. Nolan, and life safety concerns for an unknown party on scene (Ms. Nolan, Mr. Smith, or another undiscovered). (Section B, 1(a)(v) and Section B, 1(b)(iii) provide support).

5. The Code of Federal Regulations (CFR) provides the definition: **"Actual and imminent threat refers to a physical danger that is real, would occur within an immediate time frame, and could result in death or serious bodily harm.** In determining whether an individual would pose an actual and imminent threat, the factors to be considered include: The duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the length of time before the potential harm would occur." (<u>24 CFR § 5.2003</u>) (Expert's #197)

6. In *Brigham City v. Stuart,* citing additional cases: "This Court has explained that the following situations may give rise to exigent circumstances: …. (4) a risk of danger **to the police or others."** *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994) (internal citations omitted); *see Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).(*Brigham City v. Stuart*, 547 U.S. 398 (2006)

   a. Citing *Mincey V. Arizona*, *Brigham v. Stuart* continues, "Because the Fourth Amendment's ultimate touchstone is "reasonableness," the warrant requirement is subject to certain exceptions. For example, **one exigency obviating the requirement is the need to render emergency assistance to occupants of private property who are seriously injured or threatened with such injury**. *Mincey* v. *Arizona*, 437 U. S. 385, 392." (*Brigham City v. Stuart*, 547 U.S. 398 (2006))

   b. *Mincey* further supports the exigency of officers to enter without a warrant and to do so quickly:
      i. "**We do not question the right of the police to respond to emergency situations**. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches **when they reasonably believe that a person within is in need of immediate aid**." (*Mincey v. Arizona*, 437 U.S. 385, 392 (1978)

      ii. Officer Myers expressed his concern for both subjects involved in this call for service during his May 9, 2019, FIT interview, there were a "couple other radio broadcasts that informed me so, there was the radio broadcast where she that he was going to kill her, kill himself. And then there were also, radio broadcast of somebody said, there's blood everywhere and that she had barricaded herself into the bathroom. (p.4)

   c. In 2015, in the Vanderbilt Law Review:
      i. "The Court's holdings in *Brigham* and *Fisher* are not surprising. Despite the defendants' arguments that the injuries or actions in each case did not justify warrantless entry, **each case examined extant and volatile situations with the potential to devolve into further harm without police intervention. Thus, the officers' need to immediately address ongoing or imminent harm was objectively reasonable and sufficiently compelling** to overcome the defendants' expectation of privacy in their homes." (P. 927, second paragraph).

7. The Washington State Criminal Justice Commission is the state training agency for law enforcement and produces and updates a Domestic Violence Handbook every year. Related to domestic violence, the training guide stated the following factors for consideration by officers in determining exigent circumstances include (p. 66):

   a. A grave offense, particularly involving violence.
   b. Suspect is armed, or "reasonable, trustworthy" information that the suspect is armed.
   c. Strong reason to believe that the suspect is on the premises.
   d. Danger to arresting officer.

8. Training regarding exigent circumstances is also included in the Seattle Police Department Policy Manual:

   a. 'Police may conduct an immediate, warrantless search or seizure **under emergency conditions** … **Officers are allowed to enter a home** when the suspect retreats into the home or private area and there is reasonable fear of escape, destruction of evidence, **or injury to police or public**. (p. 231, 6.180 2. (b))
   b. The following section discusses exigency consideration for both investigative and arrest purposes, <u>as well as</u> emergency purposes which can change the response. The Manual criteria examined by the court specific to emergency response includes, "exigent circumstances also exist if the police are responding to a domestic violence call," and "entry may be made if a per person's **health, welfare, or safety is concerned.** (p. 231, 6.180 2. (b))

9. Because Officers Myers and Beecroft "reasonably believed that a person within (was) in need of immediate aid" (*Mincey v. Arizona*, 437 U.S. 385, 392 (1978), to include Ms. Nolan trapped in the apartment with Mr. Smith who was threatening to kill her with the knife he held, and to determine if someone was in immediate need of life saving measures, Officers Myers and Beecroft had exigent circumstances to defeat the front door by force and enter the residence without a warrant.

10. The Officers' exigent life safety concern also included Mr. Smith, as well as Ms. Nolan. Hearing there is "blood everywhere" on the radio traffic heightened the response for the officers as they were then additionally concerned that someone could be injured inside the apartment.

11. Because Mr. Smith brandished and threatened Ms. Nolan with a knife during the incident, it increased the risk to all involved; to Ms. Nolan, Mr. Smith, the Officers, and anyone in the neighboring area (should Mr. Smith escape the apartment).

12. Officer Myers' comments regarding his domestic violence training give weight to this issue, as well: "So, basically, I'm thinking of many DV incidents. That's one representative that everybody in the room would be on the same page with because it was a recent idea, emphasizing how dangerous domestic violence calls are and why there is a need to intervene rather than allowing it to play out." (Experts #161, p. 118; L 13-17).

13. Officer Myers was involved in a previous officer-involved shooting with a knife-wielding subject just inside the front foyer and rooms of an apartment (Expert's #167 and #168), that was similar in nature.

    a.  In this incident, when Officer Myers stepped into the threshold the responding officers located a woman's body on the floor with his head cut off.

    b.  The suspect was on a bed in a room to the left of the front door but visible, without a weapon in his hands. He had jerky movements and kept waving them away.

    c.  Initially, the man complied and lay flat on the bed, but then he stood up. Officers yelled for him to stop moving, not to "do it." They gave him several commands.

    d.  The man reached down and grabbed the knife.

    e.  They yelled at him to drop it, but he stepped towards them.

    f.  Both Officer Myers and his partner fired.

Officer Myers stated during his FIT interview that the previous incident was going through his mind Um, so with that I'm also having visions of that recent north Northgate D V, where the man had decapitated the woman. And so, I kind of had that in the back of my head of, maybe we're replaying that as well.

14. *United States v. McConney* supports the finding of exigent circumstances and of limited or even no knock and notice:

    a.  "The district court found that the agents had knocked and announced their identity, and that their simultaneous entry (without waiting for refusal of admittance) was justified by exigent circumstances. The district court also found that seizure of the first pistol was an incident of a lawful arrest. **We define exigent circumstances as those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons**, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." (*United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984)

15. *United States v. Lundin* identifies what constitutes officers' creating the exigency upon which they then acted to gain entry into a residence, specifically if they were or were not lawfully present when an exigent circumstance revealed itself:

a. "….to show that exigent circumstances justified the warrantless search, **the government must show that the officers lawfully stood** on Lundin's front porch and knocked on his door." *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016) (U*nited States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir.2016).

16. Officers Myers and Beecroft were present at 617 Third Avenue West, Apt. 314, as a response to a lawful call for service (2019-165328), were let into the locked building by a resident and were at the #314 apartment door in a communal hallway where all apartment residents had access, showing they were lawfully present. Officer Myers asserted his belief that responding officers had exigency to enter the apartment based on what they knew, and even with all additional information, "At the time of this incident my belief was that I was firmly on solid ground and within policy to make exigent circumstances entry, and subsequently that is still my belief that the reviews have all been in favor of it." (Expert's 160; p. 102-103; L 23-25, 1) This belief was reasonable and consistent with generally applied police practices.

17. Upon arrival, Officer Myers saw Mr. Smith through the open speakeasy in the apartment door as he walked down the hallway and got close to the apartment. Officer Myers was wearing his Department-issued uniform and he engaged Mr. Smith immediately as they "locked eyes"(Expert's 160)  telling him, "Open the door! Open the door now!" Officer Myers recalled the "peephole" (speakeasy) closing at some point, but he could not recall when that happened in sequence of Officer Myers telling Mr. Smith to open the door. (Expert's #161; p. 99; L 4-12)

18. In his deposition, Officer Muoio explained the officers had to get through the door to the suspect to control his actions to protect the victim and they did not have any time to stop and slow the response down, but they had to react together based on their training. "We knew that time was of the essence to protect everyone's life, especially the one who was calling 911 scared for her life. We weren't afforded the luxury to have that conversation and we used our prior experience working with each other to know that everyone knows what to do in this situation." (Expert's #160; p. 68; L. 3-8)

"So, starting at the beginning, we have a victim who is in fear for her life, so much so that she's barricaded herself into a room with an armed individual who's threatening to kill himself and kill her. Once somebody has reached the point of suicidal ideation, they become very dangerous because they no longer care about their life or anybody else's life. So as soon as we were compromised on approach, which is what that would be considered, compromised on approach, when he looks out, sees us, sees that we're officers closing on his apartment, now becomes a exigent circumstance entry because this is the decision point where subjects typically make the decision to either surrender or carry out the attacks that they have threatened. So knowing that he has

1    not opened the door to surrender, my biggest concern is that he is now launching his
2    attack on Ms. Nolan. And so, my goal at this point is to intervene in that attack or to
3    have him refocus his attention from her back on to us, therefore, buying her more
4    time." (Expert's #161; P. 10-1021; L. 9-25, 1-3)
5

19. I stated my opinion previously in this document  that the officers did not have the choice
of waiting to break down the exterior door only at the moment Mr. Smith decided to
break or push through the bathroom door, depending on its unknown state, if the officers
were intent upon preventing Mr. Smith from causing Ms. Nolan harm. Especially since
officers were blocked from reaching the suspect with a far more substantial exterior
apartment door. When questioned as to why officers the officers needed to get to the
victim as soon as possible, Officer Muoio stated in his deposition (Expert's #160,  Muoio
Deposition):

Officer Muoio: *The only thing between her and her assailant is a door. Motivated
individuals can quickly defeat a door, a bathroom door, nonetheless, in an old
apartment complex.* (p. 47;  L.12-15)

…..
Q. BY MR. ROME: *What additional facts did you have that put her in imminent
danger?*(p. 48; L. 22-23)

Officer Muoio: *The fact that she's claiming the suspect has knives and he's
threatening to assault her, and she was fearful enough to barricade herself in a
bathroom and call 911. That was -- that's my belief that there was an imminent threat
to her safety.* (p. 48; L. 24 – L.3)

…..
Officer Muoio: *I expected us to gain entry to that apartment, yes.(* p. 71; L 9)

20. During the 911 call, Ms. Nolan was crying and said that Mr. Smith "needs help," (SPD
324 @ 03:39) and "he needs to leave" (@05:30). To focus solely on these comments
would be in error, and dismissing her as an abuse victim by choosing only to focus on her
desire to see Mr. Smith get help, while ignoring the numerous statements she made about
him placing her in great fear and believing he was going to kill her, is grievous.

Domestic abuse victim characteristics often include minimization in an effort to
normalize their trauma. Psychological analysis is outside my scope, but as a domestic
violence expert who has worked with numerous victims over several years, I know that

minimization is common, as is a victim wishing their abusive partner would "get better" and change.

> "When you minimize certain things, it's as if they're not really there," says Ambroes Pass-Turner, Ed.D., a clinically certified domestic violence counselor with a doctorate in counseling psychology. "Minimization is a coping mechanism to get through difficult times." (Expert's #180)

We cannot focus solely on Ms. Nolan's statement that Mr. Smith needs help, and must also include the statements that dominate the call, as well as her continued distressed, emotional state on her phone call to 911 that indicated she did not feel safe. She fled to the bathroom and held her weight against it, wedging and object against the door in an effort to keep Mr. Smith out. She may have wanted him to get help. But at that moment, she was afraid for her life because of Mr. Smith, and Mr. Smith alone.:

    e.  "He tackled me,"(@00:40, @03:29)
    f.  "My boyfriend is trying to kill me"(@00:09)
    g.  "He just keeps telling me he's going to kill me and his knife's out," (@00:32)
    h.  "He's threateningto kill himself and me," (@01:07)
    i.  "He's been pounding on it" (the door) (@04:41)
    j.  "He's saying that there's blood everywhere and that I can't come out there because I fucked up," (@03:48)
    k.  "I can't leave, he's going to kill me,' (@3:04) as well as her continued distressed, emotional state and her phone call to 911 that indicated she did not feel safe.

To look at Ms. Nolan's actions and focus on how she stated she wanted Mr. Smith to leave and how he needed help, we should also then look at her and identify characteristics of a domestic violence victim and how they learn to navigate their lives with their abusers to keep themselves safer in the short and long-term. But in this instance, it is Ms. Nolan's safety that must be the paramount issue as she calls for emergency aid because she is afraid she is going to be killed by her boyfriend.

    a.  Importantly, Ms. Nolan is not the individual deciding the exigency related to the dangers present and it is not fair to place her in a position then or now to have done so. She was a provider of information as she was frightened about her life and why the person she cares about would do this to her.

**V. CLOSING**

My opinions, summarized with evidentiary support, are based on the items reviewed and provided as listed, and are open to change if additional evidence is provided that contradicts or supports them.

Under penalty of perjury, the above opinions are true and accurate to the best of my knowledge based upon information provided and reviewed as listed.

SIGNATURE: _____ on October 1, 2023.

               Rachael L. N. Frost