**EXHIBIT D**

### Report of Chris M. Nielsen
### In the matter of
### Estate of Ryan Smith et al. v. City of Seattle et al.
### U.S. District Court, Western District of Washington - Seattle
### Case no. 2:22-cv-00609-TSZ

I have reviewed the current case at the request of the attorneys for the City of Seattle. I have further reviewed actions of Seattle Police Officers Ryan Beecroft, Chris Myers, and members of the Seattle Police department during their encounter with Ryan Smith on the evening of May 18, 2019.

I am currently a commissioned police sergeant in the State of Washington. I have been a law enforcement officer for approximately 12 ½ years. During my career as commissioned police officer I have held assignments in administration, patrol operations, special operations, investigations and with the Valley Regional SWAT Team (VSWAT). I served on VSWAT for approximately six years before transitioning to a supervisory position in patrol operations and, subsequently, administrative services, where I currently serve. As a police officer I have approximately thirty-one thousand hours of training and operational experience in patrol-level operations, tactics, supervisory and leadership experience.

My educational background is as follows: I have an Associate of Arts degree from Bellevue College, a Bachelor of Arts in psychology from the University of Washington (*cum laude, Phi Beta Kappa*), a Master of Arts degree in political science from the Maxwell School of Citizenship and Public Affairs at Syracuse University and a *Juris Doctor* degree from the Syracuse University College of Law (*cum laude).*

**General Police Experience:** In August 2022 I was selected to serve as the administrative training sergeant at the Renton Police Department. As such, I am the primary supervisor for the entire training cadre serving a department of approximately 135 sworn police officers. As the administrative training sergeant, I monitor policy developments, contemporary training practices, and emerging trends in law enforcement training. I review all training procedures for compliance with policies, procedures, and best practices. In this role, I am a designated subject matter expert in use of force training/defensive tactics, firearms training, crisis intervention, de-escalation, less-lethal training (Taser, baton, chemical irritants, less lethal projectiles/launchers, etc.), patrol tactics (field contacts, investigative detentions, custodial arrests, handcuffing techniques, vehicle extractions, building/structure clearing, etc.), emergency vehicle operation (EVOC), first aid, and criminal procedure, report writing, etc.

I am responsible for the recruitment, hiring, and training of all administrative personnel, new-hire, and lateral police officers. In this role, I coordinate recruiting efforts, background investigations, polygraph examinations, psychological testing, health screening, basic academy training and field training. I oversee the assignment of all patrol equipment, including uniforms, ballistic protection, firearms/firearm accessories/ammunition, body worn cameras, police radios, "stop sticks," less-lethal equipment (Taser, baton, chemical irritants, 40 mm launchers), etc.

Prior to being selected to the administrative training sergeant position, I was selected for promotion to patrol sergeant and assumed formal supervision of a patrol group commencing in March 2021. In this capacity I supervised an early nightshift patrol unit. My responsibilities included a variety of administrative

duties, including evaluating the performance of police officers, drafting and documenting performance evaluations, reviewing training application requests, ensuring compliance with training requirements, managing staffing levels and time management software, managing training requirements, responding to citizen queries and complaints, managing patrol/community outreach efforts, managing equipment needs, implementing administrative directives, and ensuring compliance with statutory, policy and generally accepted procedural and tactical principles in patrol operations.

Prior to being promoted to sergeant, I served approximately four years as the Officer in Charge (OIC) of a special operations proactive enforcement unit. In this capacity I have broad experience supervising police officers tasked with providing operational support to various divisions within an accredited police agency consisting of approximately 135 commissioned law enforcement officers. My responsibilities included reviewing and approving tactical operational plans, reviewing and approving police reports, use of force reports/incidents, vehicle pursuits and general police activities for compliance with statutory, policy, and generally accepted procedural and tactical principles in a special operations domain.

Since 2013 I have been a member of the Renton Police Department's Lethal Force Review Board. In this capacity I review all lethal force incidents involving Renton Police Officers for conformity with constitutional requirements, statutory/case law, department policies and generally accepted procedural and tactical principles. I have attended and successfully completed numerous courses on the study of human performance, perception, and cognition, including Introduction to Human Dynamics and Conflict Resolution (2 days consisting of 16 instructional hours), Force Science Analyst Certification (5 days consisting of 40 instructional hours), and Force Science Advanced Specialist Certification (18 weeks consisting of approximately 300 instructional and clinical hours). This field focuses on human performance in the realm of vision, attention, learning/performance, memory, decision-making, speed/dynamics, and human error as applied to police training, tactics, procedures, and critical incidents.

I have substantial training, experience and familiarity with scientific literature involving human performance under stress, including the many ways in which stress impacts the physical performance, physiology, and cognitive processes in human subjects. This training and knowledge augment my professional experience in police-related matters, including critical incidents where events are volatile, uncertain, ambiguous, and complex. Consequently, I have a sound theoretical and practical understanding of the complexities of human performance in police operations.

I have training and operational experience in crisis intervention, de-escalation techniques and dealing with subjects in mental crisis and/or under the influence of mind-altering substances. I have personally dealt with numerous individuals in the throes of mental crises and/or under the influence of mind-altering substances. Through these experiences I have utilized trained and novel techniques in resolving many such encounters without the use of force; however, through my experience I know the actions of a given individual oftentimes dictate police response and the eventual resolution of the encounter. Accordingly, I have experience using force subsequent to unsuccessful attempts to de-escalate encounters.

I have received regular and ongoing training in principles related to bias-based policing, bias, implicit bias, equity, and inclusion as it relates to contemporary principles in modern policing.

My professional experience includes the response, investigation and arrest of offenders for crimes such as misdemeanor/felony domestic violence crimes, vehicular assault, felony/misdemeanor theft, ID theft, trafficking/possession of stolen property, narcotics possession/trafficking, reckless/negligent driving, DUI,

obstructing a law enforcement officer, resisting arrest, indecent exposure, communication with a minor for immoral purposes, commercial sexual abuse of a minor, rape, rape of a child, child molestation, murder, manslaughter, attempted murder, theft of a motor vehicle, possession of a stolen vehicle, felony/misdemeanor malicious mischief, bail jumping, disorderly conduct, residential burglary, robbery, unlawful transit conduct, breach of peace, unlawful use of a building for drug purposes, unlawful possession of a firearm, drive-by shooting, driving while license suspended, money laundering, forgery, criminal trespassing, malicious harassment, harassment, failure to disperse, criminal mistreatment, animal cruelty, attempt to elude a pursuing police vehicle, illegal discharge of a firearm, and myriad offenses included in the Revised Code of Washington.

I have training and operational experience in the operation and use of less-lethal tools such as the X2 and X26 model taser ECW, collapsible/non-collapsible batons, OC spray, CS gas and 37- and 40-mm munitions and less-than-lethal projectiles. I have basic training in physical combat disciplines such as mui thai, Brazilian Jiu Jitsu, traditional boxing, and freestyle/collegiate wresting at the collegiate level. I have training and operational experience in traditional police defensive tactics techniques involving joint manipulations, "pain compliance techniques", weapons defense/retention and edged weapons defense. I have been involved in numerous use of force incidents including taser applications, chemical agents, vehicles, firearms, joint manipulations/pain compliance, and a variety of knee, palm, shin and fist strikes and kicks. I have been slapped, kicked, tackled, spat upon, rammed with a vehicle, and targeted by direct gunfire. As a result of these incidents, I have been admitted to the hospital and sought emergency medical treatment approximately six times during my career. Additionally, I have been tased numerous times in both training and during live operations. I have experienced numerous chemical agent exposures, such as OC and CS gas in both training and operational environments.

I have training and experience in "quarrying" tactics, techniques and procedures in working with police tracking canines. In this capacity I have worked with numerous police canines in training scenarios, including: outdoor canine tracks, indoor canine tracks, direct canine applications, vehicle extractions, canine handler assaults, and SWAT applications, among others. I have been contacted numerous times by police canines during these activities.

I have training and operational experience in emergency vehicle operations including vehicle pursuits, PIT techniques and vehicle displacement techniques using marked, unmarked and under cover vehicles. I am familiar with various policies, procedures, laws and regulations related to this topic. Likewise, I am familiar with generally accepted tactics, techniques and principles involving emergency vehicle operation and pursuits. I have been involved in approximately twenty vehicle pursuits including approximately nine involving direct vehicle contact in various forms. Most of my career has involved the use and operation of an unmarked police vehicle.

I have training and operational experience in patrol and SWAT-level high-risk vehicle stops and vehicle extraction techniques for compliant and non-compliant/combative subjects, including high-risk mobile arrest and vehicle window breaching tactics.

I was formerly assigned to a mounted bicycle patrol unit for approximately 6 years. I am an International Police Mountain Bike Association (IPMBA) certified patrol officer. I have training and operational experience in mounted bicycle patrol tactics, including crowd control, investigative, arrest and proactive patrol tactics, techniques and procedures.

I am currently a firearms instructor for the Renton Police Department. In this capacity I receive advanced training and instruction in adult learning models and firearms tactics. I develop lesson plans, review case studies in lethal force incidents, and monitor emerging trends/tactics and generally accepted police practices related to firearms training and use. I instruct police officers with various professional experience in basic/advanced marksmanship, basic/advanced weapons manipulation, basic/advanced tactical movement, firearms maintenance/repair, defensive tactics involving lethal force options and a variety of other subject matter related to firearms, including compliance with statutory, case law, policy and best practices.

During my career I have authored, reviewed or participated in the drafting and service of approximately three hundred search warrants, including residential, automobile, financial, business records, computers, mobile devices, body cavities and myriad other applications.

**Specialized/SWAT/Tactical Experience:** Between 2015 and 2021 I was assigned to the Valley Regional SWAT team (VSWAT). VSWAT is a regional team consisting of personnel from the cities of Auburn, Des Moines, Federal Way, Kent, Renton, Tukwila, and the Port of Seattle. VSWAT is one of the largest and most active tactical teams in the Pacific Northwest. In my SWAT experience I have been involved in approximately five hundred live operations and I have approximately four thousand seven-hundred hours of training and operational experience.

During this period, I was simultaneously assigned to the Special Operations Division at the Renton Police Department. In this capacity, I was assigned to a proactive street crimes unit with other SWAT and non-SWAT trained officers. My duties included providing tactical, operational, and investigative support for a plainclothes/undercover investigative unit. I have training and operational experience in both uniformed and plain clothes operations, including mobile/static surveillance, high-risk arrest operations, residential warrant service, arrest warrant service, narcotics investigations, property crimes investigations, violent crimes, child crimes, and sex crimes, among others.

I have training and operational experience in short and long-term investigations, including complex operations targeting human trafficking and child sex crimes. During these investigations, I have provided surveillance, tactical, and investigative support for undercover operations targeting the child sex trade. These operations generally involve monitoring various social media platforms and interacting with subjects interested in sexual activities related to children and underage persons. I have experience monitoring electronic communications between adult suspects (usually males) and undercover detectives posing as children or offering sex with children. I have experience with the general terminology and lexicon related to underground/deviant sexual culture, including the child sex trade. I have surveilled, arrested, and conversed with individuals under investigation, under arrest, prosecuted for, and convicted of child sex crimes.

Between 2016 and 2021 I served as an instructor for the Washington State Tactical Officers Association (WSTOA). WSTOA is one of the primary training entities for basic and advanced-level SWAT instruction in Washington State and the Pacific Northwest. Prior to being operational, all SWAT officers are required to attend a 60-hour basic SWAT operator course. WSTOA contracts with the Washington State Criminal Justice Training Commission to provide basic SWAT instruction for tactical officers in the Pacific Northwest. In this role I provided instruction to commissioned police officers in mission planning, basic building clearing techniques, mechanical breaching, officer rescue, high-risk vehicle arrest tactics,

chemical munitions, less-lethal options, immediate action drills, tactical fitness and a variety of other topics related to special operations/SWAT.

I am a Washington State certified explosives handler. I have training and operational experience in high-energy/explosive breaching. In this capacity I plan the deployment and use of explosive compounds designed to gain access to a variety of structures and otherwise provide vantage points for tactical operations.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in law enforcement active shooter response and chemical/less lethal munitions. Additionally, I am an NTOA certified instructor in active shooter response for non-government organizations (NGOs) and a counter-terrorism response tactics instructor for south King County metro agencies. In these roles, I instruct police officers from various agencies across the Pacific Northwest in basic SWAT tactics, active shooter response tactics and protocols, counter-terrorism response tactics and protocols, mission planning and the deployment and use of chemical and less lethal munitions. Further, I instruct various stakeholders in public and private organizations in current practices and techniques in responding to workplace violence/mass-casualty/active shooter events.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in the tactical deployment, physiological/psychological effects, techniques and procedures for less-lethal munitions, chemical munitions and noise flash diversionary devices (NFDDs, commonly known as "flash bangs"). I have instructional, operational and training experience, including numerous exposures, to less-lethal tools, chemical munitions and NFDDs.

I have live, operational and instructional experience in a broad range of SWAT tactics including mission planning, basic and advanced building clearing techniques/CQC, hostage rescue, mass casualty/active shooter response, counter-terrorism response, barricaded subject tactics, high-risk search warrant service, high-risk mobile/static vehicle arrest tactics, mass-transit hostage rescue/barricaded subject tactics, dignitary protection, close-cover undercover/informant operations, downed officer/officer rescue, combat first aid, high-risk fugitive recovery/apprehension, mobile/static surveillance techniques, high-energy, mechanical and ballistic breaching, urban and woodland operational techniques, less-lethal and chemical munitions, basic/advanced rifle/pistol tactics, basic/advanced NVG rifle/pistol tactics/techniques and tactical fitness/preparedness.

I have been personally involved in numerous high-risk tactical operations including officer-involved critical incidents/shootings.

**Legal Experience:** I am an attorney currently licensed to practice law in the State of Washington. I have held this credential since October 2005. Prior to becoming a police officer, I was employed by the King County Prosecuting Attorney's Office (KCPAO) as a Deputy Prosecuting Attorney (DPA) in 2003 and again from 2005 – 2011. The KCPAO is the primary felony-level prosecuting entity in King County serving a population of approximately two-million residents. I was assigned as a trial attorney to the juvenile and adult divisions, including assignments to the violent crimes, narcotics, domestic violence, district court, car theft and special operations divisions. In this role I reviewed cases from every municipal police agency in King County in addition to various county agencies within and outside King County, as well as the Washington State Patrol, Washington State Department of Fish and Wildlife and a variety of federal/state

task forces. I examined referrals from these agencies for legal sufficiency prior to filing misdemeanor and felony cases in district and superior court, respectively.

I was lead counsel on approximately sixty misdemeanor and felony jury trials ranging from misdemeanor theft to attempted murder. I reviewed cases for filing, conducted plea negotiations, reviewed search warrants for legal sufficiency, drafted and argued trial and appellate motions and participated in every phase of criminal prosecution from the investigative stage through final appeal and disposition.

During my assignment to the car theft unit and, later, special operations, I was an on-call attorney tasked with providing legal counsel, reviewing, and approving applications for search warrants presented by commissioned police officers and detectives. It is the policy of the KCPAO that all search warrants associated with cases filed within the county shall be reviewed by a DPA prior to being presented to a qualified magistrate. In this capacity I reviewed approximately one-hundred fifty search warrants for residential dwellings, electronic records and media, cell phones, business records, financial records, narcotics, commercial buildings, personal belongings (backpacks, purses, etc.), automobiles, global positioning surveillance and body cavities, etc.  The standard of proof for such documents is "probable cause." Accordingly, the KCPAO and the investigating agencies relied on my judgment and guidance to confirm the existence or absence of probable cause in affidavits for search warrants.

From 2009 – 2011 I was assigned to the Eastside Narcotics Taskforce (ENTF) as special counsel tasked with providing legal counsel, guidance, and oversight on mid/high-level narcotics investigations. ENTF was a regional narcotics taskforce consisting of personnel from the cities of Bellevue, Kirkland, Redmond, Mercer Island, the Washington State Patrol and King County. While at ENTF I assisted in the planning, drafting and oversight of numerous narcotics search warrants, applications for body wires and electronic surveillance. I examined these documents for legal sufficiency/probable cause prior to presenting them to a qualified magistrate for review and approval. I facilitated the seizure and forfeiture of real and personal property used, intended to be used or the proceeds of narcotics related activity and other felony crimes. I managed and litigated these cases from the investigation stage through final disposition.

From 2009 to present I have served as Hearing Examiner for various government agencies in Washington State, including the Cities of Bothell and Kent, King County, the Valley Narcotics Enforcement Team (VNET) and the Port of Seattle. A hearing examiner is a quasi-judicial officer tasked with overseeing the legal process associated with, in my case, the seizure and forfeiture of property associated with narcotics trafficking and the commission of felony-level crimes. In this role I am the primary administrative/judicial officer presiding over asset forfeiture proceedings pursuant to RCWs 69.50.505 and 10.105.010. I review pleadings, legal motions and preside over administrative hearings pursuant to Title 34 RCW and Chapter 10-08 of the Washington Administrative Code. The standards of proof in these proceedings are "preponderance of the evidence" and "probable cause." Accordingly, one of my fundamental duties is to review the sufficiency of police investigations and procedures to determine the existence or absence of probable cause.

From 2006 to 2013 I served as an adjunct instructor at the basic police academy at the Washington State Criminal Justice Training Commission. I provided guidance on curriculum, lectured, and administered practical exercises related to courtroom testimony and led discussions and interactive instruction on such topics as direct examination, cross examination, courtroom procedure/decorum, roles/responsibilities of courtroom personnel, strategies for effective testimony, identification and avoidance of common courtroom mistakes, effective report writing, etc.

I have developed and presented continuing legal education (CLE) trainings on the topics of use of force, force encounters, human performance/physiological responses to stress and tactical decision-making under stress on multiple occasions to the King County Prosecutor's Office, the Washington State Association of Prosecuting Attorneys and a variety of government and non-government entities. Additionally, I have lectured and presented on various law enforcement topics and regional and national-level professional conferences.

**Specialty Training Courses**: Background Investigations for Police Applicants; Combat first-aid, Force Science Institute—the study of human performance during high-stress events; WSTOA SWAT Basic Academy, SWAT Team Leader course, NTOA Active Shooter Instructor Course, DARC Counter-terrorism regional response protocols, Glock armor course; Lethal force legal update (ongoing); CIT Intervention—dealing with subjects in mental crisis; Equity, Inclusion and Implicit Bias; Domestic Violence Investigations and Prosecutions (King County 4th and 5th annual DV Symposiums); Mobile/static Surveillance technique; DEA Narcotics interdiction; DOJ National Trial Advocacy Center advanced criminal litigation; NTOA "Train the Trainer" mass casualty/active shooter/workplace violence response; DOJ National Advocacy Center criminal trial attorney curriculum; Seattle PD Undercover School narcotics manufacturing bloc; FBI HRT Advanced Mechanical Breaching; Explosive breaching; Advanced trial techniques for prosecution of domestic violence; Advanced trial techniques for DNA evidence; Electronic surveillance; Presenting forensic evidence; Trial techniques for prosecuting narcotics manufacturing (methamphetamine, "crack" cocaine, LSD, marijuana, ecstasy, etc.); NTOA Less Lethal/Chemical Munitions Instructor Certification; CrossFit Levels 1 and 2 instructor; USPA "A" and "B" licensed skydiver.

All opinions included in the current report are based on my education, training, personal and professional experience and my review of the below listed materials. The opinions included herein are offered on a "more probable than not" basis and are subject to revision, reconsideration and further development pending the disclosure of new materials, facts, witnesses or other information not previously considered at the time of this writing. Discovery is ongoing and materials may be considered after production of this report.

Based on my education, training, personal and professional experience I have an objective basis to evaluate and opine on the actions of Seattle Police Officers Ryan Beecroft, Chris Myers, and members of the Seattle Police department during the course of this incident. A copy of my current *Curriculum Vitae* is available upon request. I have authored this report after reviewing the following documents and materials:

### Discovery

- File "SPD 3173-3228 (Case Summary 4442_001)_Redacted" – Seattle Police Department Office of Professional Accountability Case Summary for case involving SPD Officer Christopher Myers and complainant Brenda Winder (SPD 003173-003228) (56 pages)
- File, "SPD 3229-3243 (Cert of Completion and Disposition 4443_001)_Redacted" – Seattle Police Department Memorandum for disposition of complaint involving SPD Officer Christopher Myers and complainant Brenda Winder (SPD 003229-003243) (15 pages)
- File, "SPD 3246-3288 (4440_001)_Redacted" – Seattle Police Department Memorandum for disposition of complaint involving SPD Officers Forrest Lednicky, Aaron Parker, and Christopher Myers and complainant Derrick Perry (SPD 003246-003288) (43 pages)

- File, "SPD 3289-3407 (4441_001)_Redacted" - Seattle Police Department Office of Professional Accountability Case Summary for case involving SPD Officers Forrest Lednicky, Aaron Parker, and Christopher Myers and complainant Derrick Perry and complainant Derrick Perry (SPD 003289-003407) (119 pages); includes SPD use of force policy at (SPD 003400)
- File, "SPD 3413-3500 (Case Summary 4438_001)_Redacted" – Seattle Police Department Office of Professional Accountability Case Summary for case involving SPD Officer Christopher Myers and complainant Johnson Nguyen (SPD 003413-003500) (88 pages)
- File, "SPD 3501-3528 (Cert of Completion and Disposition 4439_001)_Redacted" –
- File, "SPD 3530 (5452@20090809020627)" – in-car video of interaction with Seattle Police Officer Christopher Myers and Johnson Nguyen (36:17)
- File, "SPD 3533-3599 (Investigation Summary Report 4432_001)_Redacted" – Seattle Police Department Office of Professional Accountability Case Summary for case involving SPD Officer Christopher Myers and complainant Jose Cardenas dated 12/7/10 (SPD 003533-003599) (67 pages)
- File, "SPD 3600-3693 (General Offense Hard Copy 4433_001)_Redacted" —— case file for (SPD 003600), including disposition of investigation involving shooting by Officer Myers of Jose Cardenas (SPD 003600-003693) (94 pages)
- File, "SPD 3694 (6668@20101207220032)" – in-car video of interaction with Seattle Police Officer Christopher Myers and Jose Cardenas (00:5:00/1:01:45)
- File, "SPD 13628-13648 (Beecroft - 1061_001) Redacted" – new hire personnel records for Seattle Police Officer Ryan Beecroft (SPD 013628-013648) (21 pages)
- File, "SPD 13649-13661 (Beecroft - 1062_001) Redacted" – letters of commendation, etc. for Seattle Police Officer Ryan Beecroft (SPD 013649-013661)
- File, "SPD 13662-13663 (Beecroft - 1063_001)" – personnel records, classification change, for Seattle Police Officer Ryan Beecroft (SPD 013662-013663) (2 pages)
- File, "SPD 13664-13679 (Beecroft - 1064_001)" – personnel records, performance reviews, for Seattle Police Officer Ryan Beecroft (SPD 013664-13679) (16 pages)
- File, "SPD 13680-13683 (Beecroft - 1147_001)" – personnel records, administrative reassignment, for Seattle Police Officer Ryan Beecroft (SPD 013680-013683) (4 pages)
- File, "SPD 13684-13730 (Myers - 1065_001) Redacted" – personnel records, leave of absence, for Seattle Police Officer Chris Myers; also media article RE: camera development; letters of commendation (SPD 013684-013730) (47 pages)
- File, "SPD 13731-13753 (Myers - 1066_001) Redacted" – personnel records, duty assignment, for Seattle Police Officer Chris Myers (SPD 013731-013753) (23 pages)
- File, "SPD 13754 (Myers - 1067_001)" – personnel record, reassignment, for Seattle Police Officer Chris Myers (SPD 13754) (1 page)
- File, "SPD 13755 (Myers - 1068_001)" – Seattle Police Department Personnel Order Information form for Officer Chris Myers (SPD 013755) (1 page)
- File, "SPD 13756 (Myers - 1069_001)" – Seattle Police Department Personnel Order Information form for Officer Chris Myers (SPD 013755) (1 page)
- File, "SPD 13757-13802 (Myers - 1070_001) Redacted" – personnel records, administrative assignment related to OIS and personal leave of absence for Seattle Police Officer Chris Myers (SPD 013757-013802) (46 pages)

- File, "SPD 13803-13827 (Myers - 1148_001) Redacted" – personnel records, commendations and letters from community members, for Seattle Police Officer Chris Myers (SPD 013803-013827) (25 pages)
- File, "SPD 13828-13869 (Myers - 1149_001) Redacted" – personnel records, commendations for Seattle Police Officer Chris Myers (SPD 013828-013869) (42 pages)
- File, "SPD 13870-13961 (Myers - 1150_001) Redacted" – personnel records, performance reviews, for Seattle Police Officer Chris Myers (SPD 013870-13961) (92 pages)
- File, "SPD 94 (Audio_2193292)" – 911 call from Katy Nolan; hangup (:29)
- File, "SPD 95 (Audio_2193293)" – 911 callback to Katy Nolan (11:10)
- File, "SPD 13962-13977 (Beecroft, Ryan 7722)" – training transcripts for Seattle Police Officer Ryan Beecroft (SPD 013962-013977) (16 pages)
- File, "SPD 13978-13983 (Johnson, Daniel 8179)" – training transcripts for Seattle Police Officer Daniel Johnson (SPD 013978-013983) (6 pages)
- File, "SPD 13984-14011 (Myers, Christopher 5452)" – training transcripts for Seattle Police Officer Christopher Myers (SPD 013984-014011) (28 pages)
- File, "SPD 015145 - SPD 015209 Johnson Personnel File" – Personnel records for Seattle Police Dispatcher Daniel Johnson (SPD 015145-015209) (65 pages)
- File, "CONFIDENTIAL SPD 7828" – audio recording of interview of Sandra Workman by SPD Sergeant Bair on 1/21/2015 (5:52)
- File, "CONFIDENTIAL SPD 7836" – audio recording of interview of Sandra Workman by SPD Sergeant Bair on 3/14/2015; identified Officer Myers as involved officer (8:40)
- File, "CONFIDENTIAL SPD 7851" – audio recording of interview of Seattle Police Officer Christopher Myer by Sergeant Bair related to Sandra Workman investigation (29:52)
- File, "CONFIDENTIAL SPD 7891" – in-car video, from Officer Myers vehicle, transport compartment, of Sandra Workman (10:37)
- File, "CONFIDENTIAL SPD 7892" – in-car video from Officer Myers vehicle, front facing, of Sandra Workman transport (10:31)
- File, "CONFIDENTIAL SPD 7893" – in-car video, front facing, from Officer Myers vehicle, arrival at police station, Sandra Workman incident (1:08)
- File, "CONFIDENTIAL SPD 7894" – in-car video, front facing, footage in front of PF Chang's (19:25)
- File, "CONFIDENTIAL SPD 7895" – in-car video, front facing, footage of plaza near PF Chang's, unidentified officer's car, related to Sandra Workman complaint, audio intermittent (47:16)
- File, "SPD 7797-7799 (2015OPA-0084 intake follow up)" – Seattle Police Department Office of Professional Accountability Follow-up Form by Sergeant Bair for Sandra Workman's complaint (SPD 007797-007799) (3 pages)
- File, "SPD 7800-7804 (2015OPA-0084 Case Summary)" – Seattle Police Department Office of Professional Accountability Case Summary by Sergeant Bair for Sandra Workman's complaint (SPD 007800-007804) (5 pages)
- File, "SPD 7805 (2015OPA-0084 Investigation follow up)" – Seattle Police Department Office of Professional Accountability Follow-up Form by Sergeant Bair for Sandra Workman's complaint (SPD 007805) (1 page)
- File, "SPD 7806 (2015OPA-0084 OPA Auditor Certification Memo)" – Seattle Police Department Office of Professional Accountability Auditor Review (SPD 007806) (1 page)

- File, "SPD 7807 (2015-0084 Director Certification & Findings)" – Seattle Police Department Memorandum closing Sandra Workman investigation as unfounded (SPD 7807) (1 page)
- File, "SPD 7808-7809 (2015-0084 DCM)" – Seattle Police Department Memorandum closing Sandra Workman investigation as unfounded (SPD 007808-007809) (2 pages)
- File, "SPD 7810 (2015-0084 FRB Captain email)" – email from Pierce Murphy to Gregg Caylor RE: closing of complaint (SPD 007810) (1 page)
- File, "SPD 7811 (2015-0084 Case Completion Memo)" – Seattle Police Department case completion memo (SPD 007811) (1 page)
- File, "SPD 7812 (2015-0084 Chain of Command email)" – email from Pierce Murphy to Seattle Police Deputy Chief Carmen Best RE: closing case file (SPD 007812) (1 page)
- File, "SPD 7813 (2015-0084 Letter to complainant)" – correspondence from Pierce Murphy to complainant RE: closure of case file (SPD 007813) (1 page)
- File, "SPD 7814 (2015-0084 Myers email)" – email from Pierce Murphy to Seattle Police Officer Chris Myers RE: completion of investigation (SPD 007814) (1 page)
- File "SPD 7815-7818 (2015OPA-0084 Returned Closing Letter to Complainant)" – correspondence from Pierce Murphy to complainant RE: closure of case file, survey, and mailing envelope marked "return to sender" (SPD 007815-007818) (4 pages)
- File, "SPD 7819-7820 (2015-0084ccs07-30-15)" – Seattle Police Department Closed Case Summary (SPD 007819-007820) (2 pages)
- File, "SPD 7821-7827 (2015OPA-0084  Interview-complainant)" – transcript of interview of Sandra Workman by Seattle Police Sergeant Krist Bair dated 1/21/15 (SPD 007821-007827) (7 pages)
- File, "SPD 7829-7835 (2015OPA-0084 2nd Interview of complainant)" – transcript of interview of Sandra Workman by Seattle Police Sergeant Krist Bair dated 3/24/15 (SPD 007829-007835) (7 pages)
- File, "SPD 7837-7850 (2015OPA-0084 Interview of Ofc Chris Myers-named)" – transcript of interview of Seattle Police Officer Christopher Myers by Seattle Police Sergeant Krista Bair dated 3/11/15 (SPD 007837-007850) (14 pages)
- File, "SPD 7852-7877 (2015OPA-0084 GO #2013-457904)" – Seattle Police report for incident 13-457904 (arrest of Sandra Workman) dated 12/23/13 (SPD 007852-007877) (26 pages)
- File, "SPD 7878-7882 (2015OPA-0084  CAD #2013-457904)" – CAD log for case 13-457904 (arrest of Sandra Workman) (SPD 007878-007882) (5 pages)
- File, "SPD 7883-7888 (2015OPA-0084  CAD #2013-457911 related to foot pursuit)" – CAD log for case 13-457911 (foot pursuit that occurred during interaction w/ Sandra Workman) (SPD 007883-007888) (6 pages)
- File, "SPD 7889-7890 (2015OPA-0084 Adult Detainee Log)" – email from Seattle Police Sergeant Krista Bair to Noreen Tanaka RE: detainee log associated w/ arrest of Sandra Workman (SPD 007889-007890) (2 pages)
- File, "SPD 7896-7901 (2015OPA-0084 Westlake Security Mall incident report)" – Westlake Center Mall security incident report (SPD 007896-007901) (6 pages)
- File, "SPD 7902-7908 (6240 Effective_12_18_13)" – Seattle Police Department Use of Force Policy 6.240 dated 3/26/10 (SPD 007902-007908) (7 pages)
- File, "SPD 7909-7912 (Directive 13-00049)" – Seattle Police Department Directive regarding use of force reporting dated 11/20/13 (SPD 007909-007912) (4 pages)

- File, "SPD 7913-7915 (2014OPA-0084 notification of sworn interview date)" – email from Seattle Police Sergeant Krista Bair to Seattle Police Officer Christopher Myers RE: interview dated 3/3/15 (SPD 007913-007915) (3 pages)
- File, "SPD 7916 (2015OPA-0084 opening letter 2-10-15)" – correspondence from Seattle Police Sergeant Krista Bair to complainant RE: response to complaint (SPD 007916) (1 page)
- File, "SPD 7917 (2015OPA-0084 email 30 day notice to Ofc Myers, capt, union, bureau chief)" – email from Seattle Police Sergeant Krista Bair to Seattle Police Officer Christopher Myers RE: classification notice related to investigation (SPD 007917) (1 page)
- File, "SPD 7918 (OPA2015-0084 Myers 5 day notice)" – Seattle Police Department Office of Professional Accountability Notice of Complaint dated 1/2/15 (SPD 007918) (1 page)
- File, "SPD 7919 (OPA2015-0084 notification to commander re Myers 5 day notice)" – email from Seattle Police Sergeant Krista Bair to Seattle Police Commander Chris Fowler RE: notice of complaint (SPD 7919) (1 page)
- File, "SPD 7920 (OPA2015-0084 notification to employee and union re Myers 5 day notice)" – email from Seattle Police Sergeant Krista Bair to Seattle Police Officer Christopher Myers RE: notice of complaint (SPD 7920) (1 page)
- File, "SPD 7921 (2014OPA-0084 email from Westlake Mall Security)" – email from Westlake Mall Security to Seattle Police Sergeant Krista Bair (SPD 007921) (1 page)
- File, "SPD 7922 (OPA2015-0084 email req Adult Detainee log)" – email from Seattle Police Sergeant Krista Bair to Noreen Tanaka RE: detainee log associated w/ arrest of Sandra Workman (SPD 0078922) (1 page)
- File, "SPD 7923-7924 (OPA2015-0084 email req Sally port video)" – email from Seattle Police Sergeant Krista Bair to Gary Wilcox RE: video from Sally port (SPD 007923-007924) (2 pages)
- File, "CONFIDENTIAL SPD 7979" – audio recording of interview of Seattle Police Officer Christopher Myers by Sergeant James Kim (32:38)
- File, "CONFIDENTIAL SPD 8093" – audio recording of 911 call from Safeway employee reporting theft, suspect w/ baseball bat (4:25)
- File, "CONFIDENTIAL SPD 8094" – audio recording of radio traffic (12:00/1:59:16)
- File, "CONFIDENTIAL SPD 8095" – in-car video, front facing, from Officer Myers vehicle, driving to shoplifting incident and arrival (18:00/40:02)
- File, "CONFIDENTIAL SPD 8096" – surveillance video footage from Safeway entrance depicting arrest and use of force (3:33)
- File, "CONFIDENTIAL SPD 8097" – surveillance video from Starbucks/Safeway depicting initial contact between Officer Myers and suspect (3:26)
- File, "SPD 7925-7930 (BT Rpt)" – Seattle Police Department "IAPro" entry for incident involving Seattle Police Officer Christopher Myers (SPD 007925-007930) (6 pages)
- File, "SPD 7931 (chain of command report)" – Seattle Police Department Complaint Summary recommending additional training for "de-escalation tactics" (SPD 007931) (1 page)
- File, "SPD 7933-7935 (2015OPA-1860 Intake Follow-up)" – Seattle Police Department Office of Professional Accountability intake follow-up form (SPD 007933-007935) (3 pages)
- File, "SPD 7936-7937 (Investigation Follow Up 2015OPA-1860)" – investigation follow-up report by Seattle Police Sergeant James Kim (SPD 007036-007937) (2 pages)

- File, "SPD 7938-7952 (2015OPA-1860 Case Summary)" – Seattle Police Department Office of Professional Accountability report by Sergeant James Kim (SPD 007938-007952) (15 pages)
- File, "SPD 7953 (OPA Auditor Certification Memo 2015-1860)" – Seattle Police Office of Professional Accountability Auditor Review (SPD 007953) (1 page)
- File, "SPD 7954-7955 (2015OPA-1860 Director Certification & Findings)" – Seattle Police Office of Professional Accountability Certification and Recommended Findings (SPD007954-007955) (2 pages)
- File, "SPD 7956-7959 (2015OPA-1860 DCM)" – Seattle Police Office of Professional Accountability Director's Certification Memo (SPD007956-007959) (4 pages)
- File, "SPD 7960-7962 (2015-1860ccs07-01-16)" – Seattle Police Department Office of Professional Accountability Closed Case Summary (SPD 007960-00962) (3 pages)
- File, "SPD 7963 (2015-1860 Myers email)" – email from Pierce Murphy to Seattle Police Officer Chris Myers RE: completion of investigation (SPD 007814) (1 page)
- File, "SPD 7964 (2015-1860 FRB Captain email)" – email from Seattle Police Sergeant James Kim to Seattle Police Captain Randal Woolery RE: closure of complaint (SPD 7964) (1 page)
- File, "SPD 7965 (2015-1860 Chain of Command email)" – email from Pierce Murphy to Seattle Police Deputy Chief Carmen Best RE: closing case file (SPD 007965) (1 page)
- File, "SPD 7966 (2015-1860 Case Completion Memo)" – Seattle Police Department Memorandum closing Sandra Workman investigation as not sustained (SPD 7966) (1 page)
- File, "SPD 7967-7978 (2015OPA-1860 Ofc Christopher Myers interview)" – transcript of interview of Seattle Police Officer Christopher Myers by Seattle Police Sergeant James Kim dated 5/5/16 (SPD 007967-007978) (12 pages)
- File, "SPD 7980-7990 (2015OPA-1860 CAD 15-333727)" – CAD log for case 15-333727 (SPD 007980-007978) (5 pages)
- File, "SPD 7991-8050 (2015OPA-1860 GO 15-333727)" – Seattle Police report for incident 15-333727 dated 9/23/15 (SPD 007991-008050) (60 pages), including:
  - Report of Seattle Police Officer Michael Galarita (007999)
  - Report of Seattle Police Sergeant Christopher Johnson (008014)
  - Report of Seattle Police Officer Christopher Myers (008027)
  - Photocopy of Safeway receipt
- File, "SPD 8051-8065 (2015OPA-1860 BT Report Ofr Meyers)" – Seattle Police Department Use of Force Report by Officer Christopher Myers (15 pages)
- File, "SPD 8066-8072 (Officer Myers Statement 2015-333727)" – Seattle Police Officer Use of Force Narrative by officer Christopher Myers (SPD 008066-008072) (7 pages)
- File, "SPD 8073-8081 (15-333727 W FRB Findings)" – Seattle Police Department Use of Force Review Board Findings (SPD 008073-008081) (9 pages)
- File, "SPD 8082-8090 (2015OPA-1860 Sgt Review 2015-333727 Type 2)" – Seattle Police Officer Use of Force Summary (SPD 008082-008090) (9 pages)
- File, "SPD 8091-8092 (Lt Review)" – Seattle Police Use of Force Lieutenant review (SPD 008091-008092) (2 pages)
- File, "SPD 8098-8099 (2015OPA-1860 Chiefs email re policy)" – email from Seattle Police Chief Kathleen O'Toole RE clarification of use of force policy (SPD 008098-008099) (2 pages)
- File, "SPD 8100-8101 (8_100 De-escalation 09-01-2015)" – Seattle Police Department "de-escalation" policy dated 9/1/15 (SPD 008100-008101) (2 pages)

- File, "SPD 8102 (Directive 15-00035)" – Seattle Police Department Directive "Failure to Follow Training is not a Policy Violation" (SPD 008102) (1 page)
- File, "SPD 8103 (2015OPA-1860 Complaint Summary)" – Seattle Police Department Office of Professional Accountability Complaint Summary (SPD 008103) (1 page)
- File, "SPD 8104 (2015OPA-1860 Notice of Complaint email)" – email from David Terry to Seattle Police Officer Christopher Myers RE: notice of complaint (SPD 8104) (1 page)
- File, "SPD 8105 (2015OPA-1860 Notice of Complaint)" – Seattle Police Department Office of Professional Accountability Notice of Complaint dated 12/10/15 (SPD008105) (1 page)
- File, "SPD 8106 (What to Expect After an OPA Complaint is Filed)" – document, "What to expect After Complaint is Filed With OPA" (SPD 008106) (1 page)
- File, "SPD 8107-8108 (2015OPA-1860 30-Day Email)" – email from Brian Stampfl to Seattle Police Officer Christopher Myers RE: classification notice related to investigation (SPD 008107-008108) (2 pages)
- File, "SPD 8109-8111 (2015OPA-1860 Interview Notice)" – email from Seattle Police Sergeant James Kim to Seattle Police Officer Christopher Myers RE: interview dated 4/29/16 (SPD 008109-008111) (3 pages)
- File, "SPD 8112-8113 (2015OPA-1860 Email with APRS)" – email from Seattle Police Sergeant James Kim to Brendan Koldan RE: clarification of "de-escalation" policy (SPD 008112-008113) (2 pages)
- File, "SPD 81 (Audio_2150269)" – 911 call; sounds of woman screaming and disconnect (:07)
- File, "SPD 82 (Audio_2150270)" – 911 call; woman crying, "my boyfriend is trying to kill me" "he keeps telling me he's going to kill me and his knife's out" hiding in bathroom; "threatening to kill himself and me" "he's saying there's blood everywhere" (8:27)
- File, "SPD 83 (Audio_2150271)" – attempted call back from 911 operator (:24)
- File, "SPD 84 (Audio_2150272)" – 911 call from neighbor Lydia Sobczyk about event reporting gunshots (1:14)
- File, "SPD 85 (Audio_2150273)" – 911 call from neighbor at apartment 315 who declined to ID self; reporting gunshots (4:19)
- File, "SPD 86 (Audio_2150274)" – 911 call from neighbor reporting gunshots (1:35)
- File, "SPD 87 (Audio_2150275)" – 911 call reporting gunshots (:27)
- File, "SPD 88 (Audio_2150276)" – 911 call from neighbor at unit 109 reporting gunshots (:46)
- File, "SPD 89 (Audio_2150277)" – 911 call from "Nikki" apparently representative from security company RE: police activity in area (1:18)
- File, "SPD 90 (Audio_2150303)" – phone call from SPD police dispatch to medical personnel for medical eval for officer on scene (:36)
- File, "SPD 91 (Audio_2150304)" – phone call from medical to SPD dispatch RE: location of officer who needs attention (:37)
- File, "SPD 92 (Audio_2150305)" – phone call from SPD police to medical for officer who need attention (:27)
- File, "SPD 93 (Audio_2150306)" – phone all from SPD to unknown party RE: approach route to scene (:51)
- File, "SPD 94 (Audio_2193292)" – 911 call from Katy Nolan; "my boyfriend is abusive"; hangup (:29) (duplicate)

- File, "SPD 95 (Audio_2193293)" – 911 callback to Katy Nolan (11:10)
- File, "SPD 100 (LEGAL D000006-051822_RADIO TAC1)" – radio traffic, post incident (36:12)
- File, "SPD 104 (LEGAL D000006-051822_RADIO WD)" – radio traffic for first incident between Ms. Nolan and Mr. Smith (12:00/3:26:52)
- File, "SPD 113-147 (2019OPA-0482 Intake Follow-Up)" – Seattle Police Department Office of Professional Accountability Intake Follow-Up form by Seattle Police Sergeant Matt Hendry; complainant Rose Johnson, mother of Ryan Smith (SPD 000113-000147) (35 pages)
- File, "SPD 148-153 (2019OPA-0482 Original Complaint Letter)" – Seattle Police Department Office of Professional Accountability complaint form completed by Rose Johnson (SPD 000148-000153) (6 pages)
- File, "SPD 154 (2019OPA-0482 Case Completion Notice - COC + NE)" – email "case completion notice" dated 2/6/2020 (1 page)
- File, "SPD 155 (2019OPA-0482 Case Completion Notice - Complainant)" – email "case completion notice" dated 2/6/2020 to Ms. Johnson (1 page)
- File, "SPD 156-170 (2019OPA-0482 DCM Final)" – Seattle Police Department Office of Professional Accountability Director's Certification Memo dated 1/6/2020 (SPD 000156-000170) (15 pages)
- File, "SPD 171-183 (2019OPA-0482ccs010620)" – Seattle Police Department Office of Professional Accountability Closed Case Summary dated 1/6/2020 (SPD 000171-000183) (13 pages)
- File, "SPD 184 (OIG Certification Memo 2019OPA-0482)" – City of Seattle Office of Inspector General Investigation Review dated 8/6/2019  (SPD 000184) (1 page)
- File, "SPD 185 (2019OPA-0482 Complainant Rose Johnson Interview)" – audio recording of phone interview of Rose Johnson by Sgt. Henry dated 1/24/2019 (50:12)
- File, "SPD 210-314 (1_Report Number 2019-165328 - Combined Reports)" – Seattle Police Department Case 2019-165328, including: (SPD 000210-000(105 pages)
  - Property Report by Marcia Jarvis (SPD 000210-000230) (21 pages)
  - Report of Seattle Police Officer Preston Turn (SPD 000231-000232) (2 pages)
  - Report of Seattle Police Detective Ann Strom (SPD 000233) (1 page)
  - Report of Seattle Police Detective John Brooks (SPD 000234) (1 page)
  - Report of Seattle Police Detective George Davisson (SPD 000235) (1 page)
  - Report of Seattle Police Detective Robert Howard (SPD 000236) (1 page)
  - Report of Seattle Police Seargeant Douglas Raguso (SPD 000237) (1 page)
  - Report of Seattle Police Detective Garry Jackson (SPD 000238) (1 page)
  - Report of Seattle Police Detective Stephanie Palmer/Merritt (SPD 000239) (1 page)
  - Report of Seattle Police Officer Mikael Daranciang (SPD 000240) (1 page)
  - Report of Seattle Police CSI Detective Kimberly Biggs (SPD 000241) (1 page)
  - Report of Seattle Police CSI Detective Raymond Turner (SPD 000242) (1 page)
  - Report of Seattle Police Detective Stephanie Palmer/Merritt (SPD 000243-000247) (5 pages)
  - Report of Seattle Police Detective Rachel Forbes (SPD 000248-000249) (2 pages)
  - Report of Seattle Police Detective Raymond Turner (SPD 000250-000261) (12 pages)
  - Report of Seattle Police Detective Raymond Turner (SPD 000262) (1 pages)
  - Report of Seattle Police Detective Raymond Turner (SPD 000263-000264) (2 pages)
  - Report of Seattle Police Detective Robert Howard (SPD 000265) (1 page)
  - Report of Seattle Police Officer Andrew Kral (SPD 000266-000267) (2 pages)

- Report of Seattle Police West Precinct Commander John Brooks (SPD 000268) (1 page)
- Report of Seattle Police Officer Garick Mattson (SPD 000269) (1 page)
- Report of Seattle Police Student Officer Eli Juarez (SPD 000270) (1 page)
- Report of Seattle Police Officer Bradley Richardson (SPD 000271) (1 page)
- Report of Seattle Police Officer Brian Krause (SPD 000272) (1 page)
- Report of Seattle Police Officer Christopher Rothwell (SPD 000273) (1 page)
- Report of Seattle Police Officer Anthony Morasco (SPD 000274) (1 page)
- Report of Seattle Police Officer Andrew Parker (SPD 000275) (1 page)
- Report of Seattle Police Officer Eli Akiyama (SPD 000276) (1 page)
- Report of Seattle Police Officer Ricardo Velasquez (SPD 000277) (1 page)
- Report of Seattle Police Officer Quinton Cooper (SPD 000278) (1 page)
- Report of Seattle Police Officer Jeremy Farkas (SPD 000279) (1 page)
- Report of Seattle Police Officer Vontrail Lee (SPD 000280) (1 page)
- Report of Seattle Police Officer Grant Mayer (SPD 000281) (1 page)
- Report of Seattle Police Officer Anthony Ridlon (SPD 000282) (1 page)
- Report of Seattle Police Officer Christopher Rogers (SPD 000283) (1 page)
- Report of Seattle Police Officer Howard Hoffman (SPD 000284) (1 page)
- Report of Seattle Police Officer David Passarella (SPD 000285) (1 page)
- Report of Seattle Police Officer Younghun Kim (SPD 000286) (1 page)
- Report of Seattle Police Officer Stephen Cloninger (SPD 000287-000288) (2 pages)
- Report of Seattle Police Officer Diondre Doakes (SPD 000289) (1 page)
- Report of Seattle Police Officer David Allen (SPD 000290) (1 page)
- Report of Seattle Police Officer John Branham (SPD 000291) (1 page)
- Report of Seattle Police Officer Filip Suska (SPD 000292) (1 page)
- Report of Seattle Police Officer Zachary Backman (SPD 000293) (1 page)
- Report of Seattle Police Officer Chriseley Lang (SPD 000294) (1 page)
- Report of Seattle Police Officer Zachary Pendt (SPD 000295) (1 page)
- Report of Seattle Police Sergeant William Geoghagen (SPD 000296) (1 page)
- Report of Seattle Police Officer Preston Turk (SPD 000297-00298) (2 pages)
- Report of Seattle Police Officer Vanessa Flick (SPD 000299) (1 page)
- Report of Seattle Police Officer Dustin Joyce (SPD 000300) (1 page)
- Report of Seattle Police Photographer Kathryn Durkee (SPD 000301) (1 page)
- Report of Seattle Police Officer Kurt Preuss (SPD 000302)
- Report of Seattle Police Officer Britt Kelly (SPD 000303) (1 page)
- Report of Seattle Police Detective Jason Dewey (SPD 000304) (1 page)
- Report of Seattle Police Sergeant Richard Bournes (SPD 000305) (1 page)
- Report of Seattle Police Sergent Thomas Hanley (SPD 000306-000307) (2 pages)
- Report of Seattle Police Officer Patrick Daly (SPD 000308) (1 page)
- Report of Seattle Police Detective Garry Jackson (SPD 000309) (1 page)
- Report of Seattle Police Sergeant Gregory Fliegel (SPD 000310) (1 page)
- Report of Seattle Police Officer Stephanie Palmer (SPD 000311) (1 page)
- Report of Seattle Police Officer Oliver Murphy (SPD 000312) (1 page)
- Report of Seattle Police Officer Molly Accomando (SPD 000313) (1 page)
- Report of Seattle Police Officer Thomas Barnett (SPD 000314) (1 page)

- File, "SPD 186-209 (2019OPA-0482 CAD 2019-165328)" – CAD log (SPD 000186-000209) (24 pages)
- File, "SPD 329 (Audio_2150303)" – phone call from SPD police dispatch to medical personnel for medical eval for officer on scene (duplicate of SPD 90) (:36)
- File, "SPD 330 (Audio_2150304)" – phone call from medical to SPD dispatch RE: location of officer who needs attention (duplicate of SPD 91) (:37)
- File, "SPD 331 (Audio_2150305)" – phone call from SPD police to medical for officer who need attention (duplicate of SPD 92) (:27)
- File, "SPD 332 (Audio_2150306)" – phone all from SPD to unknown party RE: approach route to scene (duplicate of SPD 93) (:51)
- File "SPD 323 (2019OPA-0482 911 Call #1)" –911 call; sounds of woman screaming and disconnect (duplicate of SPD 81) (:07)
- File, "SPD 324 (2019OPA-0482 911 Call #2)" –  911 call; woman crying, "my boyfriend is trying to kill me" "he keeps telling me he's going to kill me and his knife's out" hiding in bathroom; "threatening to kill himself and me" "he's saying there's blood everywhere" (duplicate of SPD 82) (8:27)
- File, "SPD 325 (2019OPA-0482 Call taker to Katy Nolan - Voicemail)" – attempted call back from 911 operator (duplicate of SPD 83) (:24)
- File, "SPD 326 (2019OPA-0482 Caller asking Dispatch if they need surveillance video for Roy St)" – 911 call from "Nikki" apparently representative from security company RE: police activity in area (duplicate SPD 89) (1:18)
- File, "SPD 327 (2019OPA-0482 Dispatch RADIO WD)" – radio traffic for first incident between Ms. Nolan and Mr. Smith (duplicate SPD 104) (12:00/3:26:52)
- File, "SPD 333 (2019OPA-0482 RADIO TAC1)" – radio traffic, post incident (duplicate SPD 100) (36:12)
- File, "SPD 334 (2019OPA-0482 Witness #2 Reporting Shots Fired)" – 911 call from neighbor at apartment 315 who declined to ID self; reporting gunshots (duplicate SPD 85) (4:19)
- File, "SPD 335 (2019OPA-0482 Witness #3 Reporting Shots)" – 911 call from neighbor reporting gunshots (duplicate SPD 86) (1:35)
- File, "SPD 336 (2019OPA-0482 Witness #4 Reporting Shots)" – 911 call reporting gunshots (duplicate SPD 87) (:27)
- File, "SPD 337 (2019OPA-0482 Witness #5 Reporting Shots)" – 911 call from neighbor at unit 109 reporting gunshots (duplicate SPD 88) (:46)
- File, "SPD 338 (2019OPA-0482 Witness Reporting Yelling and Gunshots)" – 911 call from neighbor Lydia Sobczyk about event reporting gunshots (duplicate of SPD 84) (1:14)
- File, "SPD 339 (Officer_Beecroft_s_BWV)" – body-worn camera footage, Seattle Police Officer Ryan Beecroft (14:00/1:05:18)
- File, "SPD 342 (Officer_Myers__BWV)" - body-worn camera footage, Seattle Police Officer Christopher Myers (5:00/1:02:33)
- File, "SPD 340 (Officer_Knight_BWV)" – body-worn camera footage, Seattle Police Officer Knight (10:00/1:02:29)
- File, "SPD 341 (Officer_Muoio_BWV)" – body-worn camera footage, Seattle Police Officer Muoio (7:00/58:59)

- File, "SPD 343 (2019OPA-0482 Photo - Katy Nolan Injury)" – photo of scratch on Ms. Nolan's chest (SPD 000343) (1 photo)
- File, "SPD 593-600 (2019OPA-0482 CSI Report)" – Seattle Police CSI report (SPD 000593-0006008) (8 pages)
- File, "SPD 593-600 (2019OPA-0482 CSI Report)" – Seattle Police Department Crime Scene Investigation summary for current event by Seattle Police CSI Detective Ray Turner (SPD 000593-000600) (8 pages)
- File, "SPD 601 (2019OPA-0482 FIT Major Investigation Summary)" – Seattle Police Department Force Investigation Team case summary (SPD 000601) (1 page)
- File, "SPD 602-678 (2019OPA-0482 Force Investigation Team Case Summary)" – Seattle Police Department Force Investigation Report by Seattle Police Detective Stephanie Merritt (SPD 000602-000678) (77 pages)
- File, "SPD 679-681 (2019OPA-0482 KCME Investigator's Report)" – King County Medical Examiner's Office Investigative Report (SPD 000679-000681) (3 pages)
- File, "SPD 682-SPD 710 (2019OPA-0482 Communications Call Taker Manual)" – section 6 of Seattle Police call receiver training manual (SPD 000682-000710) (29 pages)
- File, "SPD 711-712 (2019OPA-0482 Notice of a Receipt of Complaint - Dispatcher Johnson)" – email correspondence from Seattle Police Sergeant Ben Morrison to Daniel Johnson RE: notice of complaint (SPD 000711-000712) (2 pages)
- File, "SPD 713-714 (2019OPA-0482 Notice of a Receipt of Complaint - Grinstead)" – correspondence from Matthew Hendry to Seattle Police Sergeant Mark Grinstead RE: notice of complaint (SPD 000713-000714) (2 pages)
- File, "SPD 715-716 (2019OPA-0482 Notice of a Receipt of Complaint - Myers and Beecroft) – email correspondence from Ben Morrison to Seattle Police Officers Christopher Myers and Ryan Becroft RE: notice of complaint (SPD 000715-000716) (2 pages)
- File, "SPD 717-719 (2019OPA-0482 OPA Classifiation Notification Email ).DOC" – document, "OPA Classification Email" (SPD 000717-000719) (3 pages)
- File, "SPD 720-721 (2019OPA-0482 OPA Classification Notification - Complainant)" – email correspondence from Seattle Police Office of Accountability to Rose Johnson (Smith's mother) RE: acknowledgement of complaint (SPD 000720-000721) (2 pages)
- File, "SPD 722-723 (2019OPA-0482 OPA Classification Notification Email  - Johnson)" – email correspondence from Seattle Police Office of Accountability to Daniel Johnson RE: summary of allegations against named officers (SPD 000722-000723) (2 pages)
- File, "SPD 724-725 (2019OPA-0482 OPA Classification Notification Email - Beecroft, Myers)" – email correspondence from Seattle Police Office of Accountability to Seattle Police Officers Christopher Myers and Ryan Beecroft RE: summary of allegations against named personnel (SPD 000724-000725) (2 pages)
- File, "SPD 726-728 (2019OPA-0482 OPA Classification Notification Email - Expedited - Grinstead)" – email correspondence from Seattle Police Office of Accountability to Seattle Police Sergeant Mark Grimstead RE: summary of allegations against named personnel (SPD 000726-000728) (3 pages)
- File, "SPD 729-730 (2019OPA-0482 OPA Classification Report).DOC" – document, "OPA Classification Email" (SPD 000729-000730) (2 pages)

- File, "SPD 731-743 (2019OPA-0482ccs010620-1)" – Seattle Police Office of Police Accountability Closed Case Summary (SPD 000731-000743) (13 pages)
- File, "SPD 744-746 (2019OPA-0428 Email Thread with Johnson 08-08-19)" – email correspondence between OPA Matthew Hendry and Rose Johnson RE: intake of OPA complaint (SPD 000744-000746) (3 pages)
- File, "SPD 747-748 (2019OPA-0482 2 2022-05-06 Summons)" – summons for lawsuit, Rose Johnson/Estate of Ryan Smith v. City of Seattle (SPD 000747-000748) (2 pages)
- File, "SPD 749-750 (2019OPA-0482 4 2022-05-06 Summons Beecroft)" – summons for lawsuit, Rose Johnson/Estate of Ryan Smith v. City of Seattle and Ryan Beecroft (SPD 000749-000750) (2 pages)
- File, "SPD 751-752 (2019OPA-0482 4-1 Summons Myers)" – summons for lawsuit, Rose Johnson/Estate of Ryan Smith v. City of Seattle and Christopher Myers (SPD 000751-000752) (2 pages)
- File, "SPD 753-757 (2019OPA-0482 Complainant Letter to Chief Best 12202019)" – letter to Seattle Police Chief Carmen Best from Rose Johnson dated 11/5/2019 (SPD 000753-000757) (5 pages)
- File, "SPD 758-758 (2019OPA-0482 Email - From Johnson 08-29-19)" – email from Rose Johnson to OPA Matthew Hendry dated 8/29/19 RE: link to Washington Post article (SPD 000758) (1 page)
- File, "SPD 759-759 (2019OPA-0482 Email - From Johnson 11-07-19)" – email from Rose Johnson to OPA Matthew Hendry dated 11/7/19 RE: returning phone call (SPD 000759) (1 page)
- File, "SPD 760-775 (2019OPA-0482 Email Attachment - 3-1 Complaint)" – complaint filed in US Dist. Ct. West. Dist. of WA – Seattle, Estate of Smith, et al. v. City of Seattle, et al. (SPD 000760-000775) (16 pages)
- File, "SPD 776 (2019OPA-0482 Email from FAS - Notification of New Claim)" – email from City of Seattle risk manager Sara Kern to police accountability office (SPD 000776) (1 page)
- File, "SPD 777 (2019OPA-0482 Email from WSCAAA 07-25-19)" – email from Washington State Commission on African American Affairs Executive Assistant Charlotte Kerney to Seattle Police Office of Professional Accountability RE: action on letter received by Commission (SPD 000777) (1 page)
- File, "SPD 778 (2019OPA-0482 Email Re Lawsuit - Summons & Complaint Served)" – email from Jay Beck to Seattle Police Office of Professional Accountability RE: receipt of summons for lawsuit (SPD 000778) (1 Page)
- File, "SPD 779-783 (2019OPA-0482 Email Thread - Rose Johnson - 08-27-19)" – email correspondence between Rose Johnson and OPA Sergeant Matthew Hendry RE: "altercation" language in medical examiner report and complaint RE Sergeant Grinstead (SPD 000779-000783) (5 pages)
- File, "SPD 784-789 (2019OPA-0482 Email Thread - Rose Johnson 07-25-19)" – email correspondence between Seattle OPA Sergeant Matthew Hendry and Rose Johnson RE: setting up interview following Ms. Johnson's complaint (SPD 000784-000789) (6 pages)
- File, "SPD 790-791 (2019OPA-0482 Email Thread - Rose Johnson 08-27-19)" – email correspondence between Seattle OPA Sergeant Matthew Hendry and Rose Johnson RE: status of investigation and Officers' Myers and Beecroft employment status (SPD 000790-000791) (2 pages)
- File, "SPD 792-801 (2019OPA-0482 Email Thread - Rose Johnson 08-29-19)" – email correspondence between Seattle OPA Sergeant Matthew Hendry and Rose Johnson RE: ongoing investigation, some duplicate (SPD 000792-000801) (10 pages)

- File, "SPD 802-805 (2019OPA-0482 Email Thread with Johnson 07-17-19)" – email correspondence between Seattle OPA Sergeant Matthew Hendry and Rose Johnson RE: scheduling phone call, some duplicate (SPD 000802-000805) (4 pages)
- File, "SPD 806-845 (2019OPA-0482 New Claim Email Attachment - C-102240_Johnson - individual)" – City of Seattle Claim for Damages submitted by counsel for individual Rose Johnson, including statement supporting claim, King County Medical Examiner Report, uncertified transcript of 911 call from Katy Nolan, death certificate for Ryan Smith, letters of administration appointing Rose Johnson estate representative (SPD 000806-000845) (40 pages)
- File, "SPD 846-885 (2019OPA-0482 New Claim Email Attachment - C-102241__Johnson - estate of Ryan Smith)" – City of Seattle Claim for Damages submitted by counsel for representative of estate Rose Johnson, including statement supporting claim, King County Medical Examiner Report, uncertified transcript of 911 call from Katy Nolan, death certificate for Ryan Smith, letters of administration appointing Rose Johnson estate representative (SPD 000846-000885) (40 pages)
- File, "SPD 886 (2019OPA-0482 Sgt Hendry Email 06-12-19)" – email correspondence from OPA Sergeant Matthew Hendry to OPA Andrew Myerberg RE: pre-complaint conversation between Hendry and Rose Johnson (SPD 000886) (1 page)
- File, "SPD 887-892 (2019OPA-0482 WSCAAA Email Attachment)" – correspondence to Washington State Commission on African American Affairs Chair Ed Prince w/ attached complaint to Seattle Police Office of Professional Accountability (SPD 000887-000892) (6 pages)
- File, "SPD 893-895 (2019OPA-Email - From Johnson - 08-07-19)" – email correspondence between OPA Matthew Hendry and Rose Johnson RE: intake of OPA complaint (duplicate) (SPD 000893-000895) (3 pages)
- File, "SPD 896 (2019OPA-Email - From Johnson - 08-19-19)" – email from Rose Johnson to OPA Sergeant Matthew Hendry RE: "altercation" language in Medical Examiner Report (duplicate) (SPD 000896) (1 page)
- File, "SPD 107-112 (BT)" – Seattle Police Department OPA Expedited Investigation Report (SPD 000107-000112) (6 pages)
- File, "SPD 897-901 (BT)" – Seattle Police Department Use of Force report for Officer Ryan Beecroft (SPD 000897-000901) (5 pages)
- File "SPD 902-907 (BT)" – Seattle Police Department Use of Force report for Officer Christopher Myers (SPD 000902-000907 (5 pages)
- File, "SPD 908-911 (BT)" – Seattle Police Department Use of Force report for Officer Joshua Knight (SPD 000908-000911 (4 pages)
- File, "SPD 918 (Officer_Beecroft's_BWV)" – video footage from Seattle Police Officer Ryan Beecroft's body-worn camera (5:00/1:05:18)
- File, "SPD 938 (Officer_Myers'_BWV)" – video footage from Seattle Police Officer Christopher Myers body-worn camera (3:00/1:02:33)
- File, "SPD 936 (Officer_Muoio_BWV)" – video footage from Seattle Police Officer Brian Muoio's body-worn camera (xx/58:59)
- File, "SPD 931 (Officer_Knight_BWV)" – (7:00/1:02:29)
- File, "SPD 1040-1043 (BT - Myers)" – Seattle Police Department 'Firearm Discharge Report' for Seattle Police Officer Christopher Myers (SPD 001040-001043) (4 pages)
- File, "SPD 1044-1047 (BT - Beecroft)" – Seattle Police Department 'Firearm Discharge Report' for Seattle Police Officer Ryan Beecroft (SPD 001044-001047) (4 pages)

- File, "SPD 2501 (Involved Officer Beecroft)"
- File: SPD 1791-1829 (Merritt_PPT_2019-0011) – PDF copy of PowerPoint presentation, Seattle Police Department Force Investigation Team (SPD 001791-001829) (39 slides)
- File, "SPD 1830-1886 (2019-165328_CSI_Portion) – PDF copy of PowerPoint presentation, Seattle Police Detective Crime Scene Analyst Ray Turner (SPD 001830-001829) 39 slides)
- File, "SPD 2234 (Precinct Captain review)" – Seattle Police Department document, 'Type III Use-of-Force Precinct/Section Captain's Review, Seattle Police Captain Tom Mahaffey (SPD 002234) (1 page)
- File, "CONFIDENTIAL SPD 015829 6226@20160223140830" – In-car video footage of patrol car prisoner compartment, dated "02-2016" (16:18/16:18)
- File, "CONFIDENTIAL SPD 015830 7640@20160223155538" –In-car video footage, dash perspective, for T-Mobile theft/property damage call; officers arresting and searching suspect (15:37/15:37)
- File, "CONFIDENTIAL SPD 015831 911 Audio_1181613" – 911 call audio for T-Mobile theft (5:06/5:06)
- File, "CONFIDENTIAL SPD 015832 911 Audio_1181614" – 911 call audio, hang up (:07/:07)
- File, "CONFIDENTIAL SPD 015833 911 Audio_1181615" – 911 call audio, call back from prior hang up; regarding theft from T-Mobile (2:38/2:38)
- File, "SPD 015757-SPD 015757 2016OPA-0205 Email - 911 Tapes - Audio for 2016-065087 – 030615" – email correspondence from Seattle Police Office of Professional Accountability Sergeant Tyrone Davis to 911 audio request email address (SPD 015757) (1 page)
- File, "SPD 015758-SPD 015758 2016OPA-0205 Email - Notice of Complaint" – email correspondence from Seattle Police Office of Professional Accountability Sergeant Tyrone Davis to Seattle Police Officers Jayme Beckon, Ryan Beecroft, Fiona Taylor, Peter Schrantz RE: notice of complaint (SPD 015758) (1 page)
- File, "SPD 015759-SPD 015760 2016OPA-0205 Intake Follow-up" – Seattle Police Department Office of Professional Accountability 'Intake Follow-up Form' by Seattle Police Sergeant Tyrone Davis (SPD 015759-015760) (2 pages)
- File, "SPD 015761-SPD 015761 2016OPA-0205 Notice of Complaint" – Seatle Police Office of Professional Accountability Notice of Complaint to Officers Jayme Beckon, Ryan Beecroft, Fiona Taylor, Peter Schrantz (SPD 015761) (1 page)
- File, "SPD 015762-SPD 015762 2016OPA-0205 OPA Web Complaint" – email correspondence from anonymous email complainant to Seattle Police Office of Professional Accountability (SPD 015762) (1 page)
- File," SPD 015763-SPD 015765 2016OPA-0205 Query Log - Officer Fiona Taylor 022316" – activity log for Seattle Police Officer Fiona Taylor dated 2/23/2016 (SPD 015763-015765) (3 pages)
- File, "SPD 015766-SPD 015771 5140 Bias Free Policing (Effective 08-01-2015)" – Seattle Police Department Bias-Free policing policy 5.140 effective date 8/1/2015 (SPD 01566-015771) (6 pages)
- File, "SPD 015772-SPD 015775 5140 CAD Call Hardcopy 2016-065087" – Seattle Police Department CAD report for T-Mobile shoplifting call (SPD 015772-015775) (4 pages)
- File, "SPD 015776-SPD 015781 CAD Call Hardcopy 2016-065191" – Seattle Police Department CAD report for property damage report (SPD 015776-015781) (6 pages)
- File, "SPD 015782-SPD 015823 GO Report 2016-065087" – Seattle Police report for case 2016-65087, (SPD 015782-015823) (42 pages) including:

- o   Report of Seattle Police Officer Peter Schrantz
- o   Report of Seattle Police Officer Jayme Beckon
- o   Report of Seattle Police Officer Ryan Beecroft
- o   Report of Seattle Police Officer Colin Carpenter
- File, "SPD 015824-SPD 015827 Incident Summary – Seattle Police Office of Professional Accountability incident summary (SPD 015824-015827) (4 pages)
- File, "SPD 015828-SPD 015828 OPA SGT DAVIS" – audio file authenticity certification document (SPD 015828) (1 page)
- File, "CONFIDENTIAL SPD 015886 2019OPA-0289 complainant in person complaint" – Audio recording of interview with complainant RE: lewd complaint (10:19/10:19
- File, "CONFIDENTIAL SPD 015887 7575@20160411125926" – In car video footage, dash perspective, RE: lewd conduct call (16:22/16:22)
- File, "CONFIDENTIAL SPD 015888 7716@20160411125202" – In-car video footage, dash perspective, RE: lewd conduct call, footage of suspect and audio of contact with reporting party (33:37)
- File, "SPD 015834-SPD 015834 2016OPA-0289  What to Expect After an OPA Complaint is Filed" – document titled, 'What to expect after an OPA complaint is filed' (SPD 015834) (1 page)
- File, "SPD 015835-SPD 015837 2016OPA-0289 2016-124778" – CAD log for Lewd report, woman exposing herself and urinating in public, Officer Beecroft (SPD 015835-015837) (3 pages)
- File, "SPD 015838-SPD 015838 2016OPA-0289 Brown  Intake Notice of Complaint" – Seattle Police Department Office of Professional Accountability complaint form (SPD 015838) (1 page)
- File, "SPD 015839-SPD 015845 2016OPA-0289 CAD 2016-124778" – Seattle Police Department CAD report for lewd conduct/public urination incident (SPD 015839-015845) (7 pages)
- File, "SPD 015846-SPD 015846 2016OPA-0289 Disregard Notice" – correspondence from Seattle Police Office of Accountability Lieutenant Rodney Strozier to Seattle Police Officers Ryan Beecroft and Robert Brown RE : disregard notice of complaint (SPD 15846) (1 page)
- File, "SPD 015847-SPD 015847 2016OPA-0289 email Brown  Intake Notice of Complaint" – Seatle Police Office of Professional Accountability Notice of Complaint to Sergeant Robert Brown (SPD 015847) (1 page)
- File, "SPD 015848-SPD 015881 2016OPA-0289 GO 2016-124778" – Seattle Police Incident Report for case 2016-124778, lewd conduct report (SPD 015848-015881) (34 pages)
- File, "SPD 015882-SPD 015882 2016OPA-0289 Intake Follow Up" – Seattle Police Office of Professional Accountability Intake Follow-up form by Seargeant L. Smith (SPD 15882) (1 page)
- File, "SPD 015883-SPD 015885 Incident Summary" – Seattle Police Office of Professional Accountability incident summary (SPD 015883-015885) (3 pages)
- File, "Beecroft, Ryan" – Deposition of Seattle Police Officer Ryan Beecroft (198 pages) and 2 exhibits:
  - o   File, "083023 Beecroft Exh 1" – transcript of interview of Seattle Police Officer Ryan Beecroft dated 5/9/19 (no Bates stamp) (24 pages)
  - o   File, "083023 Beecroft Exh 2" – Seattle Police Department Memorandum RE: commendation for dispatcher (SPD 015158) (1 page)
- File, "SPD 015577-015581 Case_Jacket" – report of Seattle Police Officer Filiip Suska for April 14 2019 contact with Smith and Nolan (SPD 015577-015581) (5 pages)

- File, "SPD 015582-SPD 015587 19-132314 CAD" – CAD report for April 14, 2019 call from Katy Nolan (SPD 015582-015587) (6 pages)
- File, "SPD 015588-SPD 015590 2002-371606 CAD" – CAD report for 8/18/2002 shoplifting incident involving Ryan Smith (SPD 015588-015590) (3 pages)
- File, "SPD 015591-SPD 015593 2002-371606 RMS" – documents related to 8/18/2002 shoplifting call (SPD 015591-015593) (3 pages)
- File, "SPD 015594-SPD 015599 2005-110158 CAD" – CAD report for 3/15/2005 incident involving person with a handgun sitting in car; Ryan Smith named in documents (SPD 015594-015599) (6 pages)
- File, "SPD 015600-SPD 015601 2005-110158 RMS" – documents related to 3/15/2005 incident (SPD 015600-015601) (2 pages)
- File, "Myers, Christopher" – transcript of deposition of Seattle Police Officer Chris Myers (226 pages)
  - File, "09152023 - Myers Exh 1" – media article detailing officers with multiple OIS (24 pages)
  - File, "09152023 - Myers Exh 2 – CONFIDENTIAL" – training materials for team tactics (SPD 018694-018696) (3 pages)
  - File, "09152023 - Myers Exh 3" – first page of complaint for civil lawsuit filed by Mahoney et al. (1 page)
  - File, "09152023 - Myers Exh 4" – use of force review for incident 2015-296462 (murder suspect barricaded in tent) (SPD 007775-007787) (13 pages)
  - File, "09152023 - Myers Exh 5" – single page from motion for summary judgement (1 page)
- File, "WSCJTC 000001-WSCJTC 000016  Facilitator Guide  - Domestic Violence (12-2015) - ARCHIVED 08092016" – domestic violence training materials from Washington State Criminal Justice Training Center, facilitator guide, law overview (WSCJTC 000001-000016) (16 pages)
- File, "WSCJTC 000017-WSCJTC 000023  Facilitator Guide - Exigent Circ & Consent Searches (12-2015)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, exigency and consent in domestic violence investigations (WSCJTC 000017-000023) (7 pages)
- File, "S WSCJTC 000024-WSCJTC 000024  FG Supp - Cycle of Violence (2008-09-22) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, cycle of violence (WSCJTC 000024) (1 page)
- File, "WSCJTC 000025-WSCJTC 000025  FG Supp - Power and Control Wheel (2008-09-22) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, power and control wheel (WSCJTC 000025) (1 page)
- File, "WSCJTC 000026-WSCJTC 000030  FG Supp - Snohomish County DV Lawsuit (2008-10-07)" – Seattle Times report about woman killed by stalker and lawsuit involving Snohomish County Sheriff's Office (WSCJTC 000026) (1 page)
- File, "WSCJTC 000031-WSCJTC 000032  FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" – domestic violence training materials from the Washington State Criminal Justice Training Commission, "three magic questions" (WSCJTC 000031-000032) (2 pages)

- File, "WSCJTC 000033-WSCJTC 000033  HANDOUT - Cycle of Violence (2008-09-18) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, cycle of violence diagram (WSCJTC 000033) (1 page)
- File, "WSCJTC 000034-WSCJTC 000036  HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, domestic violence statistics (WSJCTC 000034-000036) (3 pages)
- File, "WSCJTC 000037-WSCJTC 000037  HANDOUT - DV Behavioral Defintion (2008-09-18) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, behavioral definition of domestic violence (WSCJTC 000037) (1 page)
- File, "WSCJTC 000038-WSCJTC 000038  HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, definition of family or household member (WSCJTC 000038) (1 page)
- File, "WSCJTC 000039-WSCJTC 000039  HANDOUT[p] - Problem Statement - PART I (03-2019)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, practical exercise problem (WSCJTC  000039) (1 page)
- File, "WSCJTC 000040-WSCJTC 000042  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, continuation of practical exercise problem (WSCJTC 000040-000042) (3 pages)
- File, "WSCJTC 000043-WSCJTC 000044  OPTIONAL Study Session - DV Questionaire (2015)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, study materials (WSCJTC 000043-000044) (2 pages)
- File, "WSCJTC 000045-WSCJTC 000130  Book (86 pages) - Domestic Violence (2007-05-16) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, publication by US Department of Justice on domestic violence (WSCJTC 000045-000130) (86 pages)
- File, "WSCJTC 000131-WSCJTC 000223  Book (91 pages) - Domestic Violence Student Handbook (07-2014) – Updated" – domestic violence training materials from the Washington State Criminal Justice Training Commission, *Domestic Violence Student Handbook (2014-7-14) DV (A-24)* – training resource on domestic violence from WACJTC/BLEA (93 pages)
- File, "WSCJTC 000224-WSCJTC 000239  Facilitator Guide  - Domestic Violence (12-2015)" – same as "WSCJTC 000001-WSCJTC 000016  Facilitator Guide  - Domestic Violence (12-2015) - ARCHIVED 08092016" (WSCJTC 000224-000239) (16 pages)
- File, "WSCJTC 000240-WSCJTC 000241  Facilitator Guide - Domestic Violence Pre-Exam Review (12-2015)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, facilitator guide for pre-exam review on topics relationships and mandatory arrest (WSCJTC 000240-000000241) (2 pages)
- File, "WSCJTC 000242-WSCJTC 000242  FG Supp - Cycle of Violence (2008-09-22) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, facilitator guide for 'cycle of violence' (WSCJTC 000242) (1 page)
- File, "WSCJTC 000243-WSCJTC 000243  FG Supp - Power and Control Wheel (2008-09-22) DV" – domestic violence training materials from the Washington State Criminal Justice Training Commission, facilitator guide for 'power and control model' (WSCJTC 000243) (1 page)

- File, "WSCJTC 000244-WSCJTC 000245   FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" – duplicate of "WSCJTC 000031-WSCJTC 000032  FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" (WSCJTC 000244-000245) (2 pages)
- File, "WSCJTC 000246-WSCJTC 000248   HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" – duplicate of "WSCJTC 000034-WSCJTC 000036  HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" (WSCJTC 000246-000248) (3 pages)
- File, "WSCJTC 000249-WSCJTC 000249   HANDOUT - DV Behavioral Defintion (2008-09-18) DV" – duplicate of WSCJTC 000037-WSCJTC 000037  HANDOUT - DV Behavioral Defintion (2008-09-18) DV" (WSCJTC 000249) (1 page)
- File, "WSCJTC 000250-WSCJTC 000251   HANDOUT - DV Emergency Exception (2008-07-21)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, emergency exception for domestic violence incidents (WSCJTC 000250-000251) (2 pages)
- File, "WSCJTC 000252-WSCJTC 000253   HANDOUT - Three Magic DV Questions (2009-06-10) Domestic Violence" – duplicate (WSCJTC 000252-000253) (2 pages)
- File, "WSCJTC 000254-WSCJTC 000256   HANDOUT[p] - DV Scenarios (2009-07-21) Domestic Violence" – domestic violence training materials from the Washington State Criminal Justice Training Commission, training scenarios (WSCJTC 000254-000256) (2 pages)
- File, "WSCJTC 000257-WSCJTC 000257   HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" – duplicate of ""WSCJTC 000038-WSCJTC 000038  HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" (WSCJTC 000257) (1 page)
- File, "WSCJTC 000258-WSCJTC 000258   HANDOUT[p] - Problem Statement - PART I (2009-07-21)" – duplicate of "WSCJTC 000039-WSCJTC 000039  HANDOUT[p] - Problem Statement - PART I (03-2019)" (WSCJTC 000258) (1 page)
- File, "WSCJTC 000259-WSCJTC 000261  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" – duplicate of "WSCJTC 000040-WSCJTC 000042  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" (WSCJTC 000259-000261) (3 pages)
- File, "WSCJTC 000262-WSCJTC 000263   OPTIONAL Study Session - DV Questionaire (2015)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, facilitator guide for study session on dynamics of domestic violence, impacts of domestic violence, and court orders (WSCJTC 000262-000263) (2 pages)
- File, "WSCJTC 000264-WSCJTC 000283   PowerPoint - Domestic Violence (07-2014)" – domestic violence training materials from the Washington State Criminal Justice Training Commission, PowerPoint overview of domestic violence for law enforcement officers (WSCJTC 00026000283) (20 slides)
- File, "WSCJTC 000284 ENCRYPTED King Co Dating & DV Handbook (2009-03-10)" – publication, *Domestic and Dating Violence – An Information and Resource Handbook* distributed by King County (no Bates stamp) (60 pages)
- File, "WSCJTC 000285 MEDIA (1 min) Cats Fighting Video (2008-03-10)" – video of two cats briefly fighting (:10)
- File, "WSCJTC 000286  MEDIA (2 min) - Security Camera Footage of Strangulation (2008-09-16)" – surveillance video footage of male choking female in parking lot of business (1:14)
- File, "WSCJTC 000287 MEDIA (3 min) - Signs of Strangulation (2008-09-16)" – training video for signs of strangulation (2:16)

- File, "WSCJTC 000288-WSCJTC 000375  Book (87 pages) - Domestic Violence Student Handbook (08-2016) – Updated" – domestic violence training materials from the Washington State Criminal Justice Training Commission, *Domestic Violence Student Handbook (2016-08) DV (A-24)* – training resource on domestic violence from WACJTC/BLEA (WSCJTC 000288-000375) (88 pages)
- File, "WSCJTC 000376-WSCJTC 000390  Facilitator Guide  - Domestic Violence (08-2016)" – domestic violence training materials from Washington State Criminal Justice Training Center, facilitator guide, law overview (WSCJTC 000376-000390) (15 pages)
- File, "WSCJTC 000391-WSCJTC 000392  Facilitator Guide - Domestic Violence Pre-Exam Review (12-2015)" – duplicate of "WSCJTC 000240-WSCJTC 000241  Facilitator Guide - Domestic Violence Pre-Exam Review (12-2015)" (WSCJTC 000391-000392) (2 pages)
- File, "WSCJTC 000393-WSCJTC 000393  FG Supp - Cycle of Violence (2008-09-22) DV" – duplicate
- File, "WSCJTC 000394-WSCJTC 000394  FG Supp - Power and Control Wheel (2008-09-22) DV – duplicate
- File, "WSCJTC 000395-WSCJTC 000399  FG Supp - Snohomish County DV Lawsuit (2008-10-07)" – duplicate
- File, "WSCJTC 000400-WSCJTC 000401   FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" – duplicate
- File, "WSCJTC 000402-WSCJTC 000404  HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" – duplicate
- File, "WSCJTC 000405-WSCJTC 000405  HANDOUT - DV Behavioral Defintion (2008-09-18) DV" – duplicate
- File, "WSCJTC 000406-WSCJTC 000407  HANDOUT - Three Magic DV Questions (2016) Domestic Violence" – duplicate
- File, "WSCJTC 000408-WSCJTC 000410  HANDOUT[p] - DV Scenarios (2016) Domestic Violence" – duplicate
- File, "WSCJTC 000411-WSCJTC 000411   HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" – duplicate
- File, "WSCJTC 000412-WSCJTC 000412  HANDOUT[p] - Problem Statement - PART I (2009-07-21)" – duplicate
- File, "WSCJTC 000413-WSCJTC 000415  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" – duplicate
- File, "WSCJTC 000416-WSCJTC 000417   OPTIONAL Study Session - DV Questionaire (2015)" – duplicate
- File, "WSCJTC 000418-WSCJTC 000433  PowerPoint - Domestic Violence (07-2016)" – duplicate
- File, "WSCJTC 000434 MEDIA (1 min) - Cats Fighting Video (2008-03-10)" – duplicate
- File, "WSCJTC 000435 MEDIA (2 min) - Security Camera Footage of Strangulation (2008-09-16)" – duplicate (1:14)
- File, "WSCJTC 000436 MEDIA (3 min) - Signs of Strangulation (2008-09-16)" – duplicate (2:16)
- File, "WSCJTC 000437-WSCJTC 000451   Facilitator Guide  - Domestic Violence (08-2016)" – Duplicate (WSCJTC 000437-000451) (15 pages)
- File, "WSCJTC 000452-WSCJTC 000453  Facilitator Guide - Domestic Violence Pre-Exam Review (12-2015)" – duplicate (WSCJTC 000452-000453) (2 pages)

- File, "WSCJTC 000454-WSCJTC 000454  FG Supp - Cycle of Violence (2008-09-22) DV" – duplicate (WSCJTC 000454) (1 page)
- File, "WSCJTC 000455-WSCJTC 000455  FG Supp - Power and Control Wheel (2008-09-22) DV" – duplicate (WSCJTC 000454) (1 page)
- File, "WSCJTC 000456-WSCJTC 000460  FG Supp - Snohomish County DV Lawsuit (2008-10-07)" – duplicate (WSCJTC 000456-000460) (5 pages)
- File, "WSCJTC 000461-WSCJTC 000462  FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" – duplicate (WSCJTC 000461-000462) (2 pages)
- File, "WSCJTC 000463-WSCJTC 000463  HANDOUT - Cycle of Violence (2008-09-18) DV" – duplicate (WSCJTC 000463) (1 page)
- File, "WSCJTC 000464-WSCJTC 000466  HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" – duplicate (WSCJTC 000464-000466) (3 pages)
- File, "WSCJTC 000467-WSCJTC 000467  HANDOUT - DV Behavioral Defintion (2008-09-18) DV" – duplicate (WSCJTC 000467) (1 page)
- File, "WSCJTC 000468-WSCJTC 000469  HANDOUT - Three Magic DV Questions (2016) Domestic Violence" – duplicate (WSCJTC 000468-000469) (2 pages)
- File, "WSCJTC 000470-WSCJTC 000472  HANDOUT[p] - DV Scenarios (2016) Domestic Violence" – duplicate (WSCJTC 000470-000472) (3 pages)
- File, "WSCJTC 000473-WSCJTC 000473  HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" – duplicate (WSCJTC 000473) (1 page)
- File, "WSCJTC 000474-WSCJTC 000474  HANDOUT[p] - Problem Statement - PART I (2009-07-21)" – duplicate (WSCJTC 000474) (1 page)
- File, "WSCJTC 000475-WSCJTC 000477  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" – duplicate (WSCJTC 000475-000477) (3 pages)
- File, "WSCJTC 000478-WSCJTC 000479  OPTIONAL Study Session - DV Questionaire (2015)" – duplicate (WSCJTC 000478-000479) (2 pages)
- File, "WSCJTC 000480-WSCJTC 000495  PowerPoint - Domestic Violence (01-2018)" – duplicate (WSCJTC 000480-000495) (16 slides)
- File, "WSCJTC 000496-WSCJTC 000583  Domestic Violence Student Handbook (08-2016) – Updated" – duplicate (WSCJTC 000496-000583) (88 pages)
- File, "WSCJTC 000584 MEDIA (1 min) - Cats Fighting Video (2008-03-10)" – duplicate (:10)
- File, "WSCJTC 000585 MEDIA (2 min) - Security Camera Footage of Strangulation (2008-09-16)" – duplicate (1:14)
- File, "WSCJTC 000586 MEDIA (3 min) - Signs of Strangulation (2008-09-16)" – (2:16)
- File, "WSCJTC 000587-WSCJTC 000674  Book (87 pages) - Domestic Violence Student Handbook (08-2016) – Updated" – duplicate (000587-000674) (88 pages)
- File, "WSCJTC 000675-WSCJTC 000689  Facilitator Guide  - Domestic Violence (08-2016)" – duplicate (WSCJTC 000675-000689)
- File, "WSCJTC 000690-WSCJTC 000691  Facilitator Guide - Domestic Violence Pre-Exam Review (12-2015)" – duplicate (WSCJTC 000690-000691) (2 pages)
- File, "WSCJTC 000692-WSCJTC 000692  FG Supp - Cycle of Violence (2008-09-22) DV" – duplicate (WSCJTC 000692) (1 page)

- File, "WSCJTC 000693-WSCJTC 000693  FG Supp - Power and Control Wheel (2008-09-22) DV" – duplicate (WSCJTC 000693) (1 page)
- File, "WSCJTC 000694-WSCJTC 000698  FG Supp - Snohomish County DV Lawsuit (2008-10-07)" – duplicate (000694-000698) (5 pages)
- File, "WSCJTC 000699-WSCJTC 000700   FG Supp - Three Magic DV Questions (2008-05-22) Domestic Violence" – duplicate (WSCJTC 000699-000700) (2 pages)
- File, "WSCJTC 000702-WSCJTC 000704  HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" – duplicate (000702-000704) (3 pages)
- File, "WSCJTC 000705-WSCJTC 000705  HANDOUT - DV Behavioral Defintion (2008-09-18) DV" – duplicate (WSCJTC 000705) (1 page)
- File, "WSCJTC 000706-WSCJTC 000707  HANDOUT - Three Magic DV Questions (2016) Domestic Violence" – duplicate (WSCJTC 000706-000707) (2 pages)
- File, "WSCJTC 000708-WSCJTC 000710  HANDOUT[p] - DV Scenarios (03-2019) Domestic Violence" – duplicate (WSCJTC 000708-000710) (3 pages)
- File, "WSCJTC 000711-WSCJTC 000711  HANDOUT[p] - Legal Definition of Family or Household Member (2008-03-13) DV" – duplicate (WSCJTC 000711) (1 page)
- File, "WSCJTC 000712-WSCJTC 000712  HANDOUT[p] - Problem Statement - PART I (03-2019)" – duplicate (WSCJTC 000712) (1 page)
- File, "WSCJTC 000713-WSCJTC 000715  HANDOUT[p] - Problem Statement - PART II (2009-07-21)" – duplicate (WSCJTC 000713-000715) (3 pages)
- File, "WSCJTC 000716-WSCJTC 000717  OPTIONAL Study Session - DV Questionaire (2015)" – duplicate (000716-000717) (2 pages)
- File, "WSCJTC 000718-WSCJTC 000733  PowerPoint - Domestic Violence (01-2018)" – duplicate (WSCJTC 000718-000733) (16 slides)
- File, "WSCJTC 000734 MEDIA (1 min) - Cats Fighting Video (2008-03-10)" – duplicate (:10)
- File, "WSCJTC 000735 MEDIA (2 min) - Security Camera Footage of Strangulation (2008-09-16)" – duplicate (1:14)
- File, "WSCJTC 000736 MEDIA (3 min) - Signs of Strangulation (2008-09-16)" – duplicate (2:16)
- File, "Dkt 3-1 Joint Mtn Exh A1)" – filing, "Settlement agreement and stipulated order of resolution in *United States v. City of Seattle* dated July 27, 2012 (no Bates stamp) (76 pages)
- File, "Dkt 107 Memo Submitting Consensus Use of Force Policies" – filing, *Memorandum submitting consensus use of force policies* in *United States v. City of Seattle* dated 11/27/2013 (no Bates stamp) (7 pages)
- File, "Dkt 187 Monitor's Fourth Semiannual Report" – filing, "*The Seattle Police Monintor's Fourth Annual Report* in *United States v. City of Seattle* dated 12/15/2015 (no Bates stamp) (115 pages)
- File, "Dkt 350  SPD's 2017 Training Plan" – filing, *Memorandum submitting 2017 SPD Training Plan* in *United States v. City of Seattle* dated 12/31/2016 (no Bates stamp) (3 pages)
- File, "Dkt 350.1  Ex A to SPD's 2017 Training Plan" – filing, *Propose Training Plan*, attachment to 12/31/2016 memorandum (no Bates stamp) (50 pages)
- File, "Dkt 353 Ord Approving SPD 2017 Training Plan" – filing, "*Order Approving SPD Training Plan*" in *United States v. City of Seattle* dated 1/3/2017 (no Bates stamp) (1 page)

- File, "Dkt 383 Monitor's 9th Systemic Assessment re Use of Force" – filing, "*Memorandum Submitting Ninth Systemic Assessment Regarding Use of Force*" in *United States v. City of Seattle* dated 4/6/2017 (no Bates stamp) (108 pages)
- File, "Dkt 471 - Mtn Approve Use of Force Revisions" – filing, "*City of Seattle's Unopposed Motion for Court Approval of Revisions to Seattle Police Department's Use of Force Policy*" in *United States v. City of Seattle* dated 7/31/2018 (no Bates stamp) (8 pages)
- File, "Dkt 471-1 - Exs A-G" – filing, Exhibits A-G for 7/31/2018 motion in *United States v. City of Seattle,* (no Bates stamp) (90 pages) including:
    - ○ Exhibit A – Core Use of Force Principles
    - ○ Exhibit B – Use of Force – Definitions
    - ○ Exhibit C – Use of Force – De-Escalation
    - ○ Exhibit D – Use of Force – Using Force
    - ○ Exhibit E – Use of Force – Tools
    - ○ Exhibit F – Use of Force – Reporting and Investigation
    - ○ Exhibit G – Use of Force – Reviewing Use of Force
- File, "Dkt. 477 - Order granting mtn approve use of force revisions" – filing, "*Order Granting City of Seattle's Unopposed Motion for Court Approval of Revisions to Seattle Police Department's Use of Force Policy*" in *United States v. City of Seattle* dated 8/14/2018 (no Bates stamp) (3 pages)

- Folder, "CONFIDENTIAL SPD 017972 SPD 2019FITRespforOffRs-Sups" – 2019 roll call training; Force Investigate Team (FIT) response for officers and supervisors
- Folder, "SPD 017971 Tukwila Taser" – video of roll call training; taser application post-pursuit and single vehicle collision
- Folder, "SPD 017973 CI Mod1" – training materials for crisis intervention; schizophrenia, etc.
- Folder, "SPD 017974 CI Mod2" – 2019 roll call training, CIT; OCD and anxiety disorders
- Folder, "SPD 017975 CI Mod3" – 2019 roll call training, CIT; depressive and bipolar disorders
- Folder, "SPD 017976 CI Mod4" – 2019 roll call training, CIT; trauma and addiction
- Folder, "SPD 017977 CI Mod5" – 2019 roll call training, CIT; various therapies as treatment
- Folder, "SPD 017978 CI Mod6" – 2019 roll call training, CIT; biomedical treatments
- File, "SPD 017979-SPD 018001 2018 Firearms Phase 2 - One-handed w-shield revised  - Copy" – 2018 firearms training lesson plan; one handed shooting and shooting w/ ballistic shield (SPD 017979-018001) (23 pages)
- File, "SPD 018002-SPD 018006 2018 firearms Short Drill description" – 2018 lesson range plan (SPD 018002-018006) (5 pages)
- File, "SPD 018007-SPD 018050 2018 ISDM Prisoner Control and Turtled Suspect" – training module for prisoner control and threat assessment of prone suspects (SPD 018007-018050) (44 pages)
- File, "SPD 018051-SPD 018240 3--2015 Taking Care ISDM" – publication for Seattle Police supervisors RE: effective supervision (SPD 018051-018240) (190 pages)
- File, "SPD 018241-SPD 018432 3--2015 Taking Care PowerPoint" – associated PowerPoint for effective supervision training (SPD 018241-018432) (192 slides)
- File, "SPD 018433-SPD 018610 2015 Critical Analysis of Force Incidents for Supervisors PowerPoint" – PowerPoint presentation for supervisors, critical analysis of force (SPD 018433-018610) (178 slides)

- File, "SPD 018611-SPD 018670 2015 DT Skills One—FINAL" – 2015 lesson plan for use of force skills training, individual defensive tactics from standing position (SPD 018611-018670) (60 pages)
- File, "SPD 018671-SPD 018773 2015 Integrated Use of Force and Tactics ISDM-Final" – 2015 lesson plan for use of force skills training, integrated tactics (integrating de-escalation into DT training) (SPD 018671-018773) (103 pages)
- File, "SPD 018774-SPD 018879 2015 Officer Sustainment UOF -final ISDM" – 2015 lesson plan for training on reporting requirements for type 1 force incidents (SPD 018671-018773) (106 pages)
- File, "SPD 018880-SPD 018923 2016 CIT Training3edit" – 2016 lesson plan for CIT training and de-escalation (SPD 018880-018923) (44 pages)
- File, "SPD 018924-SPD 019049 2016 Integrated Tactics FINAL ISDM (10-7-16)" – 2016 lesson plan for use of force skills training; integrated tactics (teamwork, communications, strategy, tactical decisions) (SPD 018924-019049) 126 pages)
- File, "SPD 019050-SPD 019124 2016-Firearms and Less Lethal Certification ISD Final" – 2016 lesson plan for firearms and less lethal training (SPD 19050-019124) (75 pages)
- File "SPD 019125-SPD 019163 2018 Phase 3 DT updated--Less lethal recert and DT Review" – 2018 lesson plan for defensive tactics, baton and OC (SPD 019125-019163) (39 pages)
- File "SPD 019164-SPD 019280 2018 Resilience ISDM 20180402" – training lesson plan for officer wellness, resiliency (SPD 019164-019280) (117 pages)
- File, "SPD 019281-SPD 019314 2019 ICC DT Phase 3" – 2019 lesson plan for defensive tactics, team arrest tactics (SPD 019281-019314) (117 pages)
- File, "SPD 019315-SPD 019397 Bias-Free Policing Power Point 4-19-16" – 2014 training presentation on bias free policing (SPD 019315-019397) (83 pages)
- File "SPD 019398-SPD 019518 CIT 2016 ISDM(Final)0524" – 2016 training materials, crisis intervention (SPD 019398-019518) (121 pages)
- File, "SPD 019519-SPD 019587 CIT ISDM 2019" – 2019 training materials for implementation of crisis intervention training (SPD 019519-019587) (69 pages)
- File, "SPD 019588-SPD 019673 CLASSROOM POWER POINT 2015 Officer Sustainment UOF updated 8-19 CLASSROOM" – 2015 training materials for type 1 use of force reporting (SPD 019588-019673) (86 pages)
- File, "SPD 019674-SPD 019755 Field Movements ISDM" – 2019 training materials for movement formations and techniques (SPD 019674-019755) (82 pages)
- File, "SPD 019756-SPD 019799 Field Movements PowerPoint FINAL" – 2019 PowerPoint for movement formations and techniques (SPD 109756-109799) (44 sldes)
- File, "SPD 019800-SPD 019801 LEAS program schedule" – document, *Law Enforcement and Society: Lessons of the Holocaust* (SPD 019800-019801) (2 pages)
- File, "SPD 019802-SPD 019842 Phase 3 ISDM Firearms and Advanced Rescue Tactics" – lesson plan for firearms training (SPD 019802-019842) (41 pages)
- File, "SPD 019843-SPD 020008 Phase 4 Master ISDM 2018" – lesson plan for mass casualty response, active threat response and de-escalation (SPD 019843-020008) (166 pages)
- File, "SPD 020009-SPD 020191 Resilience Presentation 20180910 video" – training presentation on officer wellness, resiliency, and stress (SPD 020009-020191) (183 pages)
- File, "SPD 020192-SPD 020228 SPD - 2018 Use of Force Policy Changes" – training presentation for use of force policy changes (SPD 020192-020228) (37 slides)

- File, "SPD 020229-SPD 020288 SPD 2017 CUF Operations ISDM FINAL" – 2017 training on officer down and care under fire tactics (SPD 020229-020288) (60 pages)
- File, "SPD 020289-SPD 020442 SPD 2017 Small Team Tactics ISDM - DRAFT 20170620" – training lesson plan for small team tactics (SPD 020289-020442) (154 pages)
- File, "SPD 020443-SPD 020486 TASER X2 2015 operator" – 2015 taser training materials (SPD 020443-020486) (44 slides)
- File, "SPD 020487-SPD 020896 Terry Bias ISDM submitted 9-2 mod 10-29 cleaned copy 8-5-2015" – 2014 lesson plan for search/seizure and bias (SPD 020487-020896) (410 pages)
- File, "Johnson, Daniel full version" – deposition of Seattle Police 911 call receiver Daniel Johnson (27 pages)
- File, "Rezentes, Stephanie" – deposition of Seattle 911 dispatcher Stephanie Rezentes (133 pages)
- File, "Muoio, Brian – Officer" – deposition of Seattle Police Officer Brian Muoio (215 pages)
- File, "SPD 020897 AXON_Body_2_Video_2019-04-14_1833" – body-worn camera footage of Seattle Police Officer Ryan Beecroft for April 15, 2019 contact with Katy Nolan (37:43)

Statutes and Pattern Jury Instructions

- RCW 9A.04.110(6) – Definitions
- RCW 9A.16.010 – Definitions
- RCW 9A.16.020 – Use of force – when lawful
- RCW 9A.16.040 – Justifiable homicide or use of deadly force by public officer, peace officer, person aiding—Good faith standard.
- RCW 9A.36.02 – Assault in the second degree
- RCW 10.99.020 – Definitions
- WPIC 2.06.01 Deadly Weapon—Definition as Element—Weapons Other than Firearms and Explosives
- WPIC 35.01 Assault—First Degree—Great Bodily Harm or Deadly Weapon—Definition
- WPIC 35.10 – Assault – Second Degree – Definition
- WPIC 35.50 – Assault – Definition

## Judicial Decisions

- <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)
- <u>Graham v. Connor</u>, 490 U.S. 386 (1989)
- <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006)
- <u>Brigham City v. Stuart</u>, 547 U.S. 398 (2006)
- <u>State v. Raines</u>, 55 Wn. App. 459 (1989)

**Other Materials**

- *Tactical Responses and Operations Standard for Law Enforcement Agencies*, Published by the National Tactical Officers Association, April, 2018.
- Heal, Charles "Sid," *Sound Doctrine*, Lantern Books, New York, NY (2000)
- Heal, Charles "Sid," *Field Command*, Lantern Books, New York, NY (2012)
- *Prosecutors' Domestic Violence Handbook,* prepared by the Washington Association of Prosecuting Attorneys and the King County Prosecuting Attorney's Domestic Violence Unit (147 pages)
- *Domestic Violence Student Handbook (2008-06-05) DV (A-24)* – training resource on domestic violence from WACJTC/BLEA (91 pages)
- *Confessions, Search, Seizure, and Arrest: A Guide for Police Officers and Prosecutors, May 2015 Edition, by Pamela B. Loginsky, Staff Attorney, Washington Association of Prosecuting Attorneys sourced from the WCJTC Basic Law Enforcement Curriculum.*
- *Procedure for Arrest – Misdemeanors, Felonies, Arrest Warrants, Arrests Based on Probable Cause, and Exigent Circumstances*, training presentation given at the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy (2016)

## I.    FACTUAL BACKGROUND

On the evening of April 14, 2019, Katy Nolan called 911 to report "[her] boyfriend is abusive."[1] The couple shared apartment 314 in the building located at 617 3rd Avenue West, Seattle. Prior to the initial call ending abruptly, the audio recording for the 911 call depicts Ms. Nolan crying and sobbing heavily. When the 911 operator called back, Ms. Nolan reported that the abuse had been occurring "over the last few days."[2] When asked to explain the abuse, Ms. Nolan reported that Mr. Smith had been verbally abusive and physically pushed her at some point. Ms. Nolan further reported that Mr. Smith was "very intoxicated" at the time.[3] When asked if there were any weapons present, Ms. Nolan replied that Mr. Smith was carrying two "switchblades," but they were not involved in the incident.

When asked for Mr. Smith's description, Ms. Nolan replied, in part, that he has a "strong build."[4] Ms. Nolan initially told the 911 operator that Mr. Smith had "cornered" her and she was unable to leave the apartment; however, she later hedged and explained that Mr. Smith wasn't "necessarily" stopping her from leaving the apartment, but she didn't feel safe trying. Ultimately, Ms. Nolan was able to leave the apartment and waited outside for responding officers.

Seattle Police Officers Filip Suska, Brian Muoio, Ryan Beecroft, and Michael Virgilio responded to the call. The officers contacted Ms. Nolan and, later, Mr. Smith. During this time, Officer Beecroft later recalled learning that Mr. Smith was a recreational boxer. This fact would become important during Officer Beecroft's subsequent contact with Mr. Smith. After speaking with Ms. Nolan and Mr. Smith, the officers determined that no crime had been committed. Officer Suska later wrote a short report documenting the matter.

---

[1] From file, "SPD 94 (Audio_2193292)" at :05.
[2] From file, "SPD 95 (Audio_2193293)" at :30.
[3] Id at :55.
[4] Id at 2:00.

Jessica Portlock is Ms. Nolan's Neighbor. Ms. Portlock lives in unit 313. At approximately 1:00 on the afternoon of May 8, 2019, Ms. Portlock heard Ms. Nolan and Mr. Smith arguing. She looked outside and saw Mr. Smith in the hallway banging on the door of Ms. Nolan's apartment. She later told investigators the yelling and arguing persisted into the evening. Kirsten Odegard is Ms. Nolan's neighbor in unit 315. That same evening, Ms. Odegard was napping when she woke to sounds of yelling and thumping coming from Ms. Nolan's apartment.

At approximately 7:15 p.m., Ms. Nolan called 911 to report that Mr. Smith was armed with a knife and trying to kill her. The audio recording of the first call captures her crying and shrieking before the call abruptly ends.[5] The audio from a second call opens with Ms. Nolan crying and sobbing as she blurts out, "My boyfriend is trying to kill me!"[6] Ms. Nolan continued crying and sobbing. The recording captured her gasping for air as though hyperventilating. The 911 operator asked Ms. Nolan for her address but she is apparently so distraught she is unable to answer. The 911 operator asked a second time and Ms. Nolan continued to cry, sob, and gasp. After being asked a third time, Ms. Nolan blurts out the address.

Ms. Nolan then pleads with the 911 operator: "Please get him out! I've been trying to get him to leave and he won't leave. And he just keeps telling me he's going to kill me and his knife's out...and he tackled me when I tried to call you earlier!" Ms. Nolan told the 911 operator she was hiding in the bathroom, and she was using her body to hold the door closed because the door does not lock. Ms. Nolan continued to plead, "Please get him out! Please get him out! He's threatening to kill himself and me!" In response to the 911 operator's questions, Ms. Nolan provided Mr. Smith's physical description. Ms. Nolan further stated Mr. Smith was armed with a 4-inch "switchblade."

Ms. Nolan then stated, "He's saying there's blood everywhere." The 911 operator clarified, "Who's saying blood is everywhere?" Ms. Nolan replied, "He is." The 911 operator then asked, "So you don't know if he's hurt or not but he's saying there's blood everywhere?" Ms. Nolan replied, "Yeah." Ms. Nolan stated Mr. Smith was not currently trying to force his way into the bathroom, but she was holding her weight against the door, nonetheless.

Ms. Nolan stated, "He keeps saying I fucked up. I can't leave. He's gonna kill me." The 911 operator asked whether Ms. Nolan was injured and she replied, "No – he tackled me. He needs help. He's saying there's blood everywhere and that I can't come out there 'cuz I fucked up." There is a short pause in the conversation where only Ms. Nolan's crying and rapid breaths can be heard. Ms. Nolan then told the 911 operator Ms. Smith was using his finger nails to scrape at the door.

Unprompted, Ms. Nolan told the 911 operator, "I'm waiting for the police to break the door down...I might live, ok?" She then explained that the bathroom door doesn't lock, but she was using a device she apparently purchased specifically to block the door.

Several police officers were dispatched to the event, all of them equipped with body-worn cameras. Responding officers were notified that a female 911 caller reported that her boyfriend had a knife and was trying to assault her. The officers were then advised that the male was threatening to kill himself and the female caller, the male was claiming there was blood everywhere, and he was armed with a 4-inch switchblade.

---

[5] File, "SPD 81 (Audio_2150269)"
[6] From file, "SPD 82 (Audio_2150270)"

Seattle Police Officers Chris Myers and Brian Muoio were the first officers to arrive. At the time of this event, Officer Myers has been a police officer for approximately 29 years. Officer Myers personnel records reflect that, at this point in his career, he had been extensively trained in de-escalation, patrol tactics, crisis intervention, use of force, and a range of police procedures. He was a field training officer, use of force instructor, less-lethal tools instructor, master taser instructor, and held myriad other assignments.

Ms. Nolan's apartment was located in a large apartment building in the urban neighborhood of lower Queen Ann Hill. Ms. Nolan's apartment was accessible through an interior door located at the end of a long, narrow hallway. The doors are configured with a small viewport allowing the occupant to see into the hallway. The viewport is large enough to allow visual access through either side of the door.




Hallway leading to Ms. Nolan's apartment        Viewport on door

At the time of their contact with Mr. Smith, he was extremely intoxicated and under the influence of marijuana. Laboratory tests would later reveal Mr. Smith's blood-alcohol content was .36 – 450% of the legal threshold for driving while intoxicated. When they initially encountered Mr. Smith, all responding officers were wearing fully marked Seattle Police Uniforms and each was readily identifiable as a police officer. According to the body-worn camera footage of Officer Myers and Muoio,[7] the viewport door opened as they approached Ms. Nolan's door. Officer Myers saw Mr. Smith looking at him through the viewport. Officer Myers loudly called out, "Open the door! Open the door now!" Officer Muoio stated, "Seattle Police!" followed by Officer Myers shouting, "Open the door!" Rather than opening the door, Mr. Smith closed the viewport.

Based on Ms. Nolan's reports that Mr. Smith was armed with a switchblade as was going to kill her, along with Mr. Smith's refusal to open the door, Officers Myers and Muoio believed Ms. Nolan was in imminent danger. Officer Myers kicked the door and shouted, "Seattle Police! Open the door!" Officer Myers kicked the door a second and third time with no effect. Seattle Police Officers Ryan Beecroft and Joshua Knight arrived during this time. As Officer Beecroft approached, Officer Myers asked for help. Officer Beecroft stepped in front of the door and kicked it several times while Officer Myers ordered Mr. Smith to open the door.

---

[7] Files, "SPD 342 (Officer_Myers__BWV)" and "SPD 341 (Officer_Muoio_BWV)," respectively.

After approximately ten kicks, the center panel of the door began to yield. Officers Myers and Beecroft traded kicks as the center panel of the door began to cave. Throughout this time Mr. Smith did not say anything and made no obvious effort to comply or surrender. Officer Myers was finally able to push the center of the door inward. As the door opened, Mr. Smith was standing immediately inside the entryway. Officer Beecroft later stated Mr. Smith was within five feet of him. Mr. Smith was facing the officers and holding a knife in his right hand.  The officers appeared to retreat slightly as they shouted, "Hands!" "Hands up now!" "Drop the knife!" and "Get on the ground! Get on the fucking ground!" "Drop the knife! Drop the knife!"

Mr. Smith made no effort to comply. Instead, he raised the knife to the center of his chest. The blade was oriented toward the officers as if preparing to stab them. Mr. Smith took 3-4 steps toward the officers as they shouted commands for Mr. Smith to drop the knife and surrender. Officers Myers and Beecroft had drawn their handguns during this time. Officer Myers briefly moved to holster his handgun, before deciding otherwise. He would later explain that he considered drawing his taser, but, due to Mr. Smith being armed with a knife and the close proximity, he decided against it.

Officer Beecroft later explained the moment as follows:

> [M]ister Smith was standing there with a knife, took a step forward, uh, and all I could think about was his stature and I knew his ability prior, he said he was a boxer, that I felt like I could be easily overcome by Mister Smith. He had a knife in his and, and I felt like I was dead to rights to him that if he wanted to, at any point in time, he could have stabbed me. I was close enough, I like, I said, I felt like I was three to four feet away from him. Um, once I had that feeling, I, I had nowhere to go. Uh, obviously, I felt I was in imminent danger of being killed or seriously wounded by this, this gentleman.[8]

According to Officer Myers:

> "So, there was that exigency of, if she's bleeding out, we have no idea how long she has and if she is we need to get medical attention to her right away. This guy is standing between us and her. We're giving him verbal commands, he's not complying with them, and at that point, he kind of, it wasn't a full step, it was kind of a, a half step, almost kind of like when we're doing the riot control stuff, that kind of stomp forward, with the knife. Um, and at the point, my perceptual stuff kicked in, I got really tight, um, focused vision on the knife. At that point, all I could really focus on was, was the knife in his hands, because that was the immediate threat right there in front of us. And [Officer Beecroft] was to my right, so, he's got nowhere to go."[9]

---

[8] From file, "083023 Beecroft Exh 1" – transcribed statement of Officer Beecroft at page 7.
[9] From file, "SPD 602-678 (2019OPA-0482 Force Investigation Team Case Summary)" at SPD 000650.

Officers Myers and Beecroft fired at Mr. Smith. Mr. Smith fell to the ground in the doorway of Ms. Nolan's apartment. Officers Myers, Beecroft, Muoio, and Knight entered the apartment, located Ms. Nolan, and quickly removed her from the area. Once Ms. Nolan was in a safe place, Officers Muoio and Beecroft immediately began rendering medical aid to Mr. Smith; however, it was apparent that he was critically wounded. Medics responded and confirmed that Mr. Smith did not survive the encounter.

Investigators later recovered the knife Mr. Smith used to threaten them. Additionally, investigators discovered a second knife clipped to Mr. Smith's pants pocket.



CSI Photo of Subject's handheld knife and another knife in the grey sweatpants he was wearing

## I.    <u>INTRODUCTION</u>

The fundamental duty of domestic law enforcement in the United States is the resolution of crises. Substantial time, energy, and resources are allocated to training police officers in crisis resolution tactics, techniques, and procedures. In law enforcement, *crisis* is generally defined as an emotionally stressful event or situation involving an impending, abrupt and decisive change. "Crisis" may also include any event which presents significant safety concerns or disruption to public order.[10] Law enforcement typically responds to three general class of crises: natural disasters (floods, landslides, tornadoes, etc.), mechanical crises (vehicle collisions, bridge failures, aviation events, etc.), and conflict.

Conflict in law enforcement is generally defined as any situation involving an irreconcilable collision between opposing wills involving one or more suspects who must be captured or subdued. Conflict is the most common class of crisis involving law enforcement. It is also the most dangerous and complicated.

All crises share five general characteristics. First, crises are ***confusing and uncertain***. The underlying causes are often years in the making. By the time law enforcement is involved, there is often a history known only to the participants and those closest to the underlying circumstances. Law enforcement will almost always lack detailed information on the participants' motives, intentions, goals, capabilities, and skill. Further, the crisis location is almost always selected by the suspect. Other uncertainties like time of day, weather, available personnel and resources, the capabilities of personnel on scene, and bystander actions further complicate matters.

---

[10] For more on these concepts, see Heal, Charles "Sid," *Sound Doctrine*, Lantern Books, New York, NY (2000); also Heal, Charles "Sid," *Field Command*, Lantern Books, New York, NY (2012). The term "crisis" as used here is distinguishable from the contemporary notion of a "person in crisis."

Because crises are volatile, uncertain, complex, and ambiguous, decisions may be based on probabilities derived from inaccurate, untimely, incomplete, and often contradictory information. However, as will be discussed further below, the officers in the current case reacted to the information they received in a systematic manner consistent with generally accepted police procedures, tactics, and training principles. This brings us to the second characteristic of crises: they are both *time sensitive and time competitive*.

*Time* is a continuum in which events occur in an irreversible succession from past, through the present, and into the future. Time is highly transitory, temporary, and unique. Time is indifferent. It does not favor one actor over the other. There is a common fallacy that first responders can "create time" or "slow things down." In fact, time is finite and inflexible. There are sixty seconds in a minute, sixty minutes in an hour, and twenty-four hours in a day. First responders – and anyone else – cannot change this. When laypersons and policymakers talk of "creating time," they are unknowingly referring to **tempo**. Tempo refers to the number of actions taken in a period of time. More actions equal higher tempo; conversely, fewer actions equate to lower tempo.

There exists another fallacy in which laypersons and some policy makers believe that inaction or slowing tempo only benefits first responders. While there may be some benefit to the police in delaying action or slowing tempo, that benefit is often offset by the opportunity created for the suspect to formulate a plan of their own. It is untrue that a suspect will simply wait idly for the police to assert their will. It is more common than not that the suspect uses time to advance their own goals.

There is constant tension between the uncertainty of the event and the need to intervene. This tension creates a host of issues, the most problematic being indecision. Indecision is often the product of preparedness (or lack thereof), inexperience, or fear of a suboptimal outcome. However, in all crises, there is a point in time where the additional value of more information is not worth the cost of waiting for it. For example, if officers are approached by a man holding a knife in a threatening manner, they will necessarily have to make a decision while there is still a chance to influence the outcome – that is, before the danger reaches fruition and becomes unavoidable. Decisions delayed in these circumstances are often rendered ineffective because circumstances will have changed. In the tactical realm, this period is known as the *inflection point*.

If unaddressed, law enforcement crises will rarely resolve without causing some identifiable harm to innocent persons. Thus, in law enforcement crises, a successful resolution will generally require some intervention. Consequently, the actor who most readily exploits *opportunity* will gain significant advantage. **Opportunity** is defined as a period of time during which action will benefit one adversary at the expense of the other. Opportunities are often the result of planning, skill, or chance. Likewise, opportunity can stem from an adversary's poor decision, a change in the environment or a variety of other factors.

When applied appropriately, the principle of opportunity offers significant tactical advantage in resolving conflict favorably. Opportunities are often fleeting and at times unpredictable. When deferred, an opportunity may not reappear or may do so at untenable times. Identifying and acting during a moment of opportunity provides substantial leverage to the actor who can identify and act in the fleeting moment where the actor's chances at success are increased due to an error, oversight or imprudent act by the adversary. Police officers are trained to identify such times and act in a decisive manner aimed at resolving the conflict consistent in a reasonably peaceful manner.

The opposite or *opportunity* is known as a **window of vulnerability**. Where opportunity exists for one actor, vulnerability necessarily exists for the other. Critically, opportunities cannot be exploited without proximity. Thus, to successfully leverage circumstances to one's benefit, the actor must be close enough to identify the opportunity and take action to exploit it.

The concepts of *opportunity* and *vulnerability* are closely related to *tempo*. Officers can create opportunities and mitigate vulnerabilities by managing tempo. *It is certainly untrue that delay is the best strategy in all cases*. Inaction is often a sign of deficient training, a failure of leadership, and/or undefined mission parameters.

Third, all law enforcement crises involve **risk**. Risk is defined as the potential for an outcome inconsistent with the intended goal of the action. This risk extends to the public, the suspect, and law enforcement personnel. Risk may be further exacerbated by the actions of the suspect.

Fourth, because law enforcement crises are uncertain and time-competitive, law enforcement should endeavor to resolve them at the earliest possible opportunity. Because one actor is often seeking to defeat the other, time will accrue to the benefit of the actor who can most quickly exploit circumstances to his benefit. Because decision-making is predictive, there will always be unintended outcomes. Each occurrence will require revision and improvisation of the resolution strategy. Over time, these changes compound and make the encounter more complex and less predictable.

Finally, because the fundamental characteristic of conflict is the often-irreconcilable disagreement between the suspect and authority, conflicts are especially susceptible to the *human factor*. Motives, emotions, personalities, training, experience, etc. are always considerations in developing and implementing resolution strategies.

Law enforcement training is based on maintaining peace, facilitating safety, and restoring order. No matter the circumstances, these are always the desired end-states. Because law enforcement crises are so complex, all law enforcement training is founded upon general principles and systematic practices aimed at reducing or eliminating variables that occur during crises and maintaining public safety.

## II.    TRAINING PRINCIPLES

### A.    "Priorities of Work"

In responding to law enforcement crises, police officers are trained to prioritize their efforts to maximize safety and the efficient allocation of resources. This principle is generally known as the **priorities of work**. These priorities are, in respective order: 1) render the scene safe/secure the scene, 2) render medical aid to the injured/triage casualties, 3) investigate crime. Where police respond to a violent event, they are trained to focus primary efforts on the source of the violence. Once the source is identified, they are trained to take reasonable and appropriate measures to isolate it and mitigate harm. Once danger has abated, the attention focuses on treating the injured according to severity of injuries and likelihood of survival. Finally, with the scene secure and injured treated, police will focus on documenting events, interviewing witnesses, collecting evidence, etc.

Securing the scene is the paramount concern. Scene control is the first principle listed in Seattle Police Training as the first step in the "de-escalation model."[11] Medics, mental health professionals and non-law enforcement personnel will not respond to an active, unsecured crime scene. Introducing non-law enforcement personnel into an unsecure scene places them in greater danger and elevates the risk of additional casualties. Thus, police officers are trained to prevent non-law enforcement personnel from entering a scene prior to securing it and making it safe.

B.    Safety Priorities"

When securing a scene, police officers are trained to allocate risk according to those with most control over their fate. This principle is commonly known as the *life safety priorities* or **safety priorities**. Officers are trained to make decisions based on the following priorities in respective order of importance: 1) the safety of innocent/uninvolved citizens, 2) the safety of responding officers, and 3) safety of the offender/source of the conflict. This model allocates risk according to those with most control over their circumstances, "utilizing objective criteria based on an individual's current or likely risk of suffering serious bodily injury or death *and their direct ability to remove themselves from that danger*. Those exposed to the greatest potential of injury with the least ability to escape the situation are placed at the top of the priorities... On the other end of the continuum is the suspect, who has little threat of injury and absolute control over the situation [through his/her ability to surrender and/or cease the dangerous behavior]."[12]

According to this principle, an officer would place him/herself in peril to minimize danger to the public. Officers are not trained to gamble with the lives of citizens or other officers in favor of the suspect. For example, during an active shooter event at a school, injury from gunfire is a likely outcome. Successful law enforcement intervention may not entirely prevent this outcome, but it can likely mitigate it. An appropriately trained officer should enter the school and confront the shooter, thereby placing him/herself in greater danger of being shot while reducing the danger of innocent citizens being targeted. The officer may be forced to engage the shooter, increasing the likelihood the shooter is injured while further reducing the likelihood of injury to innocents. These are the "safety priorities" in action.

Lay persons tend to characterize outcomes in binary terms: there are "good" outcomes and "bad" outcomes. A good outcome might be winning a basketball game; a bad outcome might be losing. In law enforcement, outcomes are often varying degrees of "bad." A "good" outcome in law enforcement may still be objectively "bad" by normal standards. For example, consider a victim struck and critically injured by a drunk driver. The likely outcomes might range between death and survival as a double amputee. These are both "bad" outcomes; however, one is less "bad" than the other. Responding officers may have to choose between saving the person's life at the expense of their legs. This is often the paradigm in which police officers operate. It is vastly unfamiliar to the public and, consequently, leads to radical misconceptions on the tactics used by police officers.

---

[11] See file, "SPD 018880-SPD 018923 2016 CIT Training3edit" at SPD 018894.
[12] *Tactical Responses and Operations Standard for Law Enforcement Agencies*, published by the National Tactical Officers Association, April, 2018, emphasis added.

C.    Police Training and Decision-Making

Police officers are often introduced into violent conflicts comprised of actors with competing interests. These are frequently zero-sum conflicts where one actor's gain comes at the expense of the other. The decision-making relationship between adverse actors[13] is marked by a continued cycle of observation, action, and reaction by both parties. Critical incidents are dynamic, rapidly evolving, and uncertain events. Officers involved in these events must respond to the actions of unpredictable and oftentimes highly motivated subjects. **Consequently, tactics are driven largely by the actions of the subject who is the catalyst of the event.** As noted, human beings possess the capacity to be irrational and extraordinarily unpredictable. Police officers often have no advance knowledge of a person's motives, capabilities, or intent.  Officers must continually react to the actions of a competing actor.

Beginning at the basic police academy, police officers are widely trained to understand fundamental theory in cognitive processing during what is known as a "decision-making cycle." Police officers are trained that there are four phases in this cognitive decision-making framework. These phases are: (1) the observation phase, (2) the orientation phase, (3) the decision phase and (4) the acting (or action) phase.



This framework is commonly known as "Boyd's OODA Loop" (the acronym "OODA" stands for <u>O</u>bserve, <u>O</u>rient, <u>D</u>ecide, <u>A</u>ct).[14] In the <u>observation</u> phase, a decision maker receives a stimulus/stimuli and perceives it/them based on numerous factors, including life experience, education, training and prior exposures to the stimulus/stimuli, among many others. During the <u>orientation</u> phase, the actor processes the stimulus/stimuli in the context of the current circumstances and attempts to assign meaning. In the <u>decision</u> phase, the actor/decision maker attempts to synthesize the observation/orientation information into a plan or action to achieve the desired outcome. The final stage is the <u>act/action</u> stage, during which the plan then is carried out.

In human cognition, our knowledge, experience, and memories are generally organized into categories known as "schemas." This system of cognition allows us to efficiently retrieve relevant information and implement what the actor may believe to be an appropriate response to a stimulus or stimuli. These schemata are constantly at play in our conscious and unconscious behaviors and are of critical importance in human decision making and our general interaction with the external world. Each person's collective experience provides context unique to the observer.

Most police training is tailored to create and develop schemata in hopes that the police officer has sufficient experience to orient, decide and act faster than the adversary. The goal is to impose the police officer's will upon the suspect through efficient decision making, thereby slowing the adversary's response time, limiting the adversary's options for success and leading to the most favorable outcome in light of the circumstances.

---

[13] As used here, the term "adversary" refers to an actor with competing and contrary objectives or a desired outcome inconsistent with the other actor.

[14] See generally, *Science, Strategy and War: The Strategic Theory of John Boyd* by Osinga, Frans P.B., Routledge Publishing (2007)

The temporal efficiency of an OODA cycle may depend on several factors, including the novelty and/or quantity of stimuli, the perception or lack of perception by the actor, and/or intervening acts that create new observations and disrupt the original OODA cycle. In dynamic events, it would be rare for an actor to travel through a complete, linear cycle due to the constant evolution of the event. Each "decision" and "action" creates feedback and new observations (thus, a new "cycle") as the event continues to develop.

In laymen terms, decision making takes *time*. The amount of time may vary based on an incalculable number of variables. The OODA cycles of the actor and adversary are symbiotic and are marked by an "act/react/react/react…" cycle until the more efficient actor gains momentum and the adversary falls further and further behind in the cycle, resulting in indecision or poor, rushed decisions, thereby reducing his chances at a favorable outcome. **Police officers are trained that action is faster than reaction**; thus, in resolving conflict between two or more opposing actors, the actor who can navigate the decision-making cycle most efficiently achieves a significant advantage in resolving the conflict to his/her desired end-state.

This concept is closely tied to the concepts of *time, opportunity, vulnerability, and tempo*. Tactical decisions are oftentimes carried out with these principles in mind, aimed at maximizing the officers' opportunities for success while minimizing the offender's ability to carry out harm in accordance with the life safety priorities discussed above.

The successful actor will force the adversary into a constant mode of reaction and will create opportunities for the more efficient decision maker. The goal is to leverage efficient decision making, thereby forcing the adverse actor to decide between surrender and a less desirable alternative. For example, the police may introduce chemical agents into a structure concealing an armed suspect. In this scenario, the suspect must choose between the discomfort of a chemically saturated environment or submitting to arrest. This concept is known as a *tactical dilemma*. The goal of orchestrating a tactical dilemma is to manipulate the situation so surrender is the suspect's best option.

### D.    Domestic Violence

Police officers spend a substantial amount of their time responding to, and investigating, domestic violence crime. Police officers are trained that domestic violence calls constitute up to 50% of 911 calls nationwide.[15] While police officers are trained in a variety of topics, particular attention is given to domestic violence. Police officers are trained to understand the broad impact domestic violence has on the community. "While the consequences of domestic violence to individuals are innumerable, the collective costs to the community are frequently hidden but unending. Domestic violence contributes to the systematic destruction of individuals and the family, the foundations of our society. The community pays a high price in the lost lives, not only of individual family members, but also of others."[16]

Beginning at the basic police academy, police officers are trained that "[d]omestic violence is a pattern of behavior that one person in a relationship uses to gain power and control over their current or former spouse, intimate partner, girl/boyfriend or family/household member. Domestic Violence is a broad category that includes behaviors ranging from seemingly trivial to lethal, inflicted mostly upon women.

---

[15] Domestic violence student handbook at page 15; see also WSCJTC 000147.
[16] Id at page 11; see also WSCJTC 000143.

*Domestic violence (DV) is one of the most prevalent and serious crimes* handled by prosecutors across the country.[17]

Further, Washington State police officers are trained that homicide/suicides comprise a significant portion of domestic violence homicides in Washington State.[18] Likewise, police officers are trained that, in domestic relationships, research as shown, "[t]here is a strong link between threat of bodily injury and actual bodily injury, suggesting that abuser threats should be taken seriously."[19] This is especially poignant, given Ms. Nolan reported Mr. Smith was armed with a knife and threatened to kill her and himself.

Police officers are trained that, "DV offenders are far more violent than the general offender population; *DV convictions are the greatest criminal predictor of future acts, and the greatest predictor of future violent crime.*"[20] Further, police officers are trained to understand the risk to officer safety inherent to domestic violence situations. Police training instructs officers that, oftentimes "[m]any perpetrators injure not only their immediate victims but also those who may be trying to intervene. Family members, police, children, neighbors, shelter workers, employers and others, are often secondary victims of the batterer's violence."[21]

Police officers are generally expected to use and exercise sound professional discretion; however, officer discretion is limited in domestic violence cases. Police officers in Washington State are trained that:

> Normally, officers have discretion (a choice) whether to arrest a suspect or not. In DV situations, whenever an arrest is mandated by law, the responding officer must arrest the suspect. Mandatory and discretionary arrest authority is governed by RCW 10.31, 10.99, and 26.50. RCW 10.31.100(2) states: "A police officer shall arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that [a specified domestic violence crime has occurred]." When the RCW says "shall" it means there is no choice.[22]

---

[17] *Prosecutors' Domestic Violence Handbook* at page 5.
[18] See file, "WSCJTC 000034-WSCJTC 000036 HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV" at WSCJTC 00034.
[19] File, "WSCJTC 000045-WSCJTC 000130 Book (86 pages) - Domestic Violence (2007-05-16) DV" at WSCJTC 000074.
[20] *Prosecutors' Domestic Violence Handbook* at page 6-7, emphasis in original.
[21] Domestic violence student handbook at page 11.
[22] Id at page 35.

Because of the mandatory arrest provisions associated with domestic violence, police officers are trained to arrest domestic violence suspects where there is a good-faith basis to do so. Toward this end, police officers are trained to understand they shielded from liability when carrying out the intent of the legislature:

> No police officer may be held criminally or civilly liable for making an arrest pursuant to RCW 10.31.100(2) or (10) if the police officer acts in good faith and without malice. RCW 10.99.070 states: "A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident." RCW 26.50.140 states: "No peace officer may be held criminally or civilly liable for making an arrest under RCW 26.50.110 if the police officer acts in good faith and without malice.[23]

The Washington State Legislature explained: "It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated."[24] Further, police officers are trained there are two specific legislative goals underlying Washington State's domestic violence laws: 1) victim safety, and 2) batterer accountability.[25] Thus, police are trained to err on the side of victim safety. In fact, police officers are trained to understand they can be held liable for *failing* to make an arrest when investigating domestic violence crimes.[26]

As noted, police officers are trained to take a "victim-centric" approach in investigating crimes involving domestic violence. Here, Officers Myers, Beecroft, Muoio, and Knight appropriately recognized that Mr. Smith's behavior presented urgent and ongoing concerns for the safety of Ms. Nolan. In my opinion, the officers appropriately recognized the danger of Ms. Nolan's circumstances and took necessary measures to ensure her safety. From that point on, every action should be tailored to prioritize her safety above all other concerns.

E.     Exigency

Beginning at the basic police academy, police officers are trained on the concept of "exigency." Police officers are trained that an "exigency" exists where:

> [I]f all of the circumstances known to the officer at the time would cause a reasonable person to believe that entry was necessary to prevent physical harm to the officer or other persons or give immediate aid to a

---

[23] Id at page 30.
[24] Id ap page 32.
[25] See file, SPD 020904-SPD 020919 Facilitator Guide - Domestic Violence (12-2015) - ARCHIVED 08092016 at SPD 020908.
[26] See files, ""WSCJTC 000026-WSCJTC 000030  FG Supp - Snohomish County DV Lawsuit (2008-10-07)" at WSCJTC 000026; "WSCJTC 000045-WSCJTC 000130  Book (86 pages) - Domestic Violence (2007-05-16) DV" at WSCJTC WSCJTC 000089.

person within the area to be searched and there was insufficient time to get a search warrant.[27]

Police officers are further trained that, "the role of a peace officer includes *preventing violence* and restoring order, not simply rendering first aid to casualties…".[28] Likewise, police officers are trained that, "police officers responding to a domestic violence report *have a duty* to ensure the present and continued safety and well-being of the occupants" of a home.[29] Finally, police officers are trained that they have broad authority to protect citizens from domestic violence where, as here, their actions are reasonable:

> [There is no question] about the authority of the police to enter a dwelling to protect a residence from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering… to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur…[30]

A reasonable police officer under the same or similar circumstances would believe the forced entry into Ms. Nolan's apartment was appropriate under the principle of exigency. The decision by Officers Myers, Beecroft, Muoio, and Knight to breach Ms. Nolan's door was consistent with generally accepted law enforcement practices, criminal procedures, and contemporary training principles.

## F.   Use of force principles

Police officers are widely trained on topics, tactics, techniques, procedures, and policies related to the use of force. Among other topics, police officers are trained when force is appropriate, the quantity, and what type(s) of force may be proper. Officers are further trained in many legal concepts related to the use of force. Police officers are trained that force is also generally authorized when 1) carrying out a lawful duty such as a detention or arrest and 2) in self-defense or defense of others.[31] Officers are also trained on the concept of "necessity" as it applies to force: "'**Necessary'** means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended."[32] In applying force, officers are trained to tailor force options appropriate to the perceived threat. Officers are not trained to exhaust every lesser force option prior to choosing one most likely to be effective. For example, it would be unreasonable for an officer to use a baton when confronted with a gun, as it would not be a "reasonably effective" alternative to higher degrees of force, such as a firearm.

---

[27] WPI 342.07.
[28] Brigham City v. Stuart, 547 U.S. 398 (2006).
[29] State v. Raines, 55 Wn. App. 459 (1989), emphasis added; this case is covered at the Washington State Basic Law Enforcement Academy – See file, ""WSCJTC 000017-WSCJTC 000023   Facilitator Guide - Exigent Circ & Consent Searches (12-2015)" at WSCJTC 000001; see also WSCJTC 000250.
[30] Georgia v. Randolph, 547 U.S. 103 (2006).
[31] RCW 9A.16.020.
[32] RCW 9A.16.010; see also Seattle Police Department policy 6.240.

Officers are also trained to make decisions in tense, uncertain and rapidly evolving circumstances, based on facts as they are understood at the time of the event, without the benefit of hindsight.[33] Further, in making force decisions, **officers are trained to consider the severity of the crime at issue, whether the suspect poses an immediate threat to the community or officers, and the suspect's efforts to resist detention or flee.**[34] These are commonly known as the "Graham factors" as prescribed in the U.S. Supreme Court case <u>Graham v. Connor</u>. Officers are trained to tailor force options according to such conditions as: whether the suspect's actions pose an imminent threat of harm to the public or responding officers; the number of suspects; the number of officers present; the size, age and physical condition of the suspect vs. officer(s); known or perceived abilities of suspect; availability of or proximity to weapons; prior violent or mental health history known at the time; drug or alcohol impairment; injury to officer(s); and risk associated with a prolonged struggle, among other considerations.

In law enforcement, the terminology and nomenclature related to use of force have evolved over the last decade; however, the general underlying principles remain the same. In general, police officers are trained in force options spanning a spectrum or "continuum" of options. At its lowest level, the spectrum usually begins with mere presence and verbal commands. Traditional notions of "force" usually involve some physical contact between the officer and subject beyond mere presence and verbal directives.

The lowest level of physical force involves the use of grabs, holds, leverage and joint manipulation. These are commonly known as "soft empty hand techniques" and represent the lowest level force options. The next level of force involves punches, kicks, or other strikes in a "hand-to-hand" manner. This level is commonly known as "hard empty hand techniques." The subsequent level of force involves the use of impact tools such as a baton, projectile(s) (e.g. "bean bag" or other "kinetic impact projectiles"), chemical irritants (e.g. "OC" or "pepper spray"), and/or conducted energy weapons ("CEWs" commonly known under the brand name, "Taser"). These options fall under the broad category of "less lethal" force options and are sometimes referred to as an "intermediate" level of force. The highest level of force is broadly known as "lethal force." This level involves the use of firearms or other options involving a high likelihood of serious injury or death.

Officers are extensively trained in tactics, techniques and procedures related to lethal force. In general, police officers understand lethal force is, "the intentional application of force through the use of firearms or any other means reasonably likely to cause death or serious physical injury."[35] Police officers are trained that lethal force is justified when the criteria for non-lethal force discussed above are reasonably perceived *and* other conditions exist, such as: in defense of self  or others where there is a threat of death or great bodily injury, or under certain circumstances where the suspect has committed a felony, *including where, "The suspect threatens a peace officer with a weapon or displays a weapon in a manner that could reasonably be construed as threatening."*[36]

---

[33]From <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985); also, widely a topic of police training.

[34] These principles are the result of <u>Graham v. Connor</u>, 490 U.S. 386 (1989) and are widely addressed in police training; also included in Seattle Police Department Policy 6.240.

[35] RCW 9A.16.010.

[36] RCW 9A.16.040 (emphasis added).

As always, police are trained to choose tactics, techniques, and procedures according to the safety priorities discussed above. It is quite common for initial force applications to fail. Police officers are trained to plan contingencies and "transition" between force options until the threat is abated and the situation is stabilized. Likewise, officers are trained to moderate force according to the level of resistance chosen by the suspect. Police are trained to use *proportional* – not *equal* – force. The use of force is designed to overcome resistance, *not merely meet it*. Under this model, police officers are not trained – nor expected – to begin at the "lowest" level of force and work "upward." Rather, they are trained to choose the proper level of force under the circumstances to overcome actual resistance in achieving a lawful objective. For example, if an offender punches a police officer, the police officer is not trained to stand toe-to-toe with the offender on equal footing and trade blows. Doing so increases the risk of injury to the officer and the offender. Rather, police officers are trained to *overcome* resistance as safely as possible. This may mean, for example, that if an offender punches a police officer, the officer may use greater force options such as impact tools, chemical irritants, or an electronic control device (i.e. Taser) to control the suspect's actions and meet the lawful objective. *Therefore, the suspect's actions and decisions are key factors in the amount of force used by the police.*

i.    Gravity of the offenses

Here, When Officers Myers, Beecroft, Muoio, and Knight were attempting to gain entry into Ms. Nolan's home, they were confronted by Mr. Smith, who was armed with a knife. When Mr. Smith ignored multiple commands to drop the knife and he advanced on the officers, a reasonable police officer would fear they were in danger of being stabbed, seriously wounded, or killed.  In Washington State , assault in the second degree is designated a "violent offense," and, as such, is among a special class of criminal offenses.[37]

Under these circumstances, a reasonable police officer under the same or similar circumstances would believe Mr. Smith was committing the crime of assault in the second degree. "A person is guilty of assault in the second degree if he or she…Assaults another with a deadly weapon."[38] In Washington State, a "deadly weapon" is defined as, "any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm."[39]

"Assault" is defined, in part, as:

> an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and *accompanied with the apparent present ability to inflict the bodily injury if not prevented*. **It is not necessary that bodily injury be inflicted.**
>
> An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, *and **which in fact creates in***

---

[37] See RCW 9.94A.030(58).
[38] RCW 9A.36.021.
[39] WPIC 2.06.01

> **another a reasonable apprehension and imminent fear of bodily injury**
> even though the actor did not actually intend to inflict bodily injury.[40]

Here, at the time Mr. Smith approached the officers with a knife held in a ready position, a reasonable police officer would believe there was probable cause to arrest him for assault in the first degree.

### ii.    Efforts to avoid apprehension

When officers initially contacted Mr. Smith, they identified themselves and ordered him to open the door. Rather than comply, Mr. Smith closed the viewport and made no effort to open the door. When the officers breached the door, they repeatedly ordered him to drop the knife, show his hands, and get down on the floor. Mr. Smith made no effort to comply. Rather, he raised the knife and closed distance on the officers. There is no reasonable or legally defensible explanation for this response under the circumstances. No reasonable police officer under the same or similar circumstances would believe Mr. Smith's actions made the scene safer for Ms. Nolan, the officers, or Mr. Smith.

Mr. Smith's actions clearly manifested an intent to resist arrest or detention to the highest degree. A reasonable police officer under these circumstances would not believe Mr. Smith was complying or intending to surrender.

### iii.    Danger to the public and police officers

Ms. Nolan reported that Mr. Smith was armed with a knife and attempting to kill her. Mr. Smith was alone in the apartment with Ms. Nolan. At the time officers arrived, Mr. Smith was armed with one knife in his hand and a second knife hidden in his pocket. When confronted by the police, he made no effort to comply with lawful orders. Rather, he raised the knife and closed distance on the officers. By any objective measure, Mr. Smith manifested a clear intent to harm the responding officers. Any reasonable police officer under the same or similar circumstances would believe Mr. Smith presented an extreme threat to the lives of Ms. Nolan and the officers on scene.

### iv.    Seattle Police policy on lethal force

Seattle Police officers are authorized to use lethal force under the following circumstances:

> (a) Deadly force shall only be used when the suspect poses a threat of serious physical harm to the officer or a threat of serious physical harm to another person, and the officer reasonably believes that a lesser degree of force is inadequate.

> (b) An officer may consider the use deadly force in the following circumstances only when the officer has probable cause to believe that the suspect, if not apprehended, poses a threat of serious physical harm or death to the officer or others.

---

[40] WPIC 35.50 Assault – Definition, emphasis added.

> 1. to arrest or apprehend a person whom the officer reasonably believes has committed, has attempted to commit, is committing, or is attempting to commit a violent felony.
>
> (c)   If a decision has been made to employ deadly force, the officer shall, whenever possible, identify him or herself and demand that the subject stop (example: "stop-police")
>
> …

In 2013, the United States Department of Justice (DOJ) and the Seattle Police Department drafted use of force policies and submitted them to Judge Robart. The DOJ and the Seattle Police Department agreed that Seattle's use of force policies,

> are congruent with Constitutional requirements. In addition, these policies embody best practice and reflect the policies and practices of the finest law enforcement agencies in the country. These policies distinguish when lethal or nonlethal force is permissible and when not. The policies are calibrated to bring about Constitutional policing without sacrificing the safety and well-being of police officers or the general public. The policies provide separate guidance for the use of different force instrumentalities—chemical weapons, tasers, batons, beanbag shotguns and the like. Finally, the policies detail the circumstances in which force is to be reported and how it is to be reviewed.[41]

The Seattle Police Department policies on use of force closely follow <u>Graham v. Connor</u>, <u>Tennessee v. Garner</u>, and RCW 9A.16. These principles reflect generally accepted training principles in this domain. It is particularly noteworthy that the Seattle Police Department's policies, practices, and training have been vetted by the United States Government since 2011. The Seattle Police Department's use of force training and policy in place at the time of this incident were also reviewed, vetted, and approved by a monitor serving on behalf of the U.S. Department of Justice. Once approved by the monitoring team, those policies and training were also approved by U.S. District Court Judge James L. Robart. Indeed, in 2017, the monitor overseeing Seattle's policies opined, "SPD's use of force policies are clear, simple, balanced, and well-reasoned" and "among the best in the country."[42]

In my opinion, a reasonable police officer under the same or substantially the same circumstances would believe lethal force was appropriate to prevent Mr. Smith from stabbing any of the responding officers in his close proximity. Police officers are trained to tailor force options to overcome the resistance displayed by the offender. Where, as here, the offender chooses to resist by deadly means, utilizing lesser force options would have inappropriately inverted the life-safety priorities and placed the officers in unnecessary danger. Police officers are not trained to gamble their lives in hopes that lesser force options – like a Taser – might work. An attempt to use a Taser to stop Mr. Smith's advancement towards officers while refusing to drop the knife in his hand would be contrary to generally accepted police practices and

---

[41] See file, ""Dkt 107 Memo Submitting Consensus Use of Force Policies" - *Memorandum submitting consensus use of force policies* in *United States v. City of Seattle* dated 11/27/2013.

[42] See file, ""Dkt 383 Monitor's 9th Systemic Assessment re Use of Force" – filing, "*Memorandum Submitting Ninth Systemic Assessment Regarding Use of Force*" in *United States v. City of Seattle* dated 4/6/2017 at page 1.

training and the policies of the Seattle Police Department.  Officers Myers and Beecroft believed they were in imminent danger of being stabbed, seriously injured, or killed by Mr. Smith. Under the totality of the circumstances, this belief was reasonable. Further, this belief is consistent with the law, policies of the Seattle Police Department, generally accepted training principles, contemporary tactics, practices, and procedures.

v.    "De-escalation"

The general public has little experience dealing with violent, irrational actors. Nonetheless, there is a common misperception that every violent encounter can be avoided or mitigated through "de-escalation" methods. This perspective fails to account for each person's free will and personal agency. Any reasonable police officer has come to learn that a determined human with a plan is very difficult to counter. Contrary to popular sentiment, police officers are not equipped with tactics, techniques, or magic words guaranteed to soothe every drunk, drugged, or emotionally compromised person they encounter. De-escalation is a compliance technique relying exclusively on a subject's willingness to engage in communication and rational decision-making. Like all forms of effective communication, it takes mutual engagement by all involved parties. If one party declines to engage, the lawful objective must be accomplished by other (i.e. coercive) means.

These principles are recognized by the Seattle Police Department. Under Seattle Police Department Policy, "de-escalation" is defined as "actions used by officers, *when safe and without compromising law enforcement priorities*, that *seek* to minimize the need to use force during an incident and increase the likelihood of *voluntary compliance*.[43] Further, Seattle Police Officers are trained that "de-escalation" should only be used "when safe under the totality of the circumstances and time and circumstances permit."[44] Seattle Police Officers are trained to recognize that "Sometimes the Use of Force is Unavoidable and an Officer Must Exercise Physical Control of a Violent, Assaultive, or Resisting Induvial to Make an Arrest, or to Protect Members of the Public and Officers from Risk of Harm."[45]

It is noteworthy that the policy acknowledges there are circumstances where de-escalation efforts are *unsafe*. It also acknowledges there are law enforcement priorities that transcend de-escalation efforts. This policy is consistent with the *life safety priorities* discussed above. This training is reflected in Officer Beecroft's deposition testimony:

> [T]ime is only afforded to us when it's safe and feasible to do so without compromising law enforcement priorities, which our priority at that time was first the preservation of Ms. Nolan's life and then Mr. Smith's.[46]

Prior to encountering Mr. Smith, the responding officers were aware of Ms. Nolan's report that Mr. Smith was armed with a switchblade knife, that he was trying to kill her, and she sought refuge in the bathroom. Upon encountering Mr. Smith, he refused to open the door. At that point, a reasonable police officer under the same or similar circumstances would recognize Ms. Nolan's safety as the paramount concern. Tactics and decisions would be tailored toward preventing harm to Ms. Nolan and securing her safety.

---

[43] Seattle Police Department Policy 8.100, emphasis added.
[44] Id.
[45] See file, ""Dkt 471-1 - Exs A-G" – filing, Exhibits A-G for 7/31/2018 motion in *United States v. City of Seattle,* at Exhibit A, page 3.
[46] Deposition of Officer Beecroft at page 50.

Here, de-escalation opportunities were limited insofar as the responding officers believed Ms. Nolan's safety hung in the balance. Every moment trying to soothe Mr. Smith or negotiate with him would occur at Ms. Nolan's expense.

### III.    OPINIONS

1. **Based on the information known to the officers at the time, including, at minimum, that Ms. Nolan was calling from 617 3rd Avenue West, Apartment 314; that her boyfriend was inside the apartment; that her boyfriend was armed with a switchblade knife; that her boyfriend was threatening to kill her and himself; that she barricaded herself in the bathroom in fear; and that she called 911 for help, a reasonable police officer under the same or similar circumstances would believe Ms. Nolan was in imminent danger of being seriously injured or killed.**

2. **A reasonable police officer under the same or similar circumstanced would interpret the situation at the outset as a domestic violence event in which Mr. Smith was the perpetrator and Ms. Nolan was the victim. This interpretation would be consistent with generally accepted law enforcement practices, criminal procedures, and contemporary training principles.**

3. **A reasonable police officer under the same or similar circumstances would tailor all tactics, procedures, and decisions toward the paramount goal of securing Ms. Nolan's safety according to the life safety priorities discussed above.**

4. **A reasonable police officer under the same or similar circumstances would believe there were exigent circumstances to enter Ms. Nolan's apartment to secure her safety. The decisions of Officers Myers and Beecroft to order Mr. Smith to open the door were consistent with generally accepted law enforcement practices, criminal procedures, and contemporary training principles. When Mr. Smith refused to open the door, the decisions of Officer Myers and Beecroft to breach Ms. Nolan's door were consistent with generally accepted law enforcement practices, procedures, and contemporary training principles.**

5. **Given the unavailability of breaching equipment, the exigency of the circumstances, the characteristics of the door, and the physical condition of Officers Myers and Beecroft, the breaching techniques (e.g. kicking the door), were consistent with generally accepted law enforcement practices, procedures, and contemporary training principles.**

6. **Under the circumstances, de-escalation efforts would unnecessarily delay efforts to secure Ms. Nolan's safety and place her in greater peril. A reasonable police officer under the same or similar circumstances would believe there was no meaningful opportunity to de-escalate the encounter with Mr. Smith without further endangering Ms. Nolan. The decisions of Officers Myers and Beecroft in this regard were consistent with generally accepted law enforcement practices, procedures, contemporary training principles, and Seattle Police Department policies and training.**

7. **Upon encountering Mr. Smith and identifying he was armed with a knife as reported by Ms. Nolan, the orders to show his hands, drop the knife, and get on the ground were appropriate, and consistent with generally accepted training principles, contemporary tactics, practices, and procedures.**

8. **When Mr. Smith refused to drop the knife and advance on the officers, a reasonable police officer under the same or substantially the same circumstances identify Mr. Smith's actions as a lethal threat. Under the totality of the circumstances, the use of less-lethal options would place responding officers in unnecessary danger and be an inappropriate inversion of the life safety priorities discussed above. Accordingly, the decision to forego less-lethal options under the circumstances was consistent with generally accepted law enforcement practices, procedures, contemporary training principles, and Seattle Police Department policies and training.**

9. **The Seattle Police Department's use of force and de-escalation policies and training were reviewed and approved by the U.S Department of Justice and U.S. District Court Judge James L. Robart for conformity with generally accepted law enforcement practices, procedures, and training. Based on my review, The Seattle Police Department's policies and training on use of force and de-escalation are consistent with – and oftentimes exceed – generally accepted policies, training, and oversight utilized by departments throughout the state of Washington and the United States.**

10. **Under the totality of the circumstances, the decisions of Officers Myers and Beecroft to use lethal force, was reasonable, appropriate, and consistent with the law, policies of the Seattle Police Department, generally accepted training principles, contemporary tactics, practices, and procedures.**

## IV.    PREVIOUS EXPERT TESTIMONY AND REPORTS

- City of Kirkland, Washington
  Usandivaras v. City of Kirkland, et al.
  Report generated/Deposition given

- Pierce County Sheriff's Officer, Pierce County Washington
  Estate of Regina Annas et al. v. Pierce County
  Report generated/Deposition given

- Pierce County Sheriff's Office, Pierce County, Washington
  Estate of Jessica Ann Marie Ortega v. Pierce County
  Report generated/Deposition given

- City of Spokane, Spokane, Washington
  Joseph E. Hensz v. City of Spokane, et al.
  Report generated

- City of Kirkland, Washington
  Carol Jones v. City of Kirkland, et al.
  Report generated

- City of Spokane, Washington
  Sean M. Driver v. The City of Spokane et al.
  Report generated

- Thurston County Sheriff's Office, Thurston County, Washington
  Estate of Joel A. Nelson v. Thurston County, et al.
  Report generated/testimony U.S. Dist. Ct.

- City of Lakewood, Washington
  Mykah Ward and Meosha Turner v. City of Lakewood, et al.
  No report generated

- City of Lynnwood, Washington
  Thurston Myers v. City of Lynnwood et al.
  Report generated

- City of Kent, Washington
  Linda Poplawski v. City of Kent, et al.
  Report generated

- City of Sedro Wooley, Washington
  Armen Beeman v. City of Sedro Woolley
  Report generated

- City of Auburn, Washington
  Ralph Sabininano v. City of Auburn. et al.
  No report generated

- City of Spokane, Washington
  Jackie Akins Sr, et al. v. The City of Spokane
  Report generated

- Washington State Department of Fish and Wildlife
  Shopbell, et al. v. Washington State Department of Fish and Wildlife, et al.
  Report generated/Deposition given

- City of Forks, Washington
  Joshua Hills and the Estate of Edward Hills, et al. v. Michael Gentry et. al.
  Report generated

- City of Yakima, Washington
  Gary Dobbs v. City of Yakima, et al.
  Report generated

- Naphcare, Inc., Birmingham, AL
  Estate of Demaris Rodrigues et al. v. South Correctional Entity, et al.
  Report generated

- City of Spokane, Washington
  Aaron L. Bell v. City of Spokane, et al.
  Report generated/testimony U.S. Dist. Ct.

- Jefferson County Sheriff's Office, Jefferson County, Washington
  Patrick McAllister v. Jefferson County prosecution claim
  Report Generated

- Spokane County, Washington
  Estate of Benjamin Grosser et al., v. Spokane County
  Report generated

- Spokane County, Washington
  ARW et al., v. Spokane County
  No report generated

- City of Lakewood, Washington
  Choi v. City of Lakewood
  Report generated

- City of Centralia, Washington
  Estate of Joshua Flores v. City of Centralia
  Report generated/Deposition given

- City of Tacoma, Washington
  Kristi Croskey v. City of Tacoma
  Pierce County Superior Court
  Report generated

- City of Tacoma, Washington
  Estate of Manny Ellis, et al., v. City of Tacoma
  No report generated

- Pierce County, Washington
  Estate of Manuel Ellis v. Pierce County
  No report generated

- Okanogon County, Washington
  James and Angela Faire v. Okanogon County
  Report generated

- Yakima County, Washington
  Estate of Jose M. Garcia v. Yakima County
  No report generated

- City of Kent, Washington
  Sina Ghodsee et al., v. City of Kent
  No report generated

- City of Fife, Washington
  Geraldine Hickman v. City of Fife
  Report generated/Deposition given

- City of Spokane, Washington
  Estate of David Novak, et al., v. City of Spokane
  Report generated/Deposition given

- City of Lakewood, Washington
  Estate of Said Joaquin v. City of Lakewood
  No report generated

- City of Tacoma, Washington
  Estate of Jacqueline Salyers, et al., v. City of Tacoma
  Report generated/Deposition given

- City of Sedro-Woolley, Washington
  Gerry Taylor v. City of Sedro-Woolley
  No report generated

- City of Montesano, Washington
  Estate of Patrick West, et al., v. City of Montesano, et al.
  No report generated

- Washington State Parks and Recreation Commission
  Dale Garcia, et al. v. Thomas Benenati, et al.
  Report generated

- City of Kent, Washington
  Estate of Joseph McDade et al., v. City of Kent
  Report generated/Deposition given

- City of Winthrop, Washington
  Geralds v. City of Winthrop et al.
  No report generated

- City of Arlington, WA
  Gutierrez v. City of Arlington
  Report generated

- City of Auburn, WA
  Allen v. City of Auburn
  Report generated

- City of Kent, WA
  Ascencio v. City of Kent
  No report generated

- City of Redmond, WA
  Estate of Andrea Churna v City of Redmond
  Report Generated

- City of Tacoma, WA
  Cothran v. City of Tacoma
  No report generated

- City of Kent, WA
  Estate of Sergey Pavlovic v. City of Kent
  Report generated/Deposition given

- Island County, WA
  Perillo v. Island County
  No report generated

- Snohomish County, WA
  Estate of Nikolas Peters v. Snohomish County
  No report generated

- Pierce County, WA
  Provencher v. Pierce County
  Report generated/Deposition given

- Pierce County, WA
  Denton v. Pastor
  No report generated

- King County, WA
  Mitzel v. King County
  Report generated

- Oakland County, MI
  Wilson v. Oakland County Sheriff's Office
  No report generated

- City of Vancouver, WA
  Abbe v. City of Vancouver
  No report generated

- City of Vancouver, WA
  Hunter v. City of Vancouver
  No report generated

- King County, WA
  Gizachew Wondie v. King County
  Report generated

- City of Auburn, WA
  Estate of Enosa Strickland v. City of Auburn, et al.
  Report generated/Deposition given

- City of Longview, WA
  Estate of Justin Tofte v. Longview et al.
  No report generated

- Alameda, CA
  Estate of Gonzalez v. City of Alameda et al
  No report generated

- State of Washington v. Christopher Burbank
  Report generated/Deposition given

- City of Washougal, WA
  Jeffrey Bethune v. City of Washougal et al
  Report generated

- Washington State
  Blasche v. Washington State Patrol
  No report generated

- Landerholm, PS
  Daybreak Youth Services v. Landerholm, PS
  Report generated/Deposition given

- City of Centralia, WA
  Erin McPeak v. Butcher, et al.
  Report generated

- City of Lynnwood
  Alexander et al., v. City of Lynnwood et al.
  No report generated

- Clark County, WA
  Hanks v. Clark County
  Report generated

- Pierce County, WA
  Crowe and Gerking v. Pierce County et al.
  Report generated

- Yakima, WA
  Orozco v. Yakima
  No report generated

- City of Tacoma, WA
  Galvan v. City of Tacoma
  No report generated

- Washington State
  Parker v. Washington State Patrol
  Report generated

- Washington State Patrol
  Sanchez v. Washington State Patrol
  Report generated

- City of Fircrest, WA
  Frederick v. Fircrest
  No report generated

- Pierce County, WA
  Estate of Holman v. Pierce County
  No report generated

- City of Centralia, WA
  Harris v. City of Centralia
  No report generated

- City of Bellevue
  Lerum v. City of Bellevue
  No report generated

- City of Bellevue
  Palmore v. City of Bellevue
  No report generated

- King County, WA
  Inquest of David Peppen
  No report generated

- King County, WA
  Inquest of Curtis Trade
  No report generated

- City of Olympia, WA
  Watkins v. City of Olympia
  Report generated

- City of Buckley, WA
  Estate of Bishop v. City of Buckley
  Report Generated

## **Compensation**

The billable rate for case review, consultation and report preparation in the current case is $350/hour. Deposition and courtroom testimony are billed at $400/hour.

Chris M. Nielsen                    10/2/2023